**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name   Alvarado, Antonio
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
    (Last)        (First)       (Initial)

Prisoner Number   C-09142

Institutional Address Correctional Training Facility, P.O. Box 689,

Soledad, CA. 93960-0689

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

ANTONIO ALVARADO
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
(Enter the full name of plaintiff in this action.)

          vs.

Ben Curry, Warden
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
(Enter the full name of respondent(s) or jailor in this action)

CV 08 Case No. _____ 2423

(To be provided by the clerk of court)

**PETITION FOR A WRIT**
**OF HABEAS CORPUS**

JF

(PR)

Read Comments Carefully Before Filling In

**When and Where to File**

      You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

      If you are challenging your conviction or sentence and you were **not** convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS      - 1 -

Antonio Alavardo, C-09142
Correctional Training Facility
P.O. Box 689 / East Dorm 134-Low
Soledad, CA. 93960-0689


Dated this 28 day of April, 2008


UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division
450 Golden Gate Ave.
San Francisco, CA.
94102-3483


Re: PETITION FOR WRIT OF HABEAS CORPUS.


Dear Clerk of the Court,

    Enclosed please find a true copy of petitioner's PETITION
FOR WRIT OF HABEAS CORPUS, to be filed in your court.

    Enclosed as well please find a copy of the cover/caption
sheet of my copy of this PETITION FOR WRIT OF HABEAS CORPUS to be
stamped "FILED" and returned in the S.A.S.E. I've provided.

    Thank you for your attention to these matters. Your help is
greatly appreciated.


Sincerely,

Antonio Alvarado, C-09142
Petitioner in Pro Se

1  <u>Who to Name as Respondent</u>

2    You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6    If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11    1. What sentence are you challenging in this petition?

12    (a)    Name and location of court that imposed sentence (for example; Alameda

13    County Superior Court, Oakland):

14    SUPERIOR COURT                    SANTA CLARA COUNTY

15    Court                         Location

16    (b)    Case number, if known ___67828___

17    (c)    Date and terms of sentence _9/13/79, 27 Years to Life_

18    (d)    Are you now in custody serving this term? (Custody means being in jail, on

19    parole or probation, etc.)    Yes <u>XXX</u>    No _____

20    Where?

21    Name of Institution: C.T.F. Soledad

22    Address: P.O.Box 689, Soledad, CA. 93960-0689

23    2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  P.C.§§192.1/12022(b)/187/12022.5

27

28

PET. FOR WRIT OF HAB. CORPUS         - 2 -

3. Did you have any of the following?

    Arraignment:             Yes <u>XXX</u>    No _____

    Preliminary Hearing:    Yes <u>XXX</u>    No _____

    Motion to Suppress:    Yes _____    No _____

4. How did you plead?

    Guilty _____    Not Guilty <u>XXX</u>    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury <u>XXX</u>    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?    Yes <u>XXX</u>    No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment        Yes <u>XXX</u>    No _____

    (b)    Preliminary hearing    Yes <u>XXX</u>    No _____

    (c)    Time of plea        Yes <u>XXX</u>    No _____

    (d)    Trial            Yes <u>XXX</u>    No _____

    (e)    Sentencing        Yes <u>XXX</u>    No _____

    (f)    Appeal          Yes _____    No <u>XXX</u>

    (g)    Other post-conviction proceeding    Yes _____    No <u>XXX</u>

8. Did you appeal your conviction?    Yes _____    No <u>XXX</u>

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal        Yes _____    No _____

        Year: _____    Result:_____

        Supreme Court of California    Yes _____    No _____

        Year: _____    Result:_____

        Any other court        Yes _____    No _____

        Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1     petition?                                                  Yes _____    No_____

2     (c)    Was there an opinion?                               Yes _____    No_____

3     (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                                Yes _____    No_____

5     If you did, give the name of the court and the result:

6     _____

7     _____

8   9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9   this conviction in any court, state or federal?            Yes _____    No XXX

10          [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition.  You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15   U.S.C. §§ 2244(b).]

16          (a)    If you sought relief in any proceeding other than an appeal, answer the following

17                 questions for each proceeding.  Attach extra paper if you need more space.

18          I.     Name of Court: _____

19                 Type of Proceeding: _____

20                 Grounds raised (Be brief but specific):

21                 a._____

22                 b._____

23                 c._____

24                 d._____

25                 Result: _____Date of Result:_____

26          II.    Name of Court: _____

27                 Type of Proceeding: _____

28                 Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS            - 4 -

1    a._____

2    b._____

3    c._____

4    d._____

5    Result: _____ Date of Result:_____

6    III.    Name of Court: _____

7    Type of Proceeding: _____

8    Grounds raised (Be brief but specific):

9    a._____

10    b._____

11    c._____

12    d._____

13    Result: _____ Date of Result:_____

14    IV.    Name of Court: _____

15    Type of Proceeding: _____

16    Grounds raised (Be brief but specific):

17    a._____

18    b._____

19    c._____

20    d._____

21    Result: _____ Date of Result:_____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23    Yes _____    No_____

24    Name and location of court: _____

25    B. GROUNDS FOR RELIEF

26    State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27    support each claim.  For example, what legal right or privilege were you denied?  What happened?

28    Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1  need more space.  Answer the same questions for each claim.

2  [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5  Claim One:_____ (See attached Petition For Writ of Habeas Corpus)

6  _____

7  Supporting Facts:_____

8  _____

9  _____

10  _____

11  Claim Two:_____

12  _____

13  Supporting Facts:_____

14  _____

15  _____

16  _____

17  Claim Three:_____

18  _____

19  Supporting Facts:_____

20  _____

21  _____

22  _____

23  If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS          - 6 -

1         List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    _____(SEE ATTACHED POINTS AND AUTHORITIES)_____

5    _____

6    _____

7    Do you have an attorney for this petition?                Yes_____      No_XXX_

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on __4-28-08__

14             Date                    Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

# TABLE OF CONTENTS

Topic                                                                    Pages

Index .................................................i,ii

Points and Authorities ...........................iii,iv,v,vi

MEMORANDUM OF POINTS AND AUTHORITIES

    PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONALLY
AND STATUTORILY PROTECTED RIGHT TO THE LIBERTY
INTEREST IN THE EXPECTATION OF PAROLE UNDER
PENAL CODE §3041(b) WHICH ATTACHED AT THE TIME
OF INCARCERATION. ...............................1

A. EXISTENCE OF A LIBERTY INTEREST .............1

B. PROCEDURES WHICH LED TO DEPRIVATION OF LIBERTY ...............................4

GROUND ONE:

    THE BOARD'S DECISION TO DENY PAROLE IS OTHERWISE
ARBITRARY AND IS NOT SUPPORTED BY "SOME
EVIDENCE" CONTAINING AN INDICIA OF RELIABILITY. ...............5

GROUND TWO:

    THE BOARD'S FINDING OF UNSUITABILITY AND REFUSAL
OF THE GRANTING OF PAROLE VIOLATED THE
PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED
HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST
WHEN THE BOARD DENIED PETITIONER A PAROLE GRANT
WITHOUT ANY RELIABLE EVIDENCE OR "SOME EVIDENCE"
IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS OF
THE UNITED STATES CONSTITUTION. ...............8

A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT
PETITIONER POSES AN "UNREASONABLE RISK" OF
THREAT TO PUBLIC SAFETY IF RELEASED ON PAROLE.
THE DECISION WAS WITHOUT EVIDENCE AND WAS ARBI-
TRARY AND CAPRICIOUS, VIOLATING FUNDAMENTAL
DUE PROCESS. ...............11

B. THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT
PROHIBITS STATE ACTION THAT DEPRIVES A PERSON
OF LIFE, LIBERTY OR PROPERTY WITHOUT DUE PROCESS
OF LAW. ...............15

GROUND THREE:

    THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY
RELYING ON THE UNCHANGING FACTS OF THE CRIME IN
THE FACE OF CLEAR EVIDENCE OF REHABILITATION,

TABLE OF CONTENTS (continued)

Topic                                                              Pages

(GROUND THREE cont.)
        AND BY MAKING RECOMMENDATIONS OF WHAT TO DO TO
        BE FOUND SUITABLE AT EACH HEARING. A FINDING OF
        EGREGIOUSNESS   IS   BARRED   BY   THE   INMATES
        COMPLIANCE WITH THOSE AGREED TERMS.
                           ..............................16

    A. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF
       THE CRIME VIOLATES DUE PROCESS.,
                           ..............................18

    B. CONTINUED RELIANCE UPON FACTS OF THE CRIME
       VIOLATES DUE PROCESS.
                           ..............................22

    C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE
       UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM
       AND THE LIBERTY INTERESTS OF INMATES. THE ESSENCE
       OF THE PAROLE SYSTEM IS THE RE-ENTRY OF PRISONERS
       WHO NO LONGER POSE A PUBLIC DANGER.
                           ..............................25

    D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST
       N PAROLE DECISIONS.
                           ..............................27

    E. STANDARD OF REVIEW REQUIRES AN EVIDENTIARY
       HEARING.
                           ..............................28

CONCLUSION                                                        30

PRAYER FOR RELIEF                                                 31

EXHIBITS

"A" Subsequent Parole Consideration Hearing Transcripts of
    May 31, 2007

"B" mental Health Evaluation, December 28, 2006

"C" Life Prisoner Evaluation Report, June/2006

"D" Abstract of Judgement, September 20, 1979

"E" Report of Adult Probation Officer, September 13, 1979.

"F" California Supreme Court Decision

"G" Sixth Appellate District Court Decision

"H" Superior Court of California, in and for the County of
    Santa Clara Decision.

1

POINTS AND AUTHORITIES

2

Name/Title

3

In re Bramble
(1947) 31 Cal.2d 43, 51 [6] P.2d 411

4

People v. Stuart
5    (1956) 47 Cal.2d 167, 175 [7] 302 P.2d 5, 55 A.L.R.2d 705

6    People v. Smith
(1955) 44 Cal.2d 77, 79 [2] 279 P.2d 33

7

In re McVickers
8    (1946) 29 Cal.2d 264, 278, 176 P.2d 40

9    People v. Valentine
(1946) 28 Cal.2d 121, 143 [20] 159 P.2d 1

10

People v. Ralph
11    (1944) Cal.2d 575, 581 [2] 150 P.2d 401

12   Biggs v. Terhune
(9th Cir. 2003) 334 F.3d 910, 914, 915,916

13

In re Ramirez
14   (2001) 94 Cal.App.4th 549, 564-565, 571

15   Edward v. Balisok
(1997) 520 U.S 541, 648

16

In re Caswell
17   92 Cal.App.4th 1017, 1029

18   People v. Dubon
90 Cal.App.4th 949, 952, (2001)

19

Charlton v. Federal Trade Comm.
20   543 F.2d 903-907, 908 (D.C. Cir. 1976)

21   McQuillion v. Duncan
306 F.3d 901-910, (9th Cir. 2002)

22

In re Smith
23   109 Cal.App.4th 489 (2003)

24   Kentucky Dept of Corrections v. Thompson
490 U.S. 454, 459-460 (1989)

25

Board of Pardons v. Allen
26   (1987) 482 U.S. 369, 376-78

27   Greenholtz v. Inmates of Neb. Penal & Corr. Complex
(1979) 442 U.S. 1, 11-12

28

-iii-

1    <u>POINTS AND AUTHORITIES (continued)</u>

2    <u>Name/Title</u>

3    U.S. v. Guagliardo
     275 F.3d 868-872, (9th Cir. 2002)

4    
     Graynet v. City of Rockford
5    408 U.S. 104, 108-109 (1972)

6    Irons v. Warden
     358 F.Supp.2d 936 (E.D. Cal. 2005)

7    
8    In re Scott
     34 Cal.Rptr.3d at 919-920, 133 Cal.App.4th at 594-595

9    Shaputis
     37 Cal.Rptr.3d at 335

10   
     In re Rosenkrantz
11   29 Cal.4th at 654-661

12   In re Smith
     114 Cal.App.4th 343, 370,372
13   
     Caswell v. Calderon
14   363 F.3d 832, 389 (9th Cir. 2004)

15   Scott
     119 Cal.4th at 899
16   
     Scott
17   133 Cal.App.4th at 595, 34 Cal.Rptr.3d at 919-920

18   Superintendent v. Hill
     472 U.S 445, 455-457 (1985)
19   
     In re Minnis
20   (1972) 7 Cal.3d 639, 643, n.2

21   People v. Morse
     (1964) 60 Cal.2d 631, 643, n.8
22   
     Masoner
23   2004 WL1090177 *1-2

24   Bair
     2005 WL2219220 *12 n.3
25   
     Williams v. State of New York
26   (1949) 337 U.S. 241, 247

27   Sass v. Calif. Board of Prison Terms
     376 F.Supp.2d (E.D. Cal. 2005)

28

1 <u>POINTS AND AUTHORITIES</u> (continued)

2 <u>Title/Name</u>

3 In re Lee
49 Cal.Rptr.3d 931

4

In re Elkins
5 50 Cal.Rptr.3d 503

6 Rosenkrantz v. Marshall
774 F.Supp.2d, 1063 (C.D. Cal. 2006)

7

Blankenship v. Kane,
8 2006 WL5215627 *3 (N.D. Cal. 2006)

9 Murille v. Perez
2005 L2592420 *3n.1. (C.D. Cal. 2005)

10
Siafullah v. Carey
11 2005 WL1555389 *8 (E.D. Cal. 2005)

12 Superintendent Steve Lomas.Hill
472 U.S. at 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985)

13
Rojas v. Neilson
14 428 F.3d 1229, 1232, (9th Cir. 2005)

15 Sanchez v. Kane,
444 F.Supp.2d 1049 (C.D.Cal. 2006)

16
Delgado v. Lewis
17 233 F.3d 976, 982 (9th  Cir. 2000)

18 Pham v. Terhune
400 F.3d 740, 742 (9th Cir. 2005)

19
Hines v. Thompson
20 336 F.3d 848, 853 (9th Cir. 2003)

21 Pirtle v. Morgan
313 F.3d 1160 , 1167 (9th Cir. 2002)

22
Powell v. Gomez
23 33 F.3d 39, 40

24 Earp v. Oronski
(9th Cir. 2003) 372 U.S. 293 (1963)

25
Keeney v. Tamaya-Reyes
26 504 U.S. 1, 5 1992

27 Taylor v. Maddox
(9th Cir. 2004) 336 F.3d 992, 1001.

28

POINTS AND AUTHORITIES (continued)

Title/Name

In re Lawrence
(May 22, 2007) Cal.Rptr.3d WL1475283

In re Elkins
(2006) 144 Cal.App.4th 475, 487

In re Lee
(2006) 143 Cal.App.4th 1400, 1408

In re Barker
May 29, 2007, DJDAR 7548

Martin v. Marshall
431 F.Supp.2d at p.1047

CCR, Title 15, Division 2
    §2000(b)(49)
    §2000(b)(62)(90)
    §2402
    §2402(a)(b)

Penal Codes
    §3041
    §3041(a)
    §3041(b)

Evidence Code
    §115

California Constitution, Article V
    §8(b)

1

MEMORANDUM OF POINTS AND AUTHORITIES

2

PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONALLY
AND STATUTORILY PROTECTED RIGHT TO THE LIBERTY
INTEREST IN THE EXPECTATION OF PAROLE UNDER
PENAL CODE §3041(b) WHICH ATTACHED AT THE TIME
OF INCARCERATION.

3

4

5    The due process clause of the 5th and 14th Amendment

6    prohibits a state action that deprives a person of life, liberty

7    or property without due process.

8      However, a person alleging such a violation must establish

9    that (a), he had protection; (b) that he was deprived of such a

10   protection; and, (c) that the procedure which led to the

11   deprivation was constitutionally deficient. Kentucky Dept. of

12   Corrections v. Thomas, 490 U.S 459-460, 109 S.Ct. 1904, 104

13   L.Ed.2d 506 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th

14   Cir. 2002).

15          A. EXISTENCE OF A LIBERTY INTEREST.

16     The Supreme Court held in 1979,  and reiterated in 1987

17   that, "a state's statutory scheme, if it uses mandatory

18   language, creates a presumption that parole release will be

19   granted when or unless certain designated findings are made, and

20   then, thereby, gives rise to a constitutionally protected

21   'Liberty Interest'". McQuillion v. Duncan, supra, 306 F.3d at

22   901, (citing Greenholtz v. Nebraska Penal Institute, 442 U.S. I,

23   7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) and Board of Pardons v.

24   Allen, 482 U.S. 369, 373, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).

25     Recently, our Ninth Circuit has "held" that California's

26   parole scheme created  such a liberty interest because Penal

27   Code §3041 uses mandatory language and is similar to the

28   Nebraska and Montana statues addressed in Greenholtz, supra, and

-1-

Allen, supra. (See McQuillion, supra, 306 F.3d at 901-901).

Not only did the Ninth Circuit hold that "Section 3041 of the Penal Code creates in every inmate a cognizable liberty interest in parole which is protected by the procedural safeguards of the due process clause," but further held that "the interest arises upon the incarceration of the inmate." Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir. 2003).

Two United States Supreme Court decisions, Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, (1979) 442 U.S. 1, 12, decided in 1979 and Board of Pardons v. Allen, (1987) 482 U.S. 369, 381, decided in 1987, held the Federal Due Process Clause creates a constitutional liberty interest for convicted persons in certain jurisdictions. The existence of this right depends on whether the state employs "mandatory language" indicating parole will be granted if certain findings are made, Board of Pardons v. Allen, supra, 482 U.S. at pages 377-381. In 2002 the Ninth Circuit examined the California parole scheme in MQuillion v. Duncan, (9th Cir. 2002) 306 F.3d 895 and found it "uses mandatory language and is largely parallel to the schemes found in Greenholtz and Allen," McQuillion v. Duncan, supra, 306 F.3d at page 901. Accordingly, the McQullion court found a "liberty interest" was created under the federal constitution for state prisoners in California, McQullion v. Duncan, supra, 306 F.3d at page 901.

While it is true post McQuillion, the California Supreme Court had occasion to visit and decide in In re Dannenberg that "life" prisoners did not have a liberty interest in the expectation that the Board of Parole Hearings would engage in

-2-

1  "uniform term" analysis under Penal Code §3041(a) if it

2  demonstrated that public safety warranted denial of parole under

3  §3041(b). That court did not hold, however, that there is no

4  protected liberty interest in parole whatsoever. Indeed,

5  California courts have continued to analyze such claims. See In

6  re Shaputis, 135 Cal. App. 4th, 217, 224, 231-232, Cal.Rptr.3d

7  324 (citing Dannenberg); In re Scott, 133 Cal.App.4th 573, 34

8  Cal.Rptr.3d 905 (2005); In re Lee, 49 Cal.Rptr.3d 931; In re

9  Elkins, 50 Cal.Rptr.3d 503; In re Lawrence, (May 22, 2007),

10 Cal.Rptr.3d WL1475283. Post Dannenberg, even federal courts have

11 uniformly, save one District court decision (Eastern District of

12 California), which seemingly reversed itself in its very next

13 case, [see Sass v. California Board of Prison Terms, 376

14 F.Supp.2d, 975, 982 (E.D. Cal. 2005), which was recently

15 overrulled by the Ninth Circuit in Sass v. Board of Prison Terms

16 376 F.Supp.2d, 975, 982, (9th Cir. 2006), and is currently under

17 appeal. (See and compare Sass, supra, to Bair v. Folsom State

18 Prison, 2005 WL2219110 fn.3 (E.D. Cal. 2005), Report and

19 Recommendations adopted by 2005 WL3081634 fn.1 (E.D. Cal.

20 2005).], have followed the reasoning in McQuillion, supra,

21 establishing a liberty interest. Because the Ninth Circuit

22 analyzed the liberty interest which arose from California's

23 Penal Code §3041(a), Dannenberg does not undermine the Ninth

24 Circuit decision in McQuillion. Therefore, McQuillion v. Duncan

25 holds that the mandatory language of Penal Code §3041(b)

26 creating a liberty interest in parole remains controlling

27 precedent. [See Rosenkrantz v. Marshall, 774 F.Supp.2d 1063

28 (C.D. Cal. 2006); Blankenship v. Kane, 2006 WL5215627 *3 (N.D.

1  Cal. 2006); <u>Murille v. Perez</u>, 2005 W.2592420 *3 N.1 (C.D. Cal.

2  2005); <u>Saifullah v. Carey</u>, 2005 WL1555389 *8 (E.D. Cal. 2005)].

3      Thus, petitioner has clearly established not only that he

4  has a constitutionally protected liberty interest but that he

5  was denied this liberty by the denial of parole by the Board of

6  Parole Hearings on  May  31 , 2007.

7      B. PROCEDURES WHICH LED TO DEPRIVATION OF LIBERTY.

8      It is established principles of due process that a prisoner

9  must provided <u>notice</u> of the hearings; and <u>opportunity</u> to be

10  heard; and, <u>statement of reasons</u>, for denial of parole.

11      Petitioner agrees that he was provided each of these

12  protections. However, the United States Supreme Court has

13  expanded these protections to include:

14          "In a variety of contexts, the court has
            recognized decisions resulting in a loss of an
15          important liberty interest violates due process
            if the decision is not supported by some
16          evidence." <u>Superintendent v. Hill</u>, 472 U.S. at
            455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356
17          (1985): <u>Rosenkrantz v. Marshall</u>, 444 F.Supp.2d
            1063 (C.D. Cal. 2006) fn. 13; <u>Rojas v. Neilson</u>,
18          428 F.3d 1229, 1232 (9th Cir. 2005)[Per curiam]

19  The court further held:

20          "Although '[T]he some evidence standard is
            minimally stringent', <u>Powell v. Gomez</u>, 33 F.3d
21          39, 40, the evidence underlying the
            [Governor's] decision must have some indicia of
22          reliability." <u>Hill</u>, supra, 472 U.S. at 455-56,
            105 S.Ct. at 2774; See also <u>Sanchez v. Kane</u>,
23          444 F.Supp.2d 1049 (C.D. Cal. 2006).

24      As an additional matter the <u>Hill</u> court concluded that the

25  decision to deny parole must not be "otherwise arbitrary." <u>Hill</u>,

26  supra, at 547.

27      Clearly then, the <u>Hill</u> analysis determined that due process

28  requires much more than notice, opportunity to be heard and

1  statement of reason. It also requires (A). evidence which

2  supports the conclusion; (B). the evidence to be reliably

3  related to the issue of present dangerousness (CCR Title 15,

4  §2402(a)); In re Scott, supra, 1373 Cal.App.4th 593, 34

5  Cal.Rptr.3d 905; In re Elkins, 50 Cal.Rptr.3d 503; In re Lee, 49

6  Cal.Rptr.3d 931; (C). the evidence must be truthful and (D). the

7  decision must not be arbitrary or capricious. Sanchez v. Kane,

8  444 F.Supp.2d 1049 (C.D. Cal. 2006).

9  GROUND ONE:

10        THE BOARD'S DECISION TO DENY PAROLE IS
          OTHERWISE ARBITRARY AND IS NOT SUPPORTED BY
11        "SOME EVIDENCE" CONTAINING AN INDICIA OF
          RELIABILITY.
12

13        In combining the California and federal standards of

14  review, as they have been articulated thus far by the California

15  Supreme Court and the Ninth Circuit, respectively, the

16  commitment crime can lack the power to supply "some evidence"

17  supporting a denial of parole because of the interplay between

18  two factors - the nature of that crime and the passage of time

19  since its commission. That is, the fact there is "some evidence"

20  the crime was committed and committed a certain way at a certain

21  time does not mean that crime necessarily represents "some

22  evidence", that petitioner's release on parole will pose an

23  unreasonable risk of danger to the public safety at the present

24  time. Whether it possesses the necessary predictive value

25  depends both on the nature of the crime  and how long ago it

26  happened. Petitioner's commitment offense, now over 30 years in

27  the past does not provide "some evidence" his present release

28  would represent an "unreasonable risk" of danger to the

1 community.

2 It is worth noting that the issue before this court is

3 whether petitioner is suitable for parole, not when he should be

4 released under the California parole system. The Board's initial

5 task with respect to any inmate serving an indeterminate

6 sentence is to determine whether the prisoner is suitable for

7 parole. That is whether the prisoner "pose[s] an unreasonable

8 risk of danger to society if released from prison. CCR, Title 15

9 §2402." Only after the Board deems an inmate suitable is a

10 release date set. CCR, Title 15, §2282; See also Dannenberg, 34

11 Cal.4th 1061, 1071 (2005). ("[A] determination of individual

12 suitability must proceed the setting of a ... parole release

13 date.") The actual parole release date may well be (in some

14 cases) a number of years into the future, under the Board

15 regulations, the release date is established using a matrix that

16 takes into account the inmate's offense of imprisonment and the

17 circumstances in which it was committed. CCR, Title 15, §2282.

18 Supreme Court law clearly established a parole decision,

19 like a prison disciplinary decision, deprives a prisoner of due

20 process if it is not ussported by "some evidence" or is

21 "otherwise arbitrary." Hill, supra, at 457; McQuillion v. Duncan

22 306 F.3d 895, 904 (9th Cir. 2002).

23 However, that evidence "must have some indicia of

24 reliability," Scott I, supra, 119 Cal.App.4th at p.899) and

25 "suitability determinations must have some rational basis in

26 fact. (In re Elkins, 144 Cal.App.4th at p.489).

27 As our Supreme Court has summarized it, "the judicial

28 branch is authorized to review the factual basis of a decision

-6-

1  of the board denying parole in order to ensure that the decision

2  comports with the requirements of due process of law, but ... in

3  conducting such review, the court may inquire only whether "some

4  evidence" in the record before the board supports the decision

5  to deny parole, based upon factors specified by statute and

6  regulation. If the decision's consideration of the specified

7  factors is not supported by "some evidence" in the record and

8  thus is devoid of a factual basis, the court should grant the

9  prisoner's petition for writ of habeas corpus and should order

10  the board to vacate its decision denying parole and thereafter

11  to proceed in accordance with due process of law. (Rosenkrantz,

12  supra, 29 Cal.4th at p.658, underline added). Finally, as has

13  been recently stated, because the overarching consideration is

14  public safety, the test in reviewing the board's decision

15  denying parole "is not whether some evidence supports the

16  reasons [the board] cites for denying parole, but whether some

17  evidence indicates a parolee's release unreasonably endangers

18  public safety.[Citations]. Some evidence of the existence of a

19  particular factor does not necessarily equate to some evidence

20  the parolee's release unreasonably endangers public safety." (In

21  re Lee, 143 Cal.App.4th at p.1408)(In re Barker, May 29, 2007),

22  DJDAR  7548)(In  re  Lawrence,  (May  22,  2007)  Cal.Rptr.3d

23  WL1475283)(In re Rosenkrantz, (2002) 29 Cal.4th 616, 665)(In re

24  Dannenberg, (2005) 34 Cal.4th 1061, 1100).

25  Merely to pick pieces from evidence to create one's version

26  sufficient  to  justify  an  action  is  not  "some  evidence"

27  reasonably  related  to  the  circumstances  sufficient  to  deny

28  parole. Superintendent  v.  Hill,  requires  more.  The  Hill

1  requirement mandates that the evidence relied upon possess not
2  only an "indicia of reliability" but that is is "reasonably
3  related to the circumstances so as to constitute some evidence
4  that the crime was 'particularly egregious'". (i.e. "reasonably"
5  sufficient to support the decision made). See Hill, 472 U.S.
6  445, 455-56, (1985). Accordingly, to recite in rote,
7  circumstances of the crime sufficient under different
8  circumstances (for instance as one would apply to first degree
9  murder) and proclaim that sufficient under these circumstances,
10 does not constitute "some evidence" justifying denial of parole
11 or establish a current danger to the public. The decision of the
12 board is unreasonable in light of the volumes of evidence
13 showing suitability. Furthermore, since the evidence clearly
14 does not support the board's conclusion, the"conclusion" does
15 not possess any "indicia of reliability" and is patently
16 arbitrary and capricious, denying petitioner his liberty
17 interest in parole. It is clear that the board's finding amounts
18 to an "unreasonable" determination of the facts in light of the
19 evidence available to the board at the hearing. Only by
20 examination may the court determine whether the board's decision
21 was in fact "unreasonable" or "objectively unreasonable."
22 Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000); Pham v.
23 Terhune 400 F.3d 740, 742 (9th Cir. 2005); Hines v. Thompson,
24 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d
25 1160, 1167 (9th Cir. 2002).

26 GROUND TWO:

27      THE BOARD FINDING OF UNSUITABILITY AND REFUSAL
        OF THE GRANTING OF PAROLE VIOLATED THE
28      PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED

-8-

HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST
WHEN THE BOARD DENIED PETITIONER A PAROLE GRANT
WITHOUT ANY RELIABLE EVIDENCE OR "SOME
EVIDENCE," IN VIOLATION OF THE 5TH AND 14TH
AMENDMENT OF THE UNITED STATES CONSTITUTION.

Section 3041 of the California Penal Code creates substantial presumption that a parole release date shall be set at the initial parole hearing, and in a manner that is uniform to other similar offenses. Subdivision (a) and (b), of §3041 mandates that a parole release date "shall" be set "unless" the board finds that the gravity of the commitment offense or offenses, or the timing and gravity of past convicted offenses are such that a consideration of the public safety warrant not setting a release date at that hearing. "Furthermore, if there be any reasonable doubt as to identity of offense we are bound to resolve that doubt in favor of petitioner." (In re Bramble, 1947, 31 Cal.2d 43, 51, [6], 187 P.2d 411). Moreover, the rule is established that when language which is reasonably susceptible of two constructions is used in a penal law, ordinarily that construction which is more favorable to the offender will be adopted. The defendant is entitled to the benefit of every reasonable doubt, whether it arises out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute. (People v. Stuart, (1956), 47 Cal.2d 167, 175, [7], 302 P.2d 5, 55 A.L.R.2d 705; People v. Smith, (1955) 44 Cal.2d 77, 79 [2], 279 P.2d 33; In re Bramble, (1947) supra, 31 Cal.2d 43, 51 [6,7], 187 P.2d 441; In re McVickers, (1946) 29 Cal.2d 264, 278, 176 P.2d 40; People v. Valentine, (1946 28 Cal.2d 121, 143 [20], 159 P.2d 1; People v. Ralph, (1944), 24 Cal.2d 575, 581 [2], 150 P.2d 401).

1  There is no other criteria in the statute for denying parole to

2  a prisoner. It appears from the language that "consideration of

3  the public safety" is nonetheless limited to the gravity of the

4  offense and/or the timing and gravity of any past "convicted"

5  offense or offenses. The statute does not encompass or authorize

6  some of the criteria set forth by the California Code of

7  Regulations, Title 15, §2402. It does appear that the statute

8  has been enlarged to include additional criteria not expressly

9  authorized by the statute.

10  Nothwithstanding, the argument set forth in the petition is

11  not merely an argument about a state law violation. The

12  presumption vested by the statue is substantial, while the

13  statutory criteria the board must meet in order to deny parole

14  is limited to criminal conduct at the time of the offense. For

15  the board to interpret the statute in such a manner as to deny

16  parole solely on the commitment offense after the board had

17  denied petitioner on the exact same point three times, deprives

18  petitioner of a substantial liberty interest protected by

19  federal due process. (See Biggs at 334 F.3d 917). The effect of

20  such an interpretation, established by practice, is to subject

21  all prisoners to pro forma decisions, where the board goes

22  through the motion of due processs review, citing post hoc

23  rationalizations to justify the parole denial, that is now

24  always the result. This is little different that a decision to

25  deny parole made without any evidence to support it. Thus, by

26  misinterpretation, whether inadvertently or intentionally, the

27  result is not merely a violation because it is an action the

28  board is simply not authorized to take by the enabling statute

-10-

1  that impinges on federally protected liberty interests.

2  Petitioner relies on this claim which is now brought before the

3  state court.

4      A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT
          PETITIONER POSES AN "UNREASONABLE RISK" OF

5         THREAT TO PUBLIC SAFETY IF RELEASED ON PAROLE.
          THE DECISION WAS WITHOUT EVIDENCE AND WAS

6         ARBITRARY AND CAPRICIOUS, VIOLATING FUNDAMENTAL
          DUE PROCESS.

7

8      The regulatory law requires the board to set a release date

9  unless it finds that the prisoner poses an "unreasonable risk"

10  to public safety if released at that time. (15 CCR, §2402). This

11  is consistent with the enabling state which requires the setting

12  of a release date.

13      If the preponderate record before the board demonstrates

14  that petitioner does not post the "unreasonable risk" (which the

15  record shows that he does not, from petitioner's last 3 parole

16  hearings), a release date must be set.

17      If the board denies petitioner parole without making this

18  requisite finding based on relevant and credible facts in the

19  record, then this is not merely a state law violation, but a

20  deprivation of the substantial liberty interest he has in

21  obtaining a release date. Failure of the board to act in accord

22  with the regulations, in such situations, constitutes a

23  substantive due process violation because it constitutes an

24  abuse of discretion that unfairly and inaccurately deprives the

25  prisoner of his right to that federally protected liberty

26  interest. The board needs more than "some evidence" to arrive at

27  their decision, even though once the decision is made, the

28  reviewing court needs only to find "some evidence" to support

1  the decision or findings that were made. As petitioner will

2  point out, the "some evidence" standard is not a "burden of

3  proof" - although the board and the governor seems to think it

4  is. Petitioner will demonstrate by clear and convincing facts

5  that the board's burden of proof is the "preponderance of

6  evidence" standard, but they totally ignore this in arriving at

7  their post hoc rationalization to deny parole in nearly every

8  case. There must be a weighing and balancing process according

9  to a burden of proof.

10  Thus, petitioner alleges that the board's decision in his

11  case exceeded the bounds of "review" and was made without the

12  procedural safeguards required by the Constitution, and without

13  applying the proper proof necessary to overcome the presumptive

14  right to release delineated in Penal Code §3041.

15  Statutory law in California applies the "rock bottom"

16  burden of proof in judicatory proceedings at the "preponderance

17  of evidence" level. (Evidence Code §115). The board lists under

18  "good cause," the preponderance evidence (15 CCR, Division 2,

19  §2001(b)(49), and also lists "relevant" and "material" evidence

20  as the standard for being valid "evidence." (15 CCR, Div. 2,

21  §2000(b)(62)(material evidence), and (90)(relevant evidence).

22  The "good cause" provision is a requirement for decision making

23  that applise to all substantive decisions. These regulatory and

24  statutory provisions initiate the weighing and balancing process

25  of evidence at parole hearings. A responsibility the board must

26  undertake. The board cannot apply the "some evidence" standard

27  because it is not a burden of proof. (In re Ramirez, (2001) 94

28  Cal.App.4th 549 at 564-565; Edwards v. Balisok, (1997) 520 U.S.

-12-

641, at 648). The "some evidence" applies only to questions of evidentiary sufficiency as an "additional requirement of due process, not substituted for other due process requirements." (Ibid.) The "some evidence" standard is applied only by the reviewing court to determine if the board's (governor's) decision is supported by "some evidence," if the court finds the board complied with all other requisite due process requirements. If the board failed to apply a critical element in the weighng and balancing of evidence, such as a' burden of proof, then the court cannot deny the petition because there isn't "some evidence" in the record to support the decision. (Scott I, supra, 119 Cal.App.4th at p.899, In re Elkins, supra, 144 Cal.App.4th at 489). As the Appellate Court in In re Caswell 92 Cal.App.4th 1017, 1029, pointed out, there is always some evidence in the record of unsuitability of parole, which if invoked, would subject every consideration of parole to an arbitrary standard or political whim, but for a burden of proof, and the burden of producing evidence, is clearly in California law, e.g. People v. Dubon, 90 Cal.App.4th 949, 952, (2001), and applies to all state agencies.

Here, where the statute presumes that a parole date "shall normally" be set, the board must, in their weighing and balancing of all relevant, material and reliable evidence, present by a preponderance of that evidence, a "rational connection" between the basic facts the board is asserting as sufficient to deny parole, and the ultimate fact statutorily presumed, i.e., that the prisoner is more than likely not "suitable" for setting a parole release date.

1     Petitioner submits that the board and the governor have

2    broad discretion in parole matter, but the requirement of

3    procedural due process embodied in the California Constitution

4    places some limitations upon these discretionary powers.

5     As heretofore shown, the board's burden of proof is the

6    preponderance of relevant and material evidence standard. This

7    is the "rock bottom" standard allowed by California law.

8    (Evidence Code §115; see e.g. Charlton v. Federal Trade Comm.,

9    543 F.2d, 903-907, 908, (D.C. Cir. 1976)(speaking to this

10    standard as being "rock bottom" burden of proof). "Good Cause"

11    is defined in the BPT's regulations as "a finding by the board

12    based upon a preponderance of the (material and relevant)

13    evidence that there is a factual basis and good reason for the

14    decision made." (Ibid. 2000). Here, in petitioner's case, the

15    board, based on the "material and relevant" evidence found

16    petitioner unsuitable for parole on the basis of the commitment

17    offense which petitioner has been denied three times base

18    primarily on the same issues, i.e., unchanging factors. This is

19    a clear due process violation and especially where the relevant

20    and reliable evidence concerning public safety that was

21    presented at petitioner's subsequent parole consideration

22    hearings that show that petitioner does not pose an

23    "unreasonable risk to the public if released at this time.

24     The mandatory language in §3041 of the Penal Code

25    established a rebuttable presumption affecting the board's

26    burden of producing evidence and the burden of proof

27    implementing public policy regarding the parole of "term to

28    life" prisoners.

-14-

1    Petitioner asserts that the ultimate facts sought is a

2    determination whether the prisoner is currently in "unreasonable

3    risk" of danger to the public safety if released on parole.

4    (Subd. (b), Penal code §3041; 15 CCR. §2402(a)).

5    The presumption created by mandatory language in both

6    subdivision (a) and (b) of P.C. §3041 is that the petitioner

7    "shall normally" have a parole release date set "unless" the

8    presumption is overcome by the board which carries the burden of

9    proof as to the existence of the presumed fact. McQuillion v.

10   Duncan, 306 F.3d, 901-902, (9th Cir. 2002): Biggs v. Terhune,

11   334 F.3d 910, 916-917 (9th Cir. 2003)(regarding the presumption

12   in Penal Code §3041). If the board cannot produce the evidence

13   according to the burden of proof required, then the presumption

14   stands, and the court is obliged to uphold the presumption, and

15   under In re Smith, 109 Cal.App.4th 489 (2003), must order

16   petitioner released from custody.

17       B. THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT
18          PROHIBITS STATE ACTION THAT DEPRIVES A PERSON
            OF LIFE, LIBERTY, OR PROPERTY, WITHOUT DUE
19          PROCESS OF LAW.

20   The due process clause of the 14th Amendment prohibits

21   state action that deprives a person of life, liberty, or

22   property, without due process of law, A person alleging a due

23   process violation must first demonstrate that he or she was

24   deprived of liberty or property interest protected by the due

25   process clause, and then show that the procedures that led to

26   the deprivation were constitutionally insufficient. Kentucky

27   Dept. of Corrections v. Thompson, 490 U.S. 454, 459-460 (1989);

28   McQuillion v. Duncan, 306 F.3d, 895, 900 (9th Cir. 2002).

1    In the parole context, a prisoner alleging a due process

2    claim must demonstrate the existence of a protected liberty

3    interest in parole, and the denial of one or more of the

4    procedural protections that must be afforded when a prisoner has

5    a liberty interest in parole. The Supreme Court held in 1979,

6    and reiterated in 1987, that "a state's statutory scheme, if it

7    uses mandatory language, creates a presumption that parole

8    release will be granted when or unless certain designated

9    findings are made, and thereby gives rise to a constitutional

10   liberty interest." McQuillion, supra, 306 F.3d, 16, 901 (citing

11   Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 7 (1979)

12   and Board of Pardon v. Allen, 482 U.S. 369, 373 (1987).

13   The Ninth Circuit has held that California's parole scheme

14   creates a cognizable liberty interest in release on parole

15   because Penal Code §3041 uses mandatory language and is similar

16   to the Nebraska and Montana statutes addressed in Greenholtz and

17   Allen, respectively. McQuillion, 306 F.3d 15, 901-902. As the

18   Ninth Circuit has explained, "§3041 of the California Penal Code

19   creates in every inmate a cognizable interest in parole which is

20   protected by the procedural safeguards of the due process

21   clause," and that interest arises "upon the incarceration of the

22   inmate." Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir.

23   2003).

24   GROUND THREE:

25       THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY
         RELYING ON THE UNCHANGING FACTS OF THE CRIME IN
26       THE FACE OF CLEAR EVIDENCE OF REHABILITATION
         AND BY MAKING RECOMMENDATIONS OF WHAT TO DO TO
27       BE FOUND SUITABLE AT EACH HEARING. A FINDING OF
         EGREGIOUSNESS IS BARRED BY THE INMATE'S
28       COMPLIANCE WITH THOSE AGREED TERMS.

-16-

1   When the board repeatedly relies on the unchanging facts of

2   the crime to deny parole, in the face of clear evidence that the

3   inmate has been rehabilitated, due process is violated. Biggs v.

4   Terhune, supra, at 915-916, Ramirez, supra, at 571). However,

5   here, the board goes a step further. At the conclusion of each

6   hearing attended by petitioner, the board gave him a series of

7   what to do to be found suitable for parole. If the crime was

8   going to continue to be an impediment to parole, then what

9   difference would it make whether petitioner followed those

10  recommendations, since parole would be denied in any event as

11  the crime will never change? How could the board make those

12  recommendations in good faith if the crime was such that parole

13  was not going to occur no matter how well petitioner programs?

14  Even worse, if he complies with those recommendations and the

15  board gives him a parole date, if the governor is permitted to

16  effectively negate this whole process unilaterally taking that

17  parole date away, then the recommendations and compliances are

18  rendered useless acts.

19      The board has a duty to make all recommendations

20  "sufficiently clear" to inform petitioner what conduct will

21  result in a grant of parole. (U.S. v. Guagliardo, 278 F.3d

22  868-872, (9th Cir. 2002)[citing Graynet v. City of Rockford, 408

23  U.S. 104, 108-109, (1972]). "A prisoner's due process rights are

24  violated if parole conditions are not made 'sufficiently clear'

25  so as to inform him of what conduct will result in his being

26  returned to prison. Likewise, the Board of Prison Terms has a

27  duty to make recommendations for parole eligibility

28  'sufficiently clear' so as to inform the inmate of conduct that

1  will warrant a finding of suitability." <u>U.S. V. Guagliardo</u>,

2  <u>supra</u>, 278 F.3d 868. Thus, the onus is on the board to clearly

3  and specifically stated what conduct will warrant a finding of

4  suitability. Therefore, it follows that there is only one way to

5  interpret the recommendatins given to petitioner at the

6  Documentation hearing and at each of the Subsequent parole

7  hearings. They constitute the board's "sufficiently clear"

8  instructions as to what petitioner must do to be found suitable.

9  As stated, it is indisputable but that petitioner has complied

10  with every single one of the board's directives to him, and

11  thus, the board must finally find petitioner suitable for

12  release. If the board's directions to the inmate are not

13  acknowledged as sincere offers providing legitimate goals for

14  achieving a status of parole suitability, then they are mere

15  "hoops" designated to support elaborate ruse and a further

16  affront to the due process rights of all prisoners who rely upon

17  them.

18      As noted, petitioner sincerely relied upon the

19  recommendations of the prior board panels, and he partook to

20  fulfill each one. Petitioner's fulfillment may be recognized

21  through his educational and vocational accomplishments and

22  gains, his ongoing self-help work and his crime free behavior

23  throughout his nearly 30+ years of incarceration. Petitioner has

24  complied with those directives following each and every hearing,

25  and the board should finally recognize his compliance by

26  granting parole.

27      A. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF THE
           CRIME VIOLATES DUE PROCESS.

28

1    In Biggs v. Terhune, the 9th Circuit held that even if the

2   commitment offense(s) are sufficient to support a denial of

3   parole based upon considerations of due process. Biggs v.

4   Terhune, supra, 334 F.3d at 916. The Ramirez court also

5   acknowledged that there will always be "some evidence" to

6   support a finding that a prisoner committed the underlying

7   offense. Those facts alone, however, do not justify the denial

8   of parole. Thus, while concluding that there was factual support

9   for the findings as to the crime and priors, the Ramirez, court

10  still found the board's decision arbitrary since there had been

11  7 hearings at that point, 9 years had passed beyond the minimum

12  term and it was 17 years after entering prison, and all evidence

13  showed rehabilitation. (Id. at 571). Likewise, as the Biggs court

14  more recently said, despite the fact that there may remain

15  evidence to support a finding of egregiousness of the crime:

16          "A continued reliance in the future on an
            unchanging factor, the circumstances of the
17          offense and conduct prior to imprisonment,
            runs contrary to the rehabilitative goals
18          espoused by the prison system and could result
            in a due process violation." (Biggs, supra, at
19          916-917).

20   In the published case of Irons v. Warden, 358 F.Supp.2d 936

21  (E.D. Cal. 2005), the federal court found that the board

22  violated the prisoner's due process by continuing to rely on the

23  immutable factors. (e.g. the commitment offense and history

24  prior to incarceration) to support the denial of parole. In

25  doing so, the federal judge there ruled that continuing to rely

26  on those factors that can never change, such as the commitment

27  offense, or history prior to imprisonment, where there is no

28  proof of continuing bad conduct to support a finding of current

-19-

1   threat to the public, offends due process.

2   In interpreting the rule set forth in Biggs, and the plain

3   language of Penal Code §3041, it is clear that even if the crime

4   may be considered egregious, under federal due process

5   priciples, the denial of parole based on the immutable facts of

6   the crime is only authorized at the first parole consideration

7   hearing. The provisions of Penal Code §3041 only talk of the use

8   of the crime to defer setting of a date at the initial hearing.

9   (Penal Code §3041(a)). After that, to give the statute a

10  constitutional interpretation that is not unreasonably vague,

11  further denials would have to be based on some facts arising

12  subsequent to the crime that show a continued propensity for

13  violence, making the inmate a danger to the public. (Biggs v.

14  Terhune, supra, 334 F.3d at 914-915). To rule otherwise would

15  put petitioner in an impossible situation, where no matter what

16  he shows in terms of positive behavior, reformation,, self-help,

17  work skills, parole plans, or just rehabilitation in general, he

18  would never be able to overcome the unchanging facts of the

19  crime. The only logical application of Constitutionaly Due

20  Process dictates what the court in Irons held, i.e., that any

21  subsequent denial requires the presence of some in-prison

22  behavior showing that the inmate currently presents an

23  unreasonable risk of danger if paroled.

24  Here, the facts of the crime have been used as the real

25  reason for denying parole on 3 separate occasions, yet, those

26  facts have never been tied to current behaviors showing

27  petitioner still presents an unreasonable risk of danger to the

28  public at this time. A rule requiring the presence of in-prison,

-20-

1 adverse behavior to justify further denial based on the crime,

2 simply recognizes what the 9th Circuit in Biggs alluded to when

3 it talked of the rehabilitative goals of the system, and, the

4 need to take into consideration that a person can change. At

5 this point, petitioner has been incarcerated for 30+ years,

6 eligible for parole for more than 7 of those years. His

7 programming clearly shows his full rehabilitation. In drawing

8 the line as to when further denials become arbitrary, it is

9 obvious that the line has clearly been crossed in this case, and

10 in fact, was crossed as soon as the crime was used in the second

11 parole hearing without the presence of facts showing a continued

12 risk of danger based on how petitioner was programming in

13 prison. To the contrary, the in-prison facts are exclusively

14 positive.

15      As the Ramirez court noted, the paroling authority must do

16 more than merely commend petitioner for the hard work done to

17 rehabilitate himself while in prison. They must actually

18 consider these factors "as...circumstance[s] tending to show his

19 suitability for parole." Ramirez, supra, 94 Cal.App.4th at

20 571-572 [emphasis original]. Of course, all the board did with

21 petitioner's extensive accomplishments was to brush them aside

22 with several terse lines, and issue superficial compliments. The

23 Biggs rule is clear that if an inmate continue[s] to demonstrate

24 exemplary behavior and evidence of rehabilitation, denying him a

25 parole date simply because of the nature of his offense and

26 prior conduct would raise serious questions involving his

27 liberty interest in parole. Biggs v. Terhune, supra, 334 F.3d at

28 916. Here, the evidence of rehabilitation is beyond dispute.

-21-

1    In comparing the present case with Biggs, it is undeniably
2  clear that the board lacks any justification whatsoever to
3  continue to deny petitioner a parole date. In Biggs, the inmate
4  was convicted of the premeditated and deliberate First Degree
5  Murder of a witness in a major theft case against the
6  defendants, and yet, the court was quick to caution the board
7  that it could not continue to solely rely on the commitment
8  offense to deny the inmate parole, even though it was only his
9  initial hearing at that point. Yet, petitioner has been denied
10  parole on 3 separate occasions, each time effectively relying
11  virtually exclusively upon the unchanging facts of his
12  commitment offense. The continued reliance upon the commitment
13  offense is simply arbitrary, particularly in the fact of the
14  board's acknowledgements of petitioner's model behavior in
15  prison and extensive accomplishments, all of which are conceded
16  by the statement of decision. Therefore, as the court states in
17  Biggs, denying him a parole date simply because of the nature of
18  the offense, not only raises serious questions involving his
19  liberty interest in parole, but blatantly violates due process.
20  (See Biggs v. Terhune, supra, 334 F.3d at 915-916; Irons,
21  supra).

22    B. CONTINUED RELIANCE UPON FACTS OF THE CRIME VIOLATES
       DUE PROCESS.

23    First, continued reliance upon these unchanging factors
24  makes a sham of California's parole system and amounts to an
25  arbitrary denial of petitioner's "liberty interest in release on
26  parole," and his "presumption that a parole release date will be
27  granted." (See McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir.
28  2002), Biggs, 334 F.3d at 9144-915, Rosenkrantz, 29 Cal.4th at

-22-

654, 661). Petitioner has been denied parole on 3 different occasions. continued reliance upon these unchanging factors amounts to converting petitioner's offense to a term of life without the possibility of parole. (See Irons, 358 F.Supp.2d at 947 ["continuous reliance on the unchanging circumstances transforms an offense into a de facto life imprisonment without the possibility of parole"]; Scott, 34 Cal.Rptr.3d at 919-920, 133 Cal.App.4th at 594-595; Shaputis, 37 Cal.Rptr.3d at 335). Second, the circumstances of the crime and petitioner's conduct prior to imprisonment do not amount to some evidence supporting the conclusion that petitioner "currently" (underline added) poses an unreasonable risk of danger if released at this time."] In re Shaputis, (2006) 37 Cal.Rptr.3d 324, 334-335). In the parole context, the requirments of due process can only be met if "some evidence" supports the decision and the evidence underlying the decision is supported by "some indicia of reliability." Biggs, 334 F.3d at 914; Caswell v. Calderon, 353 F.3d 832, 839 (9th Cir. 2004); Scott, 119 Cal.4th at 899; Superintendent v. Hill, 472 U.S. 445, 455-457 (1985); McQuillion v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002).

Petitioner presents a stronger case than Biggs for several reasons. First petitioner's commitment offense was less serious than the petitioner in Biggs. The Biggs petitioner was involved in a violent, manipulative and premeditated murder, the petitioner here has a much lesser serious offense than petitioner Biggs. Second, the Biggs petitioner had not yet served the full terms of his sentence, while petitioner here has exceeded his sentence by approximately three years. Finally,

-23-

1 petitioner here has demonstrated exemplary behavior and evidence

2 of rehabilitation; as required by Biggs court, for a significant

3 period of time. Therefore, the sole reliance on petitioner's

4 commitment offense in denying him parole impinges on

5 petitioner's constitutional liberty interest in parole. (Martin

6 v. Marshall, supra, 431 F.Supp.2d at p.1047). (In re Lawrence,

7 (May 22, 2007), Cal.Rptr.3d WL1475283 (Cal.App.2d Dist.).

8 While it may have been reasonable to rely on petitioner's

9 offense and conduct prior to imprisonment as an indicator of

10 dangerousness for some period of time, continued reliance on

11 such unchanging circumstances after 30+ years of incarceration

12 and three parole suitability hearings, violates due process

13 because these factors now lack predictive value with regards to

14 petitioner's present and future dangerousness. After 30+ years

15 of rehabilitation in which petitioner's eligible parole date for

16 release was passed on February 4, 2000 , (Exhibit "B" , Initial

17 M.E.P.D.), the ability to predict petitioner's future

18 dangerousness based simply on the circumstances of the crime is

19 nil. (See Irons, 358 F.Supp.2d at 947 n.2 ["four prior times in

20 finding [Irons] unsuitable for parole" and "after 15 years" of

21 imprisonment, ability to assess dangerousness "is near zero."];

22 Scott, 133 Cal.App.4th at 595, 34 Cal.Rptr.3d at 919-920 ["the

23 predictive value of the commitment offense may be very

24 questionable after a long period of time."].

25 Petitioner's record is replete with evidence of

26 petitioner's rehabilitation, which was expressed by the board,

27 including Psychological Reports, Correctional Counselor's

28 Reports, extensive self-improvement through vocational,

-24-

1  educational, self-help therapy and disciplinary free
2  incarceration for the past 13 years. (See Exhibit "B").

3      While the board may initially have been entitled to rely
4  upon the commitment offense and petitioner's conduct prior to
5  imprisonment to find petitioner unsuitable for parole, under
6  these circumstances, petitioner submits that the continued
7  reliance and sole reliance of the convicted offense do not now
8  constitute "some evidence" with "some indicia of reliability" of
9  petitioner's current dangerousness. (See Hill, 472 U.S. at 445;
10 Biggs, 334 F.3d at 917; Irons, 358 F.Supp.2d at 947; Masoner,
11 2004 WL1090188 *1-2; Bair, 2005 WL2219220, *12 n.3; Scott, 133
12 Cal.App.4th at 594-595, 34 Cal.Rptr.3d at 919-920; Rosenkrantz,
13 2002 29 Cal.4th 616, 665; Dannenberg, (2005) 34 Cal.4th 1061,
14 1100; In re Lee, (2006) 143 Cal.App.4th 1400, 1408; In re
15 Lawrence, (2007) Cal.Rptr.3d WL1475283; In re Barker, (2007)
16 DJDAR 7548).

17         C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE
              UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM
18            AND THE LIBERTY INTERESTS OF INMATES. THE
              ESSENCE OF THE PAROLE SYSTEM IS THE RE-ENTRY OF
19            PRISONERS WHO NO LONGER POSE A PUBLIC THREAT.

20     Parole, the release of the imprisoned before they have
21 served the maximum time set by their sentence, has long been
22 part of the California penal system. The Indeterminate
23 Sentencing Law, requiring the trial judge to set a minimum but
24 not a maximum sentence was enacted in 1971. In re Minnis, (1972)
25 7 Cal.3d 639, 643, n.2 ("the court in imposing the sentence
26 shall not fix the term or duration of the period of
27 imprisonment")(citation and internal quotations omitted). The
28 goal of indeterminate sentences and the California parole system

-25-

1   is not only to punish but also to provide for reformation and

2   rehabilitation:

> 3   "The belief no longer prevails that every
> 4   offense in a like legal category calls for an
>     identical punishment without regard to the
>     past life and habits of a particular offender
> 5   ... retribution is no longer the dominant
>     objective of the criminal law. Reformation and
> 6   rehabilitation of offenders have become
>     important goals of criminal jurisprudence."

7   People v. Morse, (1964) 60 Cal.2d 631, 643, n.8 (quoting

8   Williams v. State of New York, (1949) 337 U.S. 241, 247). In a

9   lengthy discussion of this topic, the California Supreme Court

10  states as follows:

> 11  [T]he purpose of the indeterminate sentence
>     law, like other modern laws in relation to the
> 12  administration of the criminal law, is to
>     mitigate the punishment which would otherwise
> 13  be imposed upon the offender. These laws place
>     emphasis upon the reformation of the offender.
> 14  They seek to make the punishment fit the
>     criminal rather than the the crime. The
> 15  endeavor to put before the prisoner great
>     incentive to well-doing, in order that his
> 16  will to do well would be strengthened and
>     confirmed by the habit of well-doing.

17  
> [...]

18  
> 19  [T]he interests of society require that under
>     prison discipline every effort should be made
> 20  to produce a reformation of the prisoner ...
>     The Legislative policy [was to provide a
> 21  system whereby] a hope was to be held out to
>     prisoners that through good conduct in prison
> 22  and a disposition shown toward reformation,
>     they might be permitted a conditional liberty
> 23  upon restraint under which they might be
>     restored again to society...

24  
> [...]

> 25  Although good conduct while incarcerated and
>     potential for reform are not the only relevant
> 26  factors, the court has acknowledged their
>     significance. Furthermore, authority has
> 27  declared that these factors are among those of
>     "paramount importance."

28  In re Minnis, Cal.3d at 644-645. The Rosenkrantz court, citing

-26-

1  Minnis, reaffirmed the principles. "[E]ven before factors

2  relevant to parole decisions had been set forth expressly by

3  state statute and by regulations, we concluded that [a]ny

4  official or board with discretion, is under obligation to

5  consider all relevant factors [citations], and the [official or

6  board] cannot, consistently with its obligation, ignore post

7  conviction factors unless directed to do so by Legislature." In

8  re Rosenkrantz, (2002) 29 Cal.4th 515, 656 (quoting Minnis, 7

9  Cal.3d at 645).

10      D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST
           IN PAROLE DECISIONS.

11      "[P]arole applicants in California have an expectation that

12  they will granted parole unless the board finds, in the exercise

13  of its discretion, that they are unsuitable for parole in light

14  of the circumstances specified by statute and by regulation."

15  Rosenkrantz, 29 Cal.4th at 659-61 (holding that the California

16  Constitution, Article V, §8(b) and the California Penal Code

17  §3041, "give rise to a protected liberty interest in that "a

18  prisoner granted parole by the board has an expectation that the

19  governor's decision to affirm, modify, or reverse, the board's

20  determination will be based upon the same factors the board is

21  required to consider," and that "liberty interest underlying a

22  governor's parole review decision is protected by due process of

23  law.").

24      Federal courts have also unequivically held that

25  California's parole system gives rise to a liberty interest

26  constitutionally protected by due process. (See Board of Pardons

27  v. Allen, (1987) 482 U.S. 369, 376-78; Greenholtz v. Inmates of

28  Neb. Penal & Correctional Complex, (1979) 442 U.S. 1, 11-12,

-27-

1  (holding a state's statutory parole scheme that uses mandatory

2  language may create a presumption that parole release will be

3  granted upon certain circumstances or findings, thus giving rise

4  to a constitutionally protected liberty interest); McQuillion v.

5  Duncan, (9th Cir. 2002) 306 F.3d 896, 902-903, n.1, 903 (holding

6  that because California's parole scheme uses mandatory language

7  and is largely parallel to the schemes found in Allen and

8  Greenholtz, that give rise to a protected liberty interest in

9  release on parole, "California's parole scheme gives rise to a

10 cognizable liberty interest in release on parole"). Biggs v.

11 Terhune, (9th Cir. 2003) 334 F.3d 910, 915-916.

12     E. STANDARD OF REVIEW REQUIRES AN EVIDENTIARY HEARING.

13     On habeas corpus, a petitioner is entitled to an

14 evidentiary hearing where the petitioner has established a

15 "colorable" claim for relief and where the petitioner has never

16 been accorded a state or federal hearing on his claim. Earp v.

17 Oronski, (9th Cir. 2003) 372 U.S 293 (1963) and Keeney v.

18 Tamaya-Reyes, 504 U.S. 1, 5 (1992). In stating a "colorable"

19 claim, a petitioner is merely required to allege specific facts

20 which, if true, would entitle him to relief. (Ibid.). Granted,

21 under AEDPA, a federal court is not required to order a hearing

22 where petitioner failed to develope the facts in state court. In

23 such cases, the federal court accords a presumption of

24 correctness to the facts found by the state court and need not

25 hold a evidentiary hearing, unless those facts are rebutted by

26 clear and convincing evidence. On the other hand, no deference

27 is due where state had made an unreasonable determination of the

28 facts and where a state court makes evidentiary finding without

-28-

1  holding a hearing and giving petitioner an opportunity to

2  present evidence. Such findings clearly result in an

3  "unreasonable determination" of the facts. Taylor v. Maddox,

4  (9th Cir. 2004) 336 F.3d 992, 1001.

5  In summation, an evidentiary hearing is required under the

6  AEDPA and the Appellate court will remand for a hearing if the

7  District Court rules without granting one, "where petitioner

8  establishes a colorable claim for relief and has never been

9  accorded a state or federal hearing on his claim." Earp, supra,

10 at 1167.

11 Here, petitioner requests an evidentiary hearing at every

12 level of the state's habeas proceedings and each of the court's

13 to which he appealed who rule without granting him an evidentiary

14 hearing. As a result, (1) petitioner is entitled to an

15 evidentiary hearing in this court before the court can make any

16 credibility determination of the facts alleged in the petition

17 and supporting exhibits; (2) any contrived facts found by the

18 state court while denying a request for an evidentiary hearing

19 necessarily resulting from an "unreasonable determination" of

20 the facts and hence are not entitled to any presumption of

21 correctness. (Earp, supra, at 1167; Taylor, supra, at

22 1101)["when state court's legal error infects the fact finding

23 process, thus resulting in factual determinations will be

24 unreasonable and no presumption of correctness can attach to

25 it"].

26

27

28

## CONCLUSION

All criminal convictions represent the basest form of human behavior. Our laws however, provide mechanisms by which even some murderers are entitled to be paroled. The judiciary has an obligation to faithfully execute those laws. The record establishes that petitioner does not pose an unreasonable risk to public safety. Any contrary conclusion lacks any evidentiary support. As the record is void of any evidence to substantiate a claim of "present danger" and allows only for a contrary conclusion, it (justice) can only be served by an order from this court directing an evidentiary hearing; and because there is nothing which, either singly or in conjunction with other evidence that could support any decision other than parole suitable, the board's decision should be vacated; the petition issued; the petitioner remanded back to the board with directions to find petitioner suitable; set a parole release date within 30 days; and/or petitioner ordered released. Only in this way can the liberty interest petitioner continues to be denied be restored.

///

///

## PRAYER FOR RELIEF

Petitioner is without remedy save for Habeas Corpus. Accordingly, petitioner requests that the court:

1. Issue a Writ of Habeas Corpus granting petitioner's Due Process violation claims;

2. Issue an Order to Show Cause;

3. Declare the rights of petitioner;

4. Appoint counsel to represent petitioner;

5. Issue an Order directing an Evidentiary Hearing;

6. Issue an Order releasing petitioner based on supporting evidence;

7. Grant any and all relief found necessary or appropriate.

Dated this 28 day of April, 2008.

Respectfully submitted,

Antonio Armando Alvarado
Petitioner in Pro Per

///

///

-31-

EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

INMATE
COPY

In the matter of the Life            )
Term Parole Consideration            )     CDC Number C-09142
Hearing of:                          )
                                     )
ANTONIO ALVARADO                     )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 31, 2007

9:12 A.M.

PANEL PRESENT:

Sandra Bryson, Presiding Commissioner
Jan Enloe, Deputy Commissioner

OTHERS PRESENT:

Antonio Alvarado, Inmate
Anthony Hall, Attorney for Inmate
Ronald Rico, Deputy District Attorney (Video)
Correctional Officers (Unidentified)

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No       See Review of Hearing
_____    Yes      Transcript Memorandum

Elizabeth Scott
Northern California Court Reporters

ii

INDEX

|                                    | Page |
| ---------------------------------- | ---- |
| Proceedings                        | 1    |
| Case Factors                       | 11   |
| Pre-Commitment Factors             | 28   |
| Post-Commitment Factors            | 33   |
| Parole Plans                       | 48   |
| Closing Statements                 | 56   |
| Recess                             | 68   |
| Decision                           | 69   |
| Adjournment                        | 85   |
| Transcriber Certification          | 86   |

--oOo--

1

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | **DEPUTY COMMISSIONER ENLOE:** We're on record. |
| 3 | **PRESIDING COMMISSIONER BRYSON:** And this is a |
| 4 | second Subsequent Parole Consideration Hearing for |
| 5 | Antonio Alvarez -- excuse me -- Alvarado. Pardon me, |
| 6 | sir. Good morning, sir. How are you? |
| 7 | **INMATE ALVARADO:** Good morning to you. |
| 8 | **PRESIDING COMMISSIONER BRYSON:** All right, CDC |
| 9 | number C-09142. Today's date is May 31st, 2007. The |
| 10 | time is 9:12. We're located at the California Training |
| 11 | Facility, Soledad. This inmate was received October 4th |
| 12 | of 1979 from Santa Clara County. The life term began |
| 13 | October 4th, 1979, with a minimum eligible parole date |
| 14 | of February 14th, 2000 -- charging in Case No. SCL67828, |
| 15 | count three, the controlling offense Penal Code 187, |
| 16 | murder first, with Penal Code 12022.5, use of a |
| 17 | firearm, a gun, with count one Penal Code 192.1, |
| 18 | voluntary manslaughter, with Penal Code 12022B, use of |
| 19 | a deadly weapon, to wit, a butcher knife, for which the |
| 20 | inmate received a term of 25 years to life, plus two |
| 21 | years. This hearing is being recorded. For the |
| 22 | purpose of voice identification, each of us will say |
| 23 | our first and last name, spelling the last name. When |
| 24 | it is your turn, sir, after you spell your last name, |
| 25 | please state your CDC number. I will start and then go |

2

1    to my left.  Sandra Bryson, B-R-Y-S-O-N, Commissioner,

2    Board of Parole Hearings.

3         **DEPUTY COMMISSIONER ENLOE:**  Jan Enloe,

4    E-N-L-O-E, Deputy Commissioner.

5         **DEPUTY DISTRICT ATTORNEY RICO:**  Ronald Rico,

6    R-I-C-O, Deputy District Attorney, Santa Clara County,

7    by way of video conference.

8         **ATTORNEY HALL:**  Anthony Hall, H-A-L-L, attorney

9    for Mr. Alvarado.

10         **INMATE ALVARADO:**  Antonio Alvarado,

11    A-L-V-A-R-A-D-O, CDC number C-09142.

12         **PRESIDING COMMISSIONER BRYSON:**  And I note for

13    the record we have two correctional peace officers in

14    the room who are here for security purposes.  And sir,

15    I need to swear you in.  Would you raise your right

16    hand, please?  Do you solemnly swear or affirm that the

17    testimony you give at this hearing will be the truth,

18    the whole truth, and nothing but the truth?

19         **INMATE ALVARADO:**  I do.

20         **PRESIDING COMMISSIONER BRYSON:**  Thank you.

21    Commissioner Enloe, is there any confidential material

22    in the file, and if so, will it be used today?

23         **DEPUTY COMMISSIONER ENLOE:**  There is a

24    confidential -- there's a lot of confidential

25    information in the file that may or may not be used.

3

1    If it is used, we'll be sure to advise counsel.

2        PRESIDING COMMISSIONER BRYSON:  All right, thank

3    you.  I have passed the hearing checklist marked

4    Exhibit 1 to your attorney to ensure we're all

5    proceeding with the same set of documents.  And

6    counsel, do you have all the documents?

7        ATTORNEY HALL:  Yes, we do.

8        PRESIDING COMMISSIONER BRYSON:  All right, thank

9    you.  And I'd like to check with the District Attorney,

10   if you have the BPT 1008, which has an initial on it,

11   EM, and dated March 13th of 2007.  Do you have those

12   documents?

13       DEPUTY DISTRICT ATTORNEY RICO:  I expect that I

14   do.  The Board Report section is not checked there, but

15   you were kind enough to have me faxed a copy of an

16   update, an addendum.  So I should have all of the

17   documents.

18       PRESIDING COMMISSIONER BRYSON:  Thank you.

19   Counsel, are there any additional documents to be

20   submitted?

21       ATTORNEY HALL:  Not at this time, Commissioner.

22       PRESIDING COMMISSIONER BRYSON:  All right.  Sir,

23   if you would please read the document on the table, ADA

24   document, ahead of you there.  Please read it out loud.

25       INMATE ALVARADO:

ʾ

4

```
 1          "The Americans with Disabilities Act, is
 2          a law to help with disabilities.
 3          Disabilities are problems that make it
 4          harder for some people to see, hear,
 5          breathe, talk, walk, learn, think, work,
 6          or take care of themselves than it is
 7          for others. Nobody can be kept out of
 8          public places or activities because of a
 9          disability.  If you have a disability,
10          you have the right to ask for help to
11          get ready for your BPT Hearing, get to
12          the hearing, talk, read forms and
13          papers, and understand the hearing
14          process.  BPT will look at what you
15          asked for to make sure that you have a
16          disability that is covered by the ADA
17          and that you have asked for the right
18          kind of help.  If you do not get help,
19          or if you don't think you got the kind
20          of help you need, ask for a BPT 1074
21          grievance form.  You can also get help
22          to fill it out."
23          PRESIDING COMMISSIONER BRYSON:  Thank you, sir.
24   Do you understand what you read?
25          INMATE ALVARADO:  Yes, ma'am.
```

5

1        **PRESIDING COMMISSIONER BRYSON:**  All right.  I

2    notice you wear glasses.  Do they accommodate you for

3    reading?

4        **INMATE ALVARADO:**  Yes, they do.  I'm 60 years

5    old.

6        **PRESIDING COMMISSIONER BRYSON:**  Well, good for

7    you.  All right, you don't appear to have any hearing

8    difficulties.  Is that correct?

9        **INMATE ALVARADO:**  No, I don't.

10       **PRESIDING COMMISSIONER BRYSON:**  Okay, good.  And

11   you also didn't appear to have any motility issues

12   getting to the hearing room.  Is that right?

13       **INMATE ALVARADO:**  That's correct.

14       **PRESIDING COMMISSIONER BRYSON:**  All right.  And

15   I notice that on January 31st, 2007, you signed the BPT

16   Form 1073, the Reasonable Accommodations Notice and

17   Request in Accordance with the Provisions of the

18   Americans With Disabilities Act.  Disability is defined

19   under the ADA.  And that shows that you don't have any

20   disabilities per se, that you in fact have a reading

21   level of 8.1, and it has noted here that you have your

22   GED.  Is that correct?

23       **INMATE ALVARADO:**  Yes, it is.

24       **PRESIDING COMMISSIONER BRYSON:**  Congratulations.

25   That's good.

6

1          INMATE ALVARADO:   Thank you.

2          PRESIDING COMMISSIONER BRYSON:   And that you

3    don't need otherwise any help for your parole hearing.

4    Were you ever in CCCMS or EOP?

5          INMATE ALVARADO:   No, ma'am.

6          PRESIDING COMMISSIONER BRYSON:   And have you

7    ever taken psychotropic medications, either in prison or

8    on the streets -- medications for mental health?

9          INMATE ALVARADO:   In '84 or '85, at San Quentin,

10   I was given Sinoquin (phonetic) for sleep.  I'm not sure

11   if that's considered a psych med or what.

12         PRESIDING COMMISSIONER BRYSON:   It probably is,

13   but that's quite a long time ago.

14         INMATE ALVARADO:   Oh, okay.  Since then I have

15   not taken medication.

16         PRESIDING COMMISSIONER BRYSON:   Outstanding.

17   All right.

18         INMATE ALVARADO:   I had a psychiatrist tell me

19   once that in the long run it's not going to be very

20   healthy for me.  He said I didn't need it, so I stopped.

21         PRESIDING COMMISSIONER BRYSON:   Outstanding.

22   All right, that's good.  Do you have any other

23   disabilities, you think, that could prevent you or

24   impede you from participating in today's hearing?

25         INMATE ALVARADO:   No, I don't, Commissioner.

7

1           **PRESIDING COMMISSIONER BRYSON:** All right. And

2      counsel, do you concur?

3           **ATTORNEY HALL:** Yes, ma'am.

4           **PRESIDING COMMISSIONER BRYSON:** Thank you. This

5      hearing is being conducted pursuant to Penal Code

6      Sections 3041 and 3042, and the Rules and Regulations

7      of the Board of Parole Hearings governing parole

8      consideration hearings for life inmates. The purpose

9      of the hearing today is to consider your suitability

10     for parole. In doing so, the panel will consider the

11     number and nature of the crimes for which you were

12     committed, your prior criminal and your social history,

13     and your behavior and programming since your

14     commitment. The panel has had the opportunity to

15     review your Central File. You will be given the

16     opportunity to correct or clarify the record. The

17     panel will consider your progress since your

18     commitment, your counselor's report and psychological

19     report, and any other relevant information. Any change

20     in parole plans should be brought to the panel's

21     attention. The panel will reach a decision today and

22     inform you whether or not it finds you suitable for

23     parole and the reasons for the decision. If you're

24     found suitable for parole, the length of your

25     confinement will be explained to you. Nothing that

8

1    happens here today will change the findings of the
2    court.  The panel is not here to retry your case.  The
3    panel is here for the sole purpose of determining your
4    suitability for parole.  Do you understand?
5              INMATE ALVARADO:  Yes.
6              PRESIDING COMMISSIONER BRYSON:  All right.  The
7    hearing will be conducted in three phases.  I will
8    discuss with you the crime for which you were committed,
9    and your prior criminal and social history.
10   Commissioner Enloe will then discuss with you your
11   progress since your commitment, your counselor's report,
12   and your psychological evaluation.  I will then discuss
13   with you your parole plans and any letters of support or
14   opposition that may be in the file.  Once that is
15   concluded, the panel, and then the District Attorney,
16   and then your attorney, will be given the opportunity to
17   ask you questions.  Questions from the District Attorney
18   shall be asked through the chair, and you'll direct your
19   answers to the panel.  Next the District Attorney, and
20   then your attorney, and then you, will be given the
21   opportunity to make a final statement regarding your
22   parole suitability.  Your statement should address why
23   you feel you are suitable for parole.  The panel will
24   then recess, clear the room and deliberate.  Once the
25   deliberations are completed, the panel will resume the

9

1    hearing and announce the decision.  The California Code

2    of Regulations states that regardless of time served, a

3    life inmate shall be found unsuitable for and denied

4    parole if in the judgment of the panel the inmate would

5    pose an unreasonable risk of danger to society if

6    released from prison.  You have certain rights, sir.

7    Those rights include the right to a timely notice of

8    this hearing, which by law is the week of the hearing

9    per Title 15.  Were you given notice of this hearing?

10           INMATE ALVARADO:  Yes, I was.

11           PRESIDING COMMISSIONER BRYSON:  All right.  The

12   right to review your Central File. Sir, I don't have any

13   indication that you did an Olsen review.  Have you done

14   a recent Olsen review?

15           INMATE ALVARADO:  Yes, I did.

16           PRESIDING COMMISSIONER BRYSON: Approximately

17   what month was that?  Do you remember?

18           DEPUTY COMMISSIONER ENLOE:  Excuse me,

19   Commissioner, there is a chrono in the file dated

20   3/14/07.  Does that sound about right?

21           INMATE ALVARADO:  Yes, it does.

22           DEPUTY COMMISSIONER ENLOE:  The inmate, he did

23   review is file --

24           PRESIDING COMMISSIONER BRYSON:  All right.

25           DEPUTY COMMISSIONER ENLOE:  -- with no

10

1    accommodation.

2         **PRESIDING COMMISSIONER BRYSON:**  Thank you.  Sir,

3    you also have the right to be heard by an impartial

4    panel.  Do you have any evidence that the panel before

5    you today cannot be impartial?

6         **INMATE ALVARADO:**  No, I don't.

7         **PRESIDING COMMISSIONER BRYSON:**  All right.  You

8    have the right to present relevant documents, and we've

9    already asked for those, but if you have any further

10    documents, they can be presented at any time during this

11    hearing as appropriate.  You will receive a copy of the

12    panel's written tentative decision today.  That decision

13    will become effective within 120 days.  It is also

14    subject to review by the Governor.  A copy of the

15    tentative decision and a copy of the transcript will be

16    sent to you.  The Board has eliminated its appeal

17    process.  If you disagree with anything in today's

18    hearing, you have the right to go directly to the court

19    with your complaint.  You are not required to admit your

20    offense or discuss your offense if you do not wish to do

21    so.  However, this panel does accept as true the

22    findings of the court, and you're invited to discuss the

23    facts and circumstances of the offense if you so desire.

24    The Board will review and consider any prior statements

25    you have made regarding the offense in determining your

11

1    suitability for parole.   So it quite simple, basically

2    -- just tell the truth.   Counsel, are there any

3    preliminary objections?

4         **ATTORNEY HALL:**   No.

5         **PRESIDING COMMISSIONER BRYSON:**   Will the inmate

6    be speaking with the panel today?

7         **ATTORNEY HALL:**   He will speak with the panel on

8    all matters except the life crime.   In the past he has

9    discussed it and he has admitted to committing the crime

10   and has taken responsibility.   He has nothing additional

11   to add.

12        **PRESIDING COMMISSIONER BRYSON:**   All right, I'm

13   going to address that, taking responsibility, after I in

14   fact incorporate by reference both chronos.   We're

15   actually looking at multiple crimes here, and

16   referencing that the manslaughter case actually came as

17   the first crime that occurred, which occurred on June

18   23rd of 1977.   And then the count three, which is the

19   controlling offense, actually occurred on January 6th of

20   1979.   And I'll incorporate by reference from the

21   probation officer's report both of those crimes.   And

22   counsel, I would like to ask you, because we have

23   multiple versions of the prisoner's version of these

24   crimes, and I'm going to refer to that in the Board

25   Report that is dated -- stand by -- March 2004 is the

12

1    comprehensive Board Report, the last one that we have,

2    and that was prepared by A. King, common spelling,

3    Correctional Counselor I.  And those -- that version, or

4    those versions, actually, appear as statements that the

5    inmate has made in writing, and they are conflicted.  So

6    my question is, I realize that your client, and

7    rightfully so, does not wish to discuss the crime, but

8    you said that everything he wanted to say before he has

9    said, but he did give conflicting versions before, so

10   we're at a loss as to what version is the correct

11   version.

12       ATTORNEY HALL:  I had a chance to review the

13   transcript of the March 2000 hearing where questions

14   were asked, and they were truthfully answered.  And as

15   far as my understanding is, as stated in the March 28,

16   2000 hearing, Mr. Alvarado answered all the questions of

17   the panel and essentially discussed both crimes.

18       PRESIDING COMMISSIONER BRYSON:  Excuse me.  So

19   you're representing that as his version of it?

20       ATTORNEY HALL:  Yes.  And let me just confirm

21   again with Mr. Alvarado.  Is that correct, Mr. Alvarado?

22       INMATE ALVARADO:  Yes.

23       ATTORNEY HALL:  In 2000, you accurately answered

24   or truthfully answered the questions posed by the panel?

25       INMATE ALVARADO:  To the best of my ability,

13

1    yes.

2         **ATTORNEY HALL:**  And that is your version as

3    well, your truthful statements as to the crime?

4         **INMATE ALVARADO:**  Yes, it is.

5         **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And

6    the panel will review that transcript as his version.  I

7    appreciate that.  All right, and then moving to the

8    pre-conviction factors for this inmate, sir, to be quite

9    candid, it appears that you were what used to commonly

10   be referred to as a career criminal at one point in your

11   life.  Is that correct?  I mean, you had -- you have an

12   enormous record.  It's so large that I'm not going to

13   read it into the file.  I'm going to merely incorporate

14   that by reference from the California Identification

15   Investigation Bureau account of your record.  But you

16   started out as a juvenile in 1956, at age 9, with a

17   burglary.  You immediately got a sentence to CYA.  And

18   then you had parole violations -- or, excuse me --

19   revocations, and which actually you had violations which

20   resulted in revocations.  And then you had in '61, at

21   age 14, another burglary for which you were sentenced to

22   CYA again.  And again, you violated parole.  That parole

23   was revoked.  In 1964, you had another commitment to CYA

24   at age 17 for destruction of property and malicious

25   mischief.  What was going on in your life, sir, that you

14

1    were -- then it continued into adulthood.  It goes from

2    drunk to driving suspended, sniffing glue, inhaling

3    poisonous fumes, resisting arrest, hit and run, assault

4    and battery.  Your record is massive, sir, and goes all

5    the way up.  Just about every single year you had jail

6    time or arrests and suspensions and probation.  What was

7    going on with you?  Can you explain that?

8         INMATE ALVARADO:  I -- probably too much

9    involved in my environment, people I hung around with,

10   being influenced, not very smart with my decisions, of

11   course.

12        PRESIDING COMMISSIONER BRYSON:  You were in a

13   gang.  Is that true?

14        INMATE ALVARADO:  What gang are we speaking of?

15        PRESIDING COMMISSIONER BRYSON:  You tell me.

16   Were you in a gang?

17        INMATE ALVARADO:  Oh, yes.  I've been involved

18   in --

19        PRESIDING COMMISSIONER BRYSON:  How early did

20   you start in with the gangs?

21        INMATE ALVARADO:  Probably 14 years old, 15.

22        PRESIDING COMMISSIONER BRYSON:  Okay.  Well, you

23   started your first burglary at age 9.  What were you

24   doing a burglary at age 9?  What was that about?

25        INMATE ALVARADO:  You know, I can't even recall

15

1    the burglary at that time, what it was that I

2    burglarized.

3          **PRESIDING COMMISSIONER BRYSON:** L wondered if

4    you were a want-to-be gangster at the age of 9.

5          **INMATE ALVARADO:** I was just a little mixed up

6    socially, you know, by choice I would have to say,

7    because my family with my mother and brothers and

8    sisters, whatever, were -- I was very close to them, and

9    I never lacked any love from any of them.  But it was

10   just my choice.

11         **PRESIDING COMMISSIONER BRYSON:** Usually, solid

12   families are sort of a bulwark against gang

13   participation.  So in your case, that didn't hold true.

14   Why did you get involved?  Since you were, as you said,

15   close to your family, why did you get involved with the

16   gangs in the first place?

17         **INMATE ALVARADO:** Well, because once I started

18   socializing with my peers at that time, I tended to not

19   recognize other things around me, my loved ones, how I

20   would hurt my mother by getting arrested, and she would

21   have to come visit me.  Those things I never really

22   realized that much.  I was naïve to all that.

23         **PRESIDING COMMISSIONER BRYSON:** Uh-huh.

24         **INMATE ALVARADO:** Maybe in denial -- I don't

25   know.  Later on in years, I realized my past, that it

16

1    was terrible as far as hurting loved ones behind my

2    acts. I once -- this time when I got arrested, I wrote a

3    letter to my nephew.  He was in a county camp, juvenile

4    camp, and I was in the jailhouse.  And I wrote a letter

5    to him and explaining everything, how my poor mother

6    used to have come walk and see me and the pain she was

7    going through.  And I finally realized it, because I

8    didn't want him to do the same to my sister, his mother.

9    And somehow the letter got to his counselor over there,

10   and my sister was telling me that the counselor who got

11   it was impressed and had it printed in the newspaper

12   over there so others could read it and see it, you know.

13   And I felt good about that because I was sincere about

14   that.  But it took -- I don't know -- years for me to

15   realize and being more of a compassionate person.

16           **PRESIDING COMMISSIONER BRYSON:**  It did, because

17   your commitment offense occurred whenever you were 32

18   years old, so you lived quite a lifestyle for a very

19   long time.  And when did you get involved with alcohol

20   and narcotics?

21           **INMATE ALVARADO:**  Alcohol came into my life

22   probably when I was about 15, 14 -- already in high

23   school -- and drugs probably 17, 16, around there, again

24   by socializing with my peers and making wrong decisions,

25   and not realizing the effect that it had in store for

17

1    me.

2    PRESIDING COMMISSIONER BRYSON:  Well, let's talk

3    about the first gang you affiliated with.  Which gang

4    was that?

5    INMATE ALVARADO:  Well, it was a neighborhood

6    gang.  It was

7    PRESIDING COMMISSIONER BRYSON:  What was it

8    called?

9    INMATE ALVARADO:  The Mariachis.

10    PRESIDING COMMISSIONER BRYSON:  The Mariachis?

11    INMATE ALVARADO:  Yeah, The Mariachis.

12    PRESIDING COMMISSIONER BRYSON:  Okay.

13    INMATE ALVARADO:  And it only lasted maybe six,

14    seven months.  And I believe I was released from

15    California Youth Authority, Casa Robles School For Boys,

16    when I was around 15 years old, 14.  And being around

17    all the youth there that were there with me, I started

18    falling into the same type of thinking as everybody did

19    there.  There was a lot of people there from Los

20    Angeles, and lots of gangs coming out of there, and I

21    just thought it was --

22    PRESIDING COMMISSIONER BRYSON:  Did you think it

23    was cool?

24    INMATE ALVARADO:  It was the thing to do, you

25    know, to be looked at as a leader.

18

1          PRESIDING COMMISSIONER BRYSON:   And the

2    Mariachis were a prison gang in CYA?

3          INMATE ALVARADO:   No, it was an outside gang.

4    It wasn't an institutional gang.

5          PRESIDING COMMISSIONER BRYSON:   Okay.

6          INMATE ALVARADO:   I formed it as I got released

7    out of California Youth Authority, Casa Robles, and I --

8          PRESIDING COMMISSIONER BRYSON:   Okay, so you

9    formed it.  So how did you know how to form a gang?

10         INMATE ALVARADO:   Well, because the -- it was a

11   way to associate with those that I grew up with.  We

12   went to school together as elementary and so forth, and

13   we used to run around together anyway daily or whenever

14   we had the opportunity, and ride our bicycles through

15   the barrios.

16         PRESIDING COMMISSIONER BRYSON:   So how did you

17   know -- did you learn in CYA how to pattern a gang -- I

18   mean, you know, how to act, what to do about let's get

19   some colors, let's get handles or markers or whatever.

20   You know -- how did you decide what it was a gang did

21   and all those -- what did you pattern yourself after?

22   And this is just historical data, sir.

23         INMATE ALVARADO:   Yes, I really didn't think of

24   those things.  It just like -- it was almost just a

25   natural thing to do.  It was simple just to get your

19

1    friends there, your associates, and talk to them and

2    tell them hey look, we're going to form a little group

3    here, more so for recognition, not so much for doing

4    crimes or trying to beat up other people -- just for our

5    own neighborhood recognition, I would guess probably for

6    the girls, to impress them or whatever, to feel secure a

7    little bit.

8         **PRESIDING COMMISSIONER BRYSON:**  Well, the fact

9    is you did a lot of drunk driving through that period,

10   and then you got into narcotics during that period as

11   well.  So what I want to know is how long was it the

12   Mariachis, and then when did you move on to another

13   gang, and what was that?  I'm trying to get your gang

14   history here, sir.

15        **INMATE ALVARADO:**  Well, the Mariachis only like

16   I mentioned, about nine months at the most.

17        **PRESIDING COMMISSIONER BRYSON:**  Okay.

18        **INMATE ALVARADO:**  It was a short era for us.

19        **PRESIDING COMMISSIONER BRYSON:**  Okay.

20        **INMATE ALVARADO:**  And the reason for that was

21   because we -- some of the members were a little bit out

22   of control and were looking at it as well, now we're a

23   gang, we're supposed to do this, and that wasn't the

24   case.  And me being the leader, I had to let them know

25   that that wasn't the purpose of it.  The purpose was for

20

1    just our recognition and to have a good time.

2            **PRESIDING COMMISSIONER BRYSON:**  So did you do

3    any crimes at all with the Mariachis?

4            **INMATE ALVARADO:**  No.

5            **PRESIDING COMMISSIONER BRYSON:**  No crimes at

6    all?

7            **INMATE ALVARADO:**  Well, perhaps maybe got into a

8    couple of fights with some other people.

9            **PRESIDING COMMISSIONER BRYSON:**  Another rival

10   gang?

11           **INMATE ALVARADO:**  Not really a gang, just

12   someone else.  I recall one time we were at a party and

13   one of the members was dancing with one of the ladies

14   there, young ladies, and her jealous boyfriend or

15   whoever he was got mad and wanted to beat him up, and so

16   they went outside and they started fighting.  We had all

17   that, and I was right there -- we were right there

18   watching it and looking at it and making sure nobody

19   would jump him and beat him all up.  And I recall this

20   incident because when I was standing there, all of a

21   sudden this guy came up to me with a knife in his hand,

22   and he wanted to stab me.  And I told him that I had

23   nothing to do with that, that was going on.  So I

24   grabbed the stick to protect myself, and he came at me,

25   and I went to hit him with the stick.  The stick broke.

21

1    I got scared because he had a big knife, and I ran and

2    he came after me.  Well, to make a long story short, you

3    know, he ended up stabbing me.  I got stabbed, and I

4    realized that there was more to it than just trying to

5    be friendly or just recognition.

6         PRESIDING COMMISSIONER BRYSON:  So why didn't

7    that kick in then?  It apparently kicked in at the

8    moment, but it didn't long term.  Why didn't you say

9    this isn't for me -- the gang style isn't the style?

10   What made it still attractive and exciting for you to go

11   on and continue with gangs?  And what was the next gang?

12   What was the next gang after the Mariachis?

13        INMATE ALVARADO:  After that there was no more

14   gangs as far as membership.  It was just running around

15   and being who I was, which was the person without

16   realizing that things that I was doing was not that

17   good.

18        PRESIDING COMMISSIONER BRYSON:  So you were

19   never a member of the Nuestra Familia?

20        INMATE ALVARADO:  Well, later on in life, I got

21   involved with it because I had family members that were

22   involved.

23        PRESIDING COMMISSIONER BRYSON:  Okay, sir, I'm

24   trying to get you -- from the Mariachis, you said you

25   were only tied to them for about the nine months.

22

1          INMATE ALVARADO:  Yes.

2          PRESIDING COMMISSIONER BRYSON:  That takes us up

3     to about 1963.

4          INMATE ALVARADO: . Yes.

5          PRESIDING COMMISSIONER BRYSON:  So what was the

6     next gang that you associated with and when?

7          INMATE ALVARADO:  It was the Nuestra Familia.

8          PRESIDING COMMISSIONER BRYSON:  Okay, and when

9     was that approximately?  Was that immediately afterwards

10    that you go into that?

11         INMATE ALVARADO:  No, not immediately after.

12         PRESIDING COMMISSIONER BRYSON:  Were you a

13    juvenile or an adult?  Do you remember?

14         INMATE ALVARADO:  I was an adult.

15         PRESIDING COMMISSIONER BRYSON:  Okay.  And why

16    did you get in with the Nuestra Familia?

17         INMATE ALVARADO:  Okay, to the best of my

18    recollection, about 1971 or 1972 I had a god brother

19    that was in prison that probably was the founder of

20    Nuestra Familia here in Soledad.  And at that same time,

21    I had a cousin that had already been in prison, and he

22    was a member of the Mexican Mafia.

23         PRESIDING COMMISSIONER BRYSON:  Okay, that's MA?

24         INMATE ALVARADO:  Yes.

25         PRESIDING COMMISSIONER BRYSON:  Okay, go ahead.

23

1          **INMATE ALVARADO:**  I was still in my
2     (indiscernible) to -- the rivalry with one another.
3     However, one day my god brother was released from San
4     Quentin on a three-day pass when they used to have those
5     three-day passes to get into society a little bit and
6     get the feel of the outside world for when they were
7     released.  Anyway, I was talking to him and I had found
8     that the MA had tried to kill him in San Quentin a
9     couple of years earlier.  He survived.  I couldn't
10    understand what was going on, you know, why two family
11·   members were, you know, to the point where they would
12    kill each other.  I was brought up very close to both of
13    them when I was a toddler.  And so I was talking to him
14    and he started explaining to me why the Nuestra Familia
15    was founded.  At that time he told me that the reason it
16    was founded was because by this time the Mexican Mafia
17    was very powerful, and they were kind of like taking a
18    little advantage of the weaker.

19          **PRESIDING COMMISSIONER BRYSON:**  So you're saying
20    Nuestra Familia was an offshoot then to try to take over
21    some of the power that the MA had?

22          **INMATE ALVARADO:**  Well, I came to believe that
23    the reason it was founded at that time was because -- it
24    was founded in order to help people from being bullied
25    from the powerful Mexican Mafia.

24

1          PRESIDING COMMISSIONER BRYSON:  I see.  And the

2     NF was a street gang?  Is that right?

3          INMATE ALVARADO:  It was a prison gang.

4          PRESIDING COMMISSIONER BRYSON:  It was a prison

5     gang.

6          INMATE ALVARADO:  It was created in prison here

7     in Soledad, I believe.

8          PRESIDING COMMISSIONER BRYSON:  Right.  Okay, so

9     how do you account for -- that was when you were about

10    25 years old, but we dropped you off from the Mariachis

11    at about 17 or something like that.  So what happened

12    between age -- or even earlier -- age 16?  There was

13    almost ten years.

14         INMATE ALVARADO:  Yes.

15         PRESIDING COMMISSIONER BRYSON:  Were you a gang

16    member during that time, or what were you doing?

17         INMATE ALVARADO:  Well, in 1971 when he was

18    explaining all this to me, he had asked me if I wanted

19    to get involved in Nuestra Familia.

20         PRESIDING COMMISSIONER BRYSON:  I understand,

21    sir, but 1971 was a long way from 1962 when you said

22    that dropped -- basically you were only involved with

23    the Mariachis for about nine months.

24         INMATE ALVARADO:  Yes.

25         PRESIDING COMMISSIONER BRYSON:  So that was back

25

1    when you were --

2          INMATE ALVARADO:   That was about '92 -- I mean

3    '62.

4          PRESIDING COMMISSIONER BRYSON:   When you were

5    about 15.

6          INMATE ALVARADO:   Yes.

7          PRESIDING COMMISSIONER BRYSON:   So how do we get

8    you from 15 years old to 25 years old?   What were you --

9    were you involved with a gang during that time period?

10          INMATE ALVARADO:   No, I wasn't.

11          PRESIDING COMMISSIONER BRYSON:   But you were

12    doing crimes.   You were doing -- mainly they had to do

13    with drunk and disorderly, battery, marijuana, dangerous

14    drugs.   So a lot of drunk crimes and jail time and

15    driving suspended.   So let's look at your social history

16    and try to tie in these time frames.   You were born in

17    Texas.   Is that right?

18          INMATE ALVARADO:   Yes.

19          PRESIDING COMMISSIONER BRYSON:   Okay.   And you

20    stayed there until three, and then your father

21    unfortunately died in 1947.   Your mother remarried to

22    Mr. Estrada and moved to California in 1949.   You have

23    four brothers, Ruben, Raymond, Richard and Sammy

24    Alvarado, and two sisters, Yolanda and Marylou.

25          INMATE ALVARADO:   Yes.

26

1          PRESIDING COMMISSIONER BRYSON:  And are they all

2    still living and well?

3          INMATE ALVARADO:  Except one brother.

4          PRESIDING COMMISSIONER BRYSON:  I'm sorry.

5          INMATE ALVARADO:  Yes.

6          PRESIDING COMMISSIONER BRYSON:  Okay.  And which

7    brother did you lose then?

8          INMATE ALVARADO:  Ruben.

9          PRESIDING COMMISSIONER BRYSON:  Ruben?  I see.

10          INMATE ALVARADO:  The next oldest one.

11          PRESIDING COMMISSIONER BRYSON:  I see.  And you

12   lost your mother and your stepfather at some point then

13   in '77 and --

14          INMATE ALVARADO:  Yes.

15          PRESIDING COMMISSIONER BRYSON:  Okay, in 1980.

16   Okay, it says that -- but it really doesn't give a good

17   time frame that's on this -- but you entered a common

18   law relationship with Ms. Eva Robinson and had a son,

19   Antonio.  Is that correct?

20          INMATE ALVARADO:  Yes.

21          PRESIDING COMMISSIONER BRYSON:  Okay.  Let's see

22   -- that was in 1977, so that was just two years before

23   the commitment offense.  So it says you completed the

24   11th grade in East Bakersfield High School at 17.

25          INMATE ALVARADO:  Yes.

1          PRESIDING COMMISSIONER BRYSON:  What made you

2    drop out of high school at that very late time?  Was

3    that because of your time in CYA?

4          INMATE ALVARADO:  Yes.

5          PRESIDING COMMISSIONER BRYSON:  Okay, but you

6    did get your GED in CYA, I see.

7          INMATE ALVARADO:  I got it in Tracy.

8          PRESIDING COMMISSIONER BRYSON:  Oh, you got it

9    at Tracy?  Oh, that's right -- DVI.

10         INMATE ALVARADO:  Yes.

11         PRESIDING COMMISSIONER BRYSON:  Okay, thank you.

12    And then you entered West Valley College, it says --

13         INMATE ALVARADO:  Yes.

14         PRESIDING COMMISSIONER BRYSON:  -- for two

15    semesters.  Were you planning in going after an AA then?

16         INMATE ALVARADO:  Yes, I was trying a major in

17    x-ray technician.

18         PRESIDING COMMISSIONER BRYSON:  I see.

19         INMATE ALVARADO:  Yes.

20         PRESIDING COMMISSIONER BRYSON:  Then you were

21    employed.  This little biography jumps back and forth

22    basically.  It shows you as having some employment at a

23    poultry farm, and Del Monte in San Jose.

24         INMATE ALVARADO:  Yes.

25         PRESIDING COMMISSIONER BRYSON:  Cannery worker,

28

1    and a Good Will janitorial custodian in San Jose

2    part-time.  And then, so basically I'm still trying to

3    account for -- in your social activities.  And the

4    reason I'm doing this, sir, is because you have to know

5    that it's quite unusual for a person of 25 through age

6    32 actually to be involved in gangs, and I'm trying to

7    understand why you were.  Were you a major player?  Is

8    that why you were?

9        INMATE ALVARADO:  No, I wasn't a major player.

10   I really didn't realize what I was really getting into,

11   the magnitude of it, what had to be done and what didn't

12   have to be done, the taking of orders.  As I was

13   explaining in the beginning, I came to believe that it

14   was founded to try to help others from being bullied,

15   being pressured or whatever.  But that wasn't the case,

16   and I come to realize that it was more to it than that

17   as time progressed.  But by that time, I had also

18   realized that this wasn't a little street -- a small

19   street gang.  It was more organized as far as their

20   little rules or bylaws, and it was said that once you

21   were in, that, you know, you're in.  It's not come in

22   and get out whenever you want.

23       PRESIDING COMMISSIONER BRYSON:  So what did you

24   do to get inducted into the NF?

25       INMATE ALVARADO:  I did nothing.  It was my --

29

1    that's why I looked at it so lightly from the very

2    beginning, because my god brother, he said okay, you're

3    a member, just like that.  And I stood there like I

4    couldn't believe it.  And then I said well, he's

5    supposed to be the big man, I guess he can do that.  You

6    know, he's supposedly the godfather, so --

7         PRESIDING COMMISSIONER BRYSON:  So what did you

8    do with the gangs then?

9         INMATE ALVARADO:  I didn't really associate with

10   them too much because I hadn't been to prison.  I didn't

11   really know the members that got involved in prison.

12   And living in Bakersfield, there wasn't that many

13   members out there.

14        PRESIDING COMMISSIONER BRYSON:  So what was your

15   function?  Why join them if you're not going to be doing

16   anything?  So what was the point there?

17        INMATE ALVARADO:  I didn't know then.  I took

18   everything so lightly like it wasn't that big of a

19   thing.

20        PRESIDING COMMISSIONER BRYSON:  Did you traffic

21   drugs?

22        INMATE ALVARADO:  No, I didn't.

23        PRESIDING COMMISSIONER BRYSON:  Did you traffic

24   arms?

25        INMATE ALVARADO:  No, I didn't.

30

1          PRESIDING COMMISSIONER BRYSON:  Okay, what did

2    you do with them during that time period?  Because you

3    were active with the gangs.  I believe you debriefed

4    here.  Is that not correct?

5          INMATE ALVARADO:  Yes.

6          PRESIDING COMMISSIONER BRYSON:  So that by

7    definition is some activity.  So what were you doing in

8    the gang if you weren't doing anything?

9          INMATE ALVARADO:  I was -- towards the end I was

10   running around with a couple of them just there in the

11   neighborhood, but never in any activities that I

12   remember of doing crime together.

13         PRESIDING COMMISSIONER BRYSON:  No crimes

14   together?

15         INMATE ALVARADO:  No.

16         PRESIDING COMMISSIONER BRYSON:  32 years old.

17   You have to understand, this is a little difficult.

18   You're an unusual profile.

19         INMATE ALVARADO:  Yes.

20         PRESIDING COMMISSIONER BRYSON:  Okay.  All

21   right.  Well, if you'll turn your attention now to

22   Commissioner Enloe, she'll talk about your

23   post-conviction factors.

24         DEPUTY COMMISSIONER ENLOE:  All right, good

25   morning, Mr. Alvarado.

31

1          INMATE ALVARADO:  Good morning.

2          DEPUTY COMMISSIONER ENLOE:  How are you today?

3          INMATE ALVARADO:  Fine, thank you.

4          DEPUTY COMMISSIONER ENLOE:  During this portion

5    of the hearing, what I'll be doing is putting on record

6    a lot of information I gathered by looking through all

7    the documents that I have here in front of me.  Your

8    Central File is here, the Board Reports, and I have a

9    transcript of the last hearing.  And I've reviewed all

10   these things.  And at the conclusion of my portion, I'll

11   give you and your attorney an opportunity to make any

12   additions or clarifications of anything I've said.  And

13   my major focus here will be on the time period between

14   your last Board hearing and today, and in a few areas

15   I'll reach outside that.  But I'll start with your last

16   Board hearing, and that was June 15th of 2004 -- well,

17   actually, that's when your last hearing was scheduled.

18   At that time you stipulated to a two-year denial.  You

19   were actually in front of the Board personally March

20   28th, 2000, at which time you received a four-year

21   denial.

22          INMATE ALVARADO:  Yes.

23          DEPUTY COMMISSIONER ENLOE:  So actually, I'll

24   try to cover that time period.  Reviewing your file

25   today, your custody level is shown as Medium A, with a

ʃ

32

1    Classification Placement Score of 19, which is the

2    lowest that you can achieve.  Your assignment, are you

3    currently with the PIA wood products machine operator

4    position?

5            INMATE ALVARADO:  Yes.

6            DEPUTY COMMISSIONER ENLOE:  That's your current

7    assignment?  Somewhere I saw laundry room, and I was a

8    little bit confused.  But I also show that you had some

9    previous jobs as a furniture finisher and as a dish

10   washer, line server during this time period.

11           INMATE ALVARADO:  Yes.

12           DEPUTY COMMISSIONER ENLOE:  And then there was a

13   period where you were unassigned, and I was trying to

14   figure that part out.  In 2006 for a while, you were

15   unassigned, according to the classification?

16           INMATE ALVARADO:  Very briefly, not for too

17   long.

18           DEPUTY COMMISSIONER ENLOE:  Okay, so you

19   basically --

20           INMATE ALVARADO:  Probably maybe a month or

21   three weeks.

22           DEPUTY COMMISSIONER ENLOE:  How long have you

23   been in the current assignment approximately?

24           INMATE ALVARADO:  About 13 months, around there.

25           DEPUTY COMMISSIONER ENLOE:  13 months, okay.

33

1    And I did find satisfactory work reports, a few above

2    averages.  And as I look through the other jobs that I

3    mentioned, furniture finisher, dish washer, line server,

4    etcetera, it seemed to be satisfactory to above average

5    work reports.  So you're doing well.  One other thing --

6    I do want to note for the record that you had two other

7    schedule appearances before the Board.  One was August

8    16th of 2006, and one was January 4, 2007.  Both times

9    your hearing was postponed because the psychiatric

10   evaluation had not been completed as ordered by the June

11   15th, 2004 panel.  So just so that we have a full record

12   of that.  Educationally, I think that's already been put

13   on the record that you did obtain your GED in 1982 at

14   DVI?

15           INMATE ALVARADO:  I believe so, yes.

16           DEPUTY COMMISSIONER ENLOE:  And there is a copy

17   in your file.  I found this.  And vocationally, I do

18   find a copy of your completion of vocational silk

19   screening, and that was in 2000.

20           INMATE ALVARADO:  Yes, Commissioner.

21           DEPUTY COMMISSIONER ENLOE:  Self-help -- it

22   looks like you've been participating in Alcoholics

23   Anonymous.  There are several chronos in here.  And

24   there are several other chronos that I definitely want

25   to cover.  And also, I think there were some provided in

34

1    the Board packet, but they're duplicated because they're

2    in your Central File.  And participation in AA -- you've

3    been doing that -- well, is it NA or AA?  It's NA?

4         INMATE ALVARADO:  Presently I'm in NA right now,

5    yes.

6         DEPUTY COMMISSIONER ENLOE:  Okay, so you're

7    going through NA classes now.

8         INMATE ALVARADO:  Yes.

9         DEPUTY COMMISSIONER ENLOE:  The last chrono was

10   April 11th, 2007.  How long have you been participating

11   in that?

12        INMATE ALVARADO:  It took me about a year to get

13   into it, but it's been about three, four months that

14   I've been into it.

15        DEPUTY COMMISSIONER ENLOE:  So that's the most

16   recent?

17        INMATE ALVARADO:  Yes, on the NA.

18        DEPUTY COMMISSIONER ENLOE:  All right.  And then

19   I have a chrono that's dated 4/2/07, that's signed by

20   Oga (phonetic) Chavez, C-H-A-V-E-Z, sponsor, Father

21   Behind Bars group.  And this documents that there was an

22   organized donation drive for the Soledad Junior ROTC

23   Drill Team in Pensacola, Florida, and that you responded

24   with voluntary contributions for this worthy cause.  And

25   your donation and those of your fellow members

35

1    represented genuine sacrifice.  So it looks like the

2    total contribution that was raised was approximately a

3    thousand dollars.  So this is to commend you to assist

4    in that contribution.

5            INMATE ALVARADO:  Thank you.  It was my

6    pleasure.

7            DEPUTY COMMISSIONER ENLOE:  December 29th, 2006,

8    there's a chrono signed by Charlie Walker, common

9    spelling, and this identifies your voluntary

10   participation in three hours of video instruction and

11   discussion of issues related to successfully re-engaging

12   into society.  And another December 29th, 2006 chrono,

13   actually signed by the same person, Charlie Walker.

14   This one talks about your voluntary participation in

15   three hours of inmate employability program.  It was a

16   video review that also seems to be assisting in anger

17   management issues and re-integrating into society as a

18   productive citizen.  June 9th, 2006, a similar chrono

19   signed by the same person, Charlie Walker, and this has

20   to do with the three hours of video instruction and

21   discussion of issues related to successfully re-engaging

22   into society.  So this was similar to the other one?

23           INMATE ALVARADO:  Yes.

24           DEPUTY COMMISSIONER ENLOE:  A different set of

25   videos?

36

1          **INMATE ALVARADO:**  Yes.

2          **DEPUTY COMMISSIONER ENLOE:**  And an anger

3     management and inmate employability program.  This also

4     must be similar, but I'm assuming it's a different set

5     as well?

6          **INMATE ALVARADO:**  Yes.

7          **DEPUTY COMMISSIONER ENLOE:**  The chronos is

8     signed by the same person, Charlie Walker, and it's

9     voluntary participation in three hours of the video

10    related to anger management.  And then I have a chrono

11    dated July 25th, 2005.  And this talks about the

12    Alcoholics Anonymous group.  So am I assuming that

13    you're current in NA?

14         **INMATE ALVARADO:**  Yes.

15         **DEPUTY COMMISSIONER ENLOE:**  So are you still

16    continuing in AA as well, or did you switch?

17         **INMATE ALVARADO:**  I didn't switch.  I'm still

18    waiting to get --

19         **DEPUTY COMMISSIONER ENLOE:**  To get back in the

20    other one?

21         **INMATE ALVARADO:**  Yes.

22         **DEPUTY COMMISSIONER ENLOE:**  Okay, so you have

23    two, AA and NA separately.

24         **INMATE ALVARADO:**  Yes.

25         **DEPUTY COMMISSIONER ENLOE:**  And it talks about

37

1    your vocational.  Excuse me, I just wanted to make sure

2    I covered the ones that are in your file in the Board

3    Report issue.  I believe I have.  Actually, there are

4    some training certificate chronos that are provided.

5    You participated in a number of training.  This has to

6    do with the machine shop program, I believe.  There's

7    one called Finishing One.  There are two that are called

8    Finishing chronos.  They're dated 4/5/06.  They're all

9    related to finishing.  One's called MSDS, Right to Know,

10   and that's safety and lookout tag-out, air, eyes and

11   sound, general safety.  So there's several, and these

12   are all related to your assignment.  Is that correct, in

13   machine operator?

14          INMATE ALVARADO:  Yes.

15          DEPUTY COMMISSIONER ENLOE:  And I talked about

16   the other ones that are in here.  Disciplinaries, there

17   are 20 total CDC 115s in your file, but there are zero

18   since your last one, which was in July of 1993.  That

19   was for possession of pruno.  So you've been

20   disciplinary free since 1993.

21          INMATE ALVARADO:  Yes, I have, Commissioner.

22          DEPUTY COMMISSIONER ENLOE:  And 128As, I found

23   nine total.  The last one was in 2005, July, for

24   refusing to report to work.  Anything I've missed about

25   your other self-help programs?  Any other vocations,

38

1       work reports?  Have I covered that for the time period?

2               **INMATE ALVARADO:**  It seems you have.

3               **DEPUTY COMMISSIONER ENLOE:**  If you think of

4       something else, be sure and let us know.  And at this

5       point then, I'll turn to the most recent psychological

6       evaluation.  And that report was prepared by Richard

7       Starrett, S-T-A-R-R-E-T-T, contract psychologist, and

8       it's dated December 28, 2006.  And on that report,

9       actually turn to page 10, under assessment of

10      dangerousness, the doctor discusses how he assessed the

11      dangerousness.  He uses a number of research risk

12      factors, and history of violence was one of them, and

13      prior performance, the inmate's compliance with Board

14      request and treatment, substance abuse, mental health

15      issues, clinical insight, environmental risks and risk

16      management.  And he's mentioned several things under

17      these categories to base how he came to his conclusions.

18      But I'm going to read into the record on page 11 under

19      clinical insight, the doctor wrote:

20              "The inmate accepts responsibility for

21              the crime.  He does have some insight

22              and does express remorse.  In rating

23              this individual in the clinical factor,

24              he would rate in the moderate range for

25              future violence.  This rating is based

39

```
 1              on the fact that the inmate has not been
 2              continuously involved in NA, AA or
 3              self-help, reflecting a possible
 4              negative attitude in this area.  There
 5              also is a discrepancy between his
 6              account and the file account."
 7   And under the environmental risks and risk management
 8   section, the doctor wrote:
 9              "The inmate would rate in the moderate
10              range in terms of his risk management
11              for the future.  Until 1993, the inmate
12              had problems handling stress, compliance
13              and destabilizers in the institutional
14              environment.  His parole plans need a
15              little more development in terms of job
16              offers.  On the positive side, the
17              inmate has been programming positively
18              since 1993.  In summary, this
19              individual's propensity to commit
20              violence in the future when compared to
21              similar violent inmates has gone down
22              from the high range down into the
23              moderate range at the current time.
24              This rating will continue to decrease as
25              the inmate is continuously involved in
```

40

```
 1          AA, NA and self-help."
 2    And then on the last page of the report, under clinician
 3    observations, comments and recommendations, the doctor
 4    wrote:
 5          "It is recommended that the inmate
 6          continue to be discipline free.  It is
 7          recommended that the inmate continue to
 8          program positively vocationally and
 9          educationally.  It is recommended that
10          the inmate be continuously involved in
11          his religion, self-help groups and AA or
12          NA, or both."
13    And so at this point, any comments or additions that you
14    would like to make?
15          INMATE ALVARADO:  Not at this time,
16    Commissioner.  Thank you.
17          DEPUTY COMMISSIONER ENLOE:  Counsel?
18          ATTORNEY HALL:  No, thank you.
19          DEPUTY COMMISSIONER ENLOE:  Then let's turn our
20    focus back to the chair.  Commissioner Bryson?
21          PRESIDING COMMISSIONER BRYSON:  Thank you.  Sir,
22    what religion are you involved in?
23          INMATE ALVARADO:  Roman Catholic.
24          PRESIDING COMMISSIONER BRYSON:  In the Roman
25    Catholic?  Okay.  And do you go to services?
```

41

1       **INMATE ALVARADO:**  Yes, I do, Commissioner.

2       **PRESIDING COMMISSIONER BRYSON:**  Do you do

3    anything else that we should note as far as the church

4    goes, besides go to services?  Are you playing a role in

5    the church in a major way?

6       **INMATE ALVARADO:**  No, but I'm willing to

7    participate on whatever they have that might need some

8    help or something like that.

9       **PRESIDING COMMISSIONER BRYSON:**  I understand.

10   Thank you.  Sir, why did you debrief?

11      **INMATE ALVARADO:**  Because by this time, I had

12   realized that without a doubt that it wasn't the right

13   thing to do, to be involved, to participate in any

14   activities that might present themselves to me.

15      **PRESIDING COMMISSIONER BRYSON:**  Why not?  What

16   was wrong with it?

17      **INMATE ALVARADO:**  Because by this time now, as

18   the years passed by, I had matured a little bit more and

19   come to realize that that's not what society's about.

20   That's not what (indiscernible) it's about.  That's not

21   what it's about with me anymore.  It's --

22      **PRESIDING COMMISSIONER BRYSON:**  Okay.  And we

23   honor your right not to speak about the crime, but what

24   I'd like to ask is after these years have gone by and

25   you've had time to reflect on the commitment offense as

42

1   well as your criminal history, as well as what's gone on
2   in prison, how are you a different man today than the
3   man who shot and knifed people?  And how do you view
4   that?  Where do you put in your mind what went on then,
5   and how do you represent to this panel that you're a
6   different person today?

7        INMATE ALVARADO:  I'm a different person today.
8   I strongly believe I'm a different person today because
9   I've matured more and realized what I did was not right
10  at all, and especially taking the life of another human
11  being, which I strongly believe no one in any
12  circumstance have the right to do that.  Even at war, I
13  don't think another human being has the right to kill a
14  man.  I don't think we're put on this earth for that, to
15  have that right by any means.  I did those things
16  perhaps because I was under the influence, perhaps
17  because I felt maybe I needed to, to protect myself.
18  But either way, it wasn't right.  And I can't turn back
19  the time, but it's just something that I'll have to live
20  with for the rest of my life, for the victims, the
21  victims' family, and myself.

22       PRESIDING COMMISSIONER BRYSON:  Okay.  You do
23  have support from your fiancé.  Is that Eva Robinson?
24       INMATE ALVARADO:  Yes, that's the one that had
25  the child, maybe been around for about 40 years, I

43

1    think.

2         PRESIDING COMMISSIONER BRYSON:  I see.  So you

3    had a son.  Is that correct?

4         INMATE ALVARADO:    Yes, junior.

5         PRESIDING COMMISSIONER BRYSON:  Okay, and are

6    you in communication with him?

7         INMATE ALVARADO:  Yes, I am.

8         PRESIDING COMMISSIONER BRYSON:  How's he doing?

9         INMATE ALVARADO:  Good.  Not the best, but he's

10   doing all right, you know.

11        PRESIDING COMMISSIONER BRYSON:  What's he doing?

12        INMATE ALVARADO:  Right now he does like

13   construction work on houses, carpentry work.  And he's

14   doing okay.

15        PRESIDING COMMISSIONER BRYSON:  Is he involved

16   in gangs or drugs?

17        INMATE ALVARADO:  Oh, no -- no.  No, he's not.

18        PRESIDING COMMISSIONER BRYSON:  We do have a

19   letter from Eva J. Robinson.

20        INMATE ALVARADO:  Yes.

21        PRESIDING COMMISSIONER BRYSON:  And the most

22   recent letter is dated March 19th of 2007.  And she says

23   she broadly supportive of you, and it says:

24        "Will support him spiritually, as well

25        as my means possible in order for him to

44

1          stream out into society constructively.

2          I'll provide his needed transportation

3          for his search of employment."

4    And she believes you're not a threat or risk to the

5    public.  Now, sir, the Board packet that we referenced

6    -- actually, it's not a Board packet we've yet

7    referenced.  The most current Board packet that we have

8    is actually that of June of 2006, and that was prepared

9    by P.O. Taporco, T-A-P-O-R-C-O, on September 1st of

10   2006.  And on page -- I believe it's page 2 of that

11   Board packet report, it says that you plan to live with

12   your fiancé in San Jose.  It gives her address.  But

13   she doesn't really reference your living with her in

14   this letter, which is of some concern.  And she

15   identifies herself, or at least the type writer

16   identifies her as being the mother of your adult son.

17          INMATE ALVARADO:  Uh-huh.

18          PRESIDING COMMISSIONER BRYSON:  So you're

19   representing that you would live with her?  Is that your

20   plan for residence?

21          INMATE ALVARADO:  Yes, Commissioner.

22          PRESIDING COMMISSIONER BRYSON:  I see.  And you

23   haven't lived together on the outside.  Is that correct?

24          INMATE ALVARADO:  Yes, we have.

25          PRESIDING COMMISSIONER BRYSON:  Oh, you have?

45

1        INMATE ALVARADO:  Yes.

2        PRESIDING COMMISSIONER BRYSON:  Okay, you did

3    live together then?

4        INMATE ALVARADO:  Yes.

5        PRESIDING COMMISSIONER BRYSON:  Okay.  Okay, the

6    inference may be drawn from this letter that perhaps she

7    would support you coming and living with her. It's just

8    not explicitly stated, but as I said before, she would

9    assist with your needed transportation as well, and also

10   your search for employment.  We also have a letter from

11   Danielle K. Robinson, who is your stepdaughter

12   apparently.

13       INMATE ALVARADO:  Yes.

14       PRESIDING COMMISSIONER BRYSON:  And says also

15   your friend, which I thought was instructive.  Again,

16   using the same language, would support you spiritually

17   as well as any means possible in order for you to stream

18   out into society constructively, as well as provide

19   transportation in your search for employment.  And she

20   also states, "I can also assist him in possibly

21   obtaining classes at Deanza Foothill Community College,"

22   and does not believe you're a threat.  We also have a

23   support letter from your sister, Yolanda Neri, N-E-R-I.

24   Is that correct?

25       INMATE ALVARADO:  Yes, it is.

46

1          PRESIDING COMMISSIONER BRYSON:  Okay.  And --

2          INMATE ALVARADO:  Excuse me, Commissioner.

3          PRESIDING COMMISSIONER BRYSON:  Yes.

4          INMATE ALVARADO:  I'm surprised, because I've

5    never got one, so --

6          PRESIDING COMMISSIONER BRYSON:  Oh, okay.

7          INMATE ALVARADO:  I didn't even know that it was

8    in there.

9          PRESIDING COMMISSIONER BRYSON:  Yes, it's in the

10   Board packet.

11         INMATE ALVARADO:  Well, that's nice.

12         PRESIDING COMMISSIONER BRYSON:  Yes, it is very

13   nice.  It's dated August 14th of 2006, and writes a

14   letter to say -- in fact, we'll make sure that you get

15   this copy of this letter so that you have a copy.

16         INMATE ALVARADO:  Thank you.

17         PRESIDING COMMISSIONER BRYSON:  And she says

18   you're her brother, Antonio.

19              " -- known to me as Tony, and she said

20              we speak over the phone.  When I'm able

21              to, I go visit him in person.  He's

22              nearly 60 years old.  He's expressed

23              deep love for his children and

24              grandchildren, calling them often.  He

25              desires to be around them when they grow

```
 1          up.  I personally have committed myself

 2          to being a support to my brother if he's

 3          granted parole.  I'll be there for him

 4          to assist him in looking for job

 5          placement, a place to stay, and he of

 6          course is welcome to parole here to my

 7          home.  My daughter is the wife of a

 8          pastor of a thriving ministry, Victory

 9          Outreach International, specializing in

10          inner city work.  They have three

11          recovery homes, and one re-entry home

12          for men.  The re-entry home assists men

13          to re-enter society.  They also help

14          with job search and offer daily

15          counseling.  They're a great support

16          group for such individuals as

17          Mr. Alvarado."
```

18   Which is really interesting, because for a while she

19   refers to you as Tony, but then she goes into a little

20   more formal mode, probably thinking that's really

21   appropriate, and calling you Mr. Alvarado.  She says:

```
22          "I feel Mr. Alvarado will have great

23          support out here, and has a good chance

24          of a successful life in his senior

25          years.  Please consider my request in
```

48

1          giving my brother a chance."

2          **INMATE ALVARADO:**  Well, that's nice.

3          **PRESIDING COMMISSIONER BRYSON:**  That's very

4     nice.  So it does appear that you have a couple of

5     residential offers, and certainly offers assisting with

6     employment.  What would be your employment plans given

7     your background?

8          **INMATE ALVARADO:**  Well, I have a couple of

9     skills, but any type of labor employment that comes my

10    way, I'm willing to tackle with it and work with it.  As

11    I say, one dollar is better than not having one dollar.

12    So until I get something better or whatever.  But as far

13    as employment, I believe that a person, if he or she

14    wants to work, there's work out there to be done.

15         **PRESIDING COMMISSIONER BRYSON:**  Okay.  Do you

16    recognize the great competition that's out there now for

17    jobs?

18         **INMATE ALVARADO:**  Sure.  That's why I have that

19    saying, I'd rather have a dollar than no dollar,

20    meaning, you know, that the rate of pay will be relevant

21    to some extent for me because some money is better than

22    no money.

23         **PRESIDING COMMISSIONER BRYSON:**  Well, sir, in

24    fact that philosophy is espoused by a lot of criminals

25    too.  In fact, that's why we're going through this,

49

1    partly to ensure that that's not how you're going to get

2    your dollar.

3         INMATE ALVARADO:  No, I don't mean it in that

4    sense.

5         PRESIDING COMMISSIONER BRYSON:  Okay.

6         INMATE ALVARADO:  I mean it in a broader sense.

7         PRESIDING COMMISSIONER BRYSON:  I understand.

8         INMATE ALVARADO:  In a society sense.

9         PRESIDING COMMISSIONER BRYSON:  But that's why

10    we're concerned that you do have skills that are

11    immediately applicable into the job market, because even

12    with a lot of skills, it's tough competition out there

13    now.

14         INMATE ALVARADO:  Well, like I was telling my

15    attorney here, Mr. Hall, you know, I've been

16    incarcerated almost 29 years.

17         PRESIDING COMMISSIONER BRYSON:  Right.

18         INMATE ALVARADO:  And for an employer to send me

19    a letter and say yes, I have a job for you, it's very

20    far and few that that will happen.  I myself, if I was

21    an employer and somebody was being released for a murder

22    charge, or even just being in prison for that length of

23    time, I would really have reservations on just really

24    opening my arms to that person.

25         PRESIDING COMMISSIONER BRYSON:  Uh-huh.

50

1          INMATE ALVARADO:  And willing to hire him,

2     although I would interview him.  But that's why I don't

3     have any employment right now because of that reason.

4          PRESIDING COMMISSIONER BRYSON:  Okay, I will

5     tell you we do have inmates come in here with firm job

6     offers.

7          INMATE ALVARADO:  Yes.

8          PRESIDING COMMISSIONER BRYSON:  But it is

9     difficult to get.

10         INMATE ALVARADO:  Yes.

11         PRESIDING COMMISSIONER BRYSON:  We understand

12    that.  Also, have you thought about following up on the

13    offer that your sister made as far as she spoke -- it

14    references actually an actual place.

15         INMATE ALVARADO:  Yes.

16         PRESIDING COMMISSIONER BRYSON:  Is there a

17    potential, do you think, for your actually going to a

18    transition housing project-type program --

19         INMATE ALVARADO:  Sure.

20         PRESIDING COMMISSIONER BRYSON:  -- as opposed to

21    just going directly to your fiancé?

22         INMATE ALVARADO:  Sure.

23         PRESIDING COMMISSIONER BRYSON:  Okay.  That

24    would be an option for you.

25         INMATE ALVARADO:  Sure.

51

1    PRESIDING COMMISSIONER BRYSON:  Would you plan

2    to continue AA or NA on the outside?

3    INMATE ALVARADO:  Yes, I went to NA/AA out there

4    before.

5    PRESIDING COMMISSIONER BRYSON:  Oh, you did?

6    INMATE ALVARADO:  Yeah.

7    PRESIDING COMMISSIONER BRYSON:  Well, sir, it

8    didn't help, did it?

9    INMATE ALVARADO:  Well --

10   PRESIDING COMMISSIONER BRYSON:  Okay.  So do you

11   live the twelve steps?

12   INMATE ALVARADO:  Yes, I do.

13   PRESIDING COMMISSIONER BRYSON:  Okay.  Do you

14   know them all?

15   INMATE ALVARADO:  No, I don't know them.  I

16   can't recite them to you, but I do recall --

17   PRESIDING COMMISSIONER BRYSON:  You can't recite

18   them, sir?

19   INMATE ALVARADO:  No, I can't recite them.

20   PRESIDING COMMISSIONER BRYSON:  After 29 years?

21   INMATE ALVARADO:  I'm not a recital person.  But

22   this much I will say -- years ago when I was out there

23   and I went to AA, and I remember my sponsor, Ranice

24   (phonetic) out of Bakersfield.  He's a recovered

25   alcoholic.  And --

52

1          PRESIDING COMMISSIONER BRYSON:  You know what?

2     Excuse me.

3          INMATE ALVARADO:  Yes.

4          PRESIDING COMMISSIONER BRYSON:  You're a very

5     good talker.  You are, okay?

6          INMATE ALVARADO:  Well --

7          PRESIDING COMMISSIONER BRYSON:  Do you know what

8     you're doing?  You're talking -- just a minute, let me

9     say this.

10          INMATE ALVARADO:  Yes.

11          PRESIDING COMMISSIONER BRYSON:  You're talking

12     because it's a way to transition because it's a way to

13     transition out of the questions I'm going to ask you.

14          INMATE ALVARADO:  Well, I want to answer your

15     question, Commissioner.

16          PRESIDING COMMISSIONER BRYSON:  Okay.  And I

17     can't figure out for the life of me why you haven't put

18     in your heart those twelve steps.  Because how on earth

19     do you think this panel is going to believe that you can

20     use those twelve steps if you don't know them?  How do

21     you practice them every day if you don't know them?

22          INMATE ALVARADO:  I practice them in this way --

23     I remember -- to take inventory on the things that I do,

24     to make amends to those people that I've done wrong to

25     -- the most important ones.  And another one is that I

53

1   know it's bad for me mentally and physically.  And last,

2   not wanting to drink no more.  I haven't had a drink in

3   a long time, and I'm not going to.  The last time I was

4   in Board, the Commissioner asked me how could she be

5   sure that I wouldn't get another 115 for pruno, and I

6   said because I don't drink anymore, and because I won't

7   associate myself with anyone that is either making it or

8   drinking it.  That's why.  And today I haven't got

9   another one.

10       **PRESIDING COMMISSIONER BRYSON:**  Okay, sir, good

11   work.  All right.  Have I missed anything, counsel, as

12   far as parole plans?

13       **ATTORNEY HALL:**  No.

14       **PRESIDING COMMISSIONER BRYSON:**  Thank you.  All

15   right.  We've sent out 3042 Notices.  Those notices go

16   to agencies having a direct interest in your case.  We

17   do have a letter of May 16th, 2007 from San Jose Police

18   Department.  This is prepared by Robert L. Davis, the

19   Chief of Police.  And I quote, beginning in paragraph 2:

20       "Antonio Alvarado and William Romo were

21       reputed to be dropouts from the Nuestra

22       Familia prison gang.  In retaliation for

23       their lack of support and respect, the

24       Nuestra Familia placed both individuals

25       on a hit list.  On January 6th of 1979,

54

1        Antonio Alvarado killed William Romo by

2        shooting him six times with a

3        small-caliber handgun.  This murder was

4        completed in an attempt by Alvarado to

5        have his name removed from the prison

6        gang's hit list.  In taking into account

7        the nature of the crime and considering

8        the totality of the circumstances, I

9        would recommend against the parole of

10       Antonio Alvarado, as he is not suitable

11       at this time.  Further, I would

12       recommend that Mr. Alvarado serve the

13       maximum prescribed by law."

14  We do have a representative of the Santa Clara County

15  District Attorney's Office present who will have the

16  opportunity to make a statement regarding parole

17  suitability prior to the conclusion of this hearing.

18  And Mr. Rico is present on video conference.  And first

19  let me ask, Commissioner, do you have any questions of

20  this inmate regarding any issue?

21        **DEPUTY COMMISSIONER ENLOE:**  No, thank you.

22        **PRESIDING COMMISSIONER BRYSON:**  All right.  Does

23  the District Attorney have questions of this inmate?

24        **DEPUTY DISTRICT ATTORNEY RICO:**  Commissioner,

25  the only questions that I have would pertain to the life

55

1    crime, and since Mr. Alvarado chooses not to talk in

2    that regard, I have no questions.

3        PRESIDING COMMISSIONER BRYSON:  Thank you.  And

4    counsel, do you have any questions of the inmate?

5        ATTORNEY HALL:  Yes.  Mr. Alvarado, in

6    conversations you and I had, you talked about your

7    desire to do charity work on the outside.  Would you

8    share some of that with the panel, some of the things

9    that you would like to do in terms of talking to young

10   people?

11       INMATE ALVARADO:  Yes, I believe that within

12   myself I could present some influence, some positive

13   influence on the younger youth about crime, gangs, loved

14   ones that they could hurt, to come to realize that if

15   they take that path, that it's not good and never will

16   be good.  As far as charity work, I've grown to be more

17   of a compassionate person.  I would love to help people

18   that are in need of help, the elderly, the disabled, the

19   raising of funds to incorporate something positive for

20   those in need. I would be rewarded just doing that job,

21   unmeasurably.

22       ATTORNEY HALL:  And to clarify something for me,

23   have you in fact taken any college courses or no?

24       INMATE ALVARADO:  Here in prison?

25       ATTORNEY HALL:  At any time.

)

56

1          **INMATE ALVARADO:**  Oh, yes, at West Valley

2     College, yes, in Santa Clara County.

3          **ATTORNEY HALL:**  And at this point, has the panel

4     covered everything that you've done since your last

5     hearing, or can you think of anything that was omitted?

6          **INMATE ALVARADO:**  Yes, the Commissioner was

7     thorough enough to my recollection.

8          **ATTORNEY HALL:**  Okay, thank you.  I have no

9     further questions.

10         **PRESIDING COMMISSIONER BRYSON:**  All right, thank

11    you.  Then I'd like to invite the District Attorney to

12    make a closing statement.

13         **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you,

14    Commissioner.  If I may, referring briefly to the facts

15    here of both crimes, I would point out, and again

16    referencing the probation report in this matter, the

17    first victim, Steven Romero, does seem to be involved in

18    provocative conduct that led up to the occurrence.  But

19    the problem is that although the victim attempted to

20    gain entry to Mr. Alvarado's residence by kicking

21    through the front door, Mr. Alvarado armed himself with

22    a knife, a butcher knife.  There was a fight, an

23    altercation inside the residence.  Mr. Alvarado stabbed

24    the victim.  The victim apparently was unarmed, was able

25    to free himself and ran from the apartment.  And the

57

1    problem is that Mr. Alvarado pursued, again stabbing the

2    victim in the parking lot, and it was at that point that

3    the fatal wound, the stab to the chest area that pierced

4    the pulmonary artery, was inflicted.  Now with the two

5    cases tying together, it would appear, at least

6    according to the probation report, that during the

7    subsequent investigation of Mr. Romero's killing, Billy

8    Romo, victim-to-be in count two, was contacted and

9    identified as a "friend" of Mr. Alvarado.  And

10   apparently Mr. Romo supplied information to another

11   witness that the stabbing had occurred perhaps because

12   Mr. Alvarado had owed the victim two hundred dollars for

13   some reds.  Whether that be true or not, Mr. Romo at

14   least had provided that information to someone else.  So

15   one and a half years later, on January 6th of 1979,

16   Mr. Alvarado, who was drunk and apparently under the

17   influence of drugs as well, or at least having -- at the

18   time of his apprehension having morphine in his system

19   -- in any event, on that date, January 6th, 1979, he was

20   with Billy Romo.  And as Mr. Alvarado became

21   increasingly inebriated, he began to make threats

22   against Mr. Romo, indicating that he planned to kill

23   him.  The threats were not taken seriously since

24   apparently Mr. Alvarado was one to commonly make threats

25   such as these when under the influence of alcohol or

58

1    drugs.  But at about 7:00 p.m. on that day, Mr. Alvarado

2    began to display a loaded 22-caliber pistol, which he

3    indicated was previously used in the killing by the

4    Nuestra Familia, and which had been given to him for

5    disposal.  He then left the residence with the gun,

6    returned a short time later, apparently having shot

7    Mr. Romo eight times.  And he then entered into the

8    bathroom area of the residence where he began to inject

9    heroine.  Mr. Romo was found dead of multiple gunshot

10   wounds.  And when Mr. Alvarado was subsequently arrested

11   early in the morning hours of January 7th, 1979 after

12   running a red light, he had a .23 percent blood alcohol

13   and the presence of morphine in his system.  And I think

14   that letter in opposition from the San Jose Police

15   Department refers to the fact that Mr. Romo apparently

16   was an NF dropout, or at least attempting to

17   disassociate himself from the NF.  He was on a hit list,

18   and there were witnesses during the investigation that

19   indicated it was known that the two disliked each other

20   for some reason, and there had possibly been an argument

21   over drugs.  And since Mr. Alvarado had also

22   disassociated himself from the NF, it was indicated that

23   part of the motivation here may have been not only the

24   dislike for the victim, but an attempt to regain his own

25   status with the NF, or at least get off the hit list.

59

1      Now I've sat here during the hearing, and I've
2   listened to Mr. Alvarado, and quite frankly,
3   Mr. Alvarado, it's a very pleasant experience to listen
4   to him talk because he was young at the time of the
5   crimes relatively speaking in terms of his current age.
6   He was 32, so it's not that these prior crimes can be
7   written off to youthful indiscretion.  He was a mature
8   adult in that sense, in his thirties at the time of this
9   crime, and it was making conscious choices.  No doubt as
10  he sits there today, he is, as he indicates, more
11  mature.  He is more relaxed, almost adopting the
12  attitude of perhaps an old warrior that wants to talk to
13  youth, wants to counsel them in the ways of the world,
14  perhaps indicating his own story, and perhaps very
15  well-intentioned, wanting them to go a different path
16  than perhaps he did.  And that's a good thing.  That's a
17  good motivation.  But (indiscernible) is that
18  Mr. Alvarado unfortunately seems to be approaching
19  rehabilitation as a part-time avocation, doing it when
20  it suits him.  He has not been enmeshed in, nor has he
21  embraced NA or AA.  He participates occasionally.  He's
22  been in NA, he indicates, for maybe three to four
23  months.  I think the new psych report indicates that
24  he's been involved in AA for 18 months, perhaps on and
25  off over the years.  But he's been in for going on 30

ℐ

60

1    years, and to not know the steps, maybe he's not someone

2    that likes to recite things, memorize things.  But he

3    seems very relaxed and casual in his approach, kind of

4    saying well, I'm getting older, I don't want to do this

5    anymore, everything's okay, I'm not going to offend.

6    Back in 1993, which is not that long ago given the total

7    term of his incarceration, he (indiscernible).

8          **PRESIDING COMMISSIONER BRYSON:**  Excuse me.  I

9    don't mean to interrupt you, Mr. Rico, but when you

10    shuffle those papers, it completely covers everything

11    you're saying.

12          **DEPUTY DISTRICT ATTORNEY RICO:**  I'm sorry.

13    Sorry about that.  I was looking for the date.  I didn't

14    want to misquote.  So I will refrain from finding that

15    particular date with my apology.  I don't want to

16    misstate the evidence by misquoting a date.  In any

17    event, the bottom line is this, that the Board Report is

18    not supportive of release.  The psych eval is not

19    supportive of release.  His parole plans need work.  He

20    needs to take things seriously rather than sitting there

21    and perhaps indicating these are my intentions and I can

22    get out, I can find work somewhere, I can do this, I'm

23    not going to resort to crime.  It's far too casual and

24    indicative of an individual that perhaps has changed in

25    terms of his intentions, no doubt has changed in terms

61

1    of his age, but otherwise has not taken those positive
2    steps that he needs to in order to get past what caused
3    him to be where he is today.  And I think that his
4    conflicting versions of the offense suggest that he has
5    never truly looked at it with an eye to see just what
6    did I do, what was wrong with me to make me do this, and
7    where is it, is it still here, how have I dealt with it.
8    Again, he should be commended for at least the
9    intentions, but as it is said, the road to hell is paved
10   with good intentions, and I think that he needs to make
11   serious effort at correcting the underlying problems
12   that have gotten him to where he is today if he is ever
13   to be suitable for release.  I think that it's going to
14   take him a long time to do that.  60 is old, but it's
15   not in today's world anywhere near as old as it used to
16   be.  So he does need to get busy, though.  And I submit
17   that he is not suitable for release at this time and
18   should be denied.  Thank you.
19        PRESIDING COMMISSIONER BRYSON:  Thank you.  And
20   counsel, I'd like to invite you to make a closing
21   statement.
22        ATTORNEY HALL:  Yes, thank you.  Clearly one of
23   the main things that this panel will be examining is the
24   insight gained by my client and understanding the nature
25   of the crime for which he was convicted.  And I think

62

1    the evidence clearly shows that.  In addition to gaining

2    insight, one has to -- the panel does have to decide

3    whether or not this will be translated into a crime-free

4    life on the outside.  And again, the answer has to be

5    yes based on Mr. Alvarado's performance, especially

6    since 1993, when he has been discipline free.  Certainly

7    his age shows more maturity, naturally, but not just

8    getting older, but in fact some of the things that he

9    has done.  And I want to just go back to look at Dr.

10   Starrett wrote with respect to the issue of insight.

11   Dr. Starrett says at page 11, "The inmate accepts

12   responsibility for the crime.  He does have some insight

13   and does express remorse."  So again, this is

14   confirmation that, in fact, Mr. Alvarado has really

15   dealt and examined the crimes for which he was

16   convicted.  Also, the doctor continues that the inmate

17   would rate in the moderate range in terms of his risk

18   management for the future.  Also that until 1993, the

19   inmate had some problems handling stress, compliance and

20   destabilizers in the institutional environment.  So

21   speaking of what he was going through up until 1993,

22   there's no doubt that Mr. Alvarado had some issues that

23   he was addressing, that he needed to address, and that

24   he clearly has addressed from 1993, almost 14 years ago.

25   I don't think that's a minimal amount of time.  14 years

63

1    of a lifetime is a long time.  So that should be taken

2    into account.  There is no question that the crimes were

3    horrific, but as the Deputy District Attorney points

4    out, in the first offense, Mr. Romero came kicking my

5    client's door down.  I think that when any individual

6    goes to someone's home and kicks down the door, the law

7    allows certain -- these are extenuating circumstances.

8    The law doesn't say you can kill the person, but you can

9    protect your home.  It is true that Mr. Alvarado went

10   beyond protecting his home, and for that he paid a

11   price.  But there's that provocation, and I think the

12   Board needs to take that into account. Similarly, while

13   his intoxication was not a justification for killing

14   Mr. Romo, the fact is that there were many issues.

15   These issues were discussed in the 2000 hearing.  And as

16   well, Mr. Alvarado has discussed with the evaluator,

17   that there was a family problem.  His sister-in-law was

18   constantly abused by Mr. Romo.  The family was petrified

19   of this man, and he has been approached by other family

20   members to speak with Mr. Romo to try to curb his

21   behavior.  It is true that Mr. Alvarado perhaps should

22   not have gone to see Mr. Alvarado (sic) on that night

23   when he was inebriated, but he did.  Nonetheless, as he

24   discussed previously, he was attacked by Mr. Romo.  It

25   is not by way of an excuse.  It is not by way of

64

1   justification, but those are the facts.  We have

2   statements about, especially the letter from the Chief

3   of Police of San Jose talking about Mr. Alvarado being a

4   dropout of the Nuestra Familia and the killing was to

5   get him off a hit list.  I'm not privy to the transcript

6   of the trial, but nothing I read in the probation

7   officer's report sustains this kind of conclusion.  So

8   again, that should be taken with a grain of salt by this

9   panel.  And it is true that this is not a re-trial.

10   Thankfully it's not a re-trial.  What the examination

11   should focus on is really whether or not Mr. Alvarado

12   has rehabilitated himself with the assistance of the

13   institution, and I think the answer to that really has

14   to be yes when you look back at his conduct over the

15   past 14 years.  The facts of the crime will never change

16   and, in fact, the court of appeals -- California Court

17   of Appeals -- has cautioned us to look, to not put too

18   much weight on the circumstances that occurred more than

19   20 years in the past.  In Mr. Alvarado's case, we're

20   talking about crimes that occurred in June of 1977 and

21   January of 1979, and it's well past 20 years.  Now it is

22   true that even prior to that, there was an extensive

23   criminal history.  But if you look clearly at those

24   offenses, you will see that most of them really involve

25   substances, whether alcohol or drugs.  I counted about

65

1    three that involved any kind of aggression, whether it's
2    -- well, four if you include possession of weapons.  And
3    then also, if you look at some of those incidents, there
4    are dismissals and things of that sort.  So we can't
5    deny the fact that yes, at face value, just looking at
6    it, it looks bad.  But when you look at the specific
7    events, there's not many that involve any violence
8    against any victim.  So I think the panel should take
9    that into account as well.  Yes, he was 31 at the time
10   of this crime.  Clearly when you have a person who
11   commits a crime that lands him in the Youth Authority at
12   age 9, I think you really have to question the type of
13   influences he had.  And to then say okay, when he's 31,
14   he should be a law-abiding citizen, it doesn't compute.
15   I think that without some serious intervention, that
16   9-year-old, whether he becomes 15 and then 30 without
17   strong intervention, would not really have been changed.
18   Without the education and the kind of exposure to
19   corrective influences, there is not going to be a
20   change.  But what we're seeing is that since coming to
21   the CDC, he's been exposed to these corrective
22   influences, and we've seen a change.  Yes, it took some
23   time after he arrived at CDC, but you can see the
24   changes.  In 1993, there was a breaking point.  So the
25   next 14 years you see someone who has grown, who has

66

1    come to appreciate the value of life, the value of

2    societal rules, and to the point where he can get the

3    kind of supportive evaluations by the psychologist who

4    evaluated him.  He's participated in the various

5    self-help programs, including AA and NA.  And I think

6    what Mr. Alvarado is trying to convey to this panel is

7    that he may not be able to recite the twelve steps, but

8    clearly they've been instrumental in helping to guide

9    him to remaining sober over all these years.  And that

10   should also be taken into account.  The fact is that he

11   has consistently worked while in the institution, again

12   demonstrating that he can be responsible and really take

13   care of himself.  He's learned vocations that will be

14   marketable once he goes out on the outside.  He has

15   taken refuge with his faith.  He has attended services,

16   and he has also used that to guide him to stay

17   discipline free.  He also has family support, both while

18   he's in custody right now, as well as to look forward to

19   when he goes out.  So I think essentially what we have

20   seen is the maturation of a person who, although not

21   having the kind of judgment that society would have like

22   to see when he was 31 years old, now that he is 60, he

23   has clearly demonstrated that.  He is demonstrating that

24   with the kind of support and corrective influences that

25   he has had within the institution and that he can expect

67

1  on the outside from his family that he will be able to
2  abide by the laws of society, someone that has the
3  skills to go out.  He came into prison without any job
4  skills.  He's going out with these skills, with the
5  ability to find gainful employment.  And the fact that
6  he's more mature, more calm, more relaxed, is indicative
7  of someone who cannot easily be angered, because
8  certainly the crimes suggested some anger, someone who
9  will not be consuming any intoxicating substances.  So
10  essentially we have someone who is ready to go out and
11  show the Board that, in fact, he can be relied upon to
12  be a law-abiding citizen, and he has the skills to
13  provide for himself.  And we ask that you find him
14  suitable because of those things.  Thank you.
15        PRESIDING COMMISSIONER BRYSON:  Thank you.  Sir,
16  are you suitable for parole?
17        INMATE ALVARADO:  I believe I am, although I
18  also believe that it's not going to be easy, because
19  like the Commissioner mentioned earlier, there's a lot
20  of competition out there.  There's a lot of hurdles.
21  But like I told my attorney yesterday, I'm going to
22  parole one day because I want to parole, and because I
23  want to make it out there, and I'm going to make it out
24  there.  With that in mind and in person, I will make it
25  one way or another, and I will parole, Commissioner, one

68

1    day, because that's what I want, and I'm going to find

2    it.

3         PRESIDING COMMISSIONER BRYSON:  Okay, sir.

4         INMATE ALVARADO:  I'm going to make it happen.

5         PRESIDING COMMISSIONER BRYSON:  Okay, sir, thank

6    you.

7         INMATE ALVARADO:  Thank you.

8         PRESIDING COMMISSIONER BRYSON:  We'll now recess

9    for deliberations.  The time is 10:46.

10                    R E C E S S

11                     --oOo—

12

13

14

15

16

17

18

19

20

21

22

23

24

69

1       CALIFORNIA BOARD OF PAROLE HEARINGS

2              D E C I S I O N

3       DEPUTY COMMISSIONER ENLOE:  Okay, we're back on

4    record.

5       PRESIDING COMMISSIONER BRYSON:  Thank you.  And

6    we've reconvened in the matter of Antonio Alvarado for

7    the decision.  The time is now 11:28, and all parties

8    have returned to the room, and additionally we have the

9    District Attorney on video conference.  Sir, the panel

10    reviewed all  information received from you and from

11    the public and relied on the following circumstances in

12    concluding that you are not yet suitable for parole and

13    would pose an unreasonable risk of danger to society or

14    a threat to public safety if released from prison.

15    This offense was carried in an especially cruel and

16    callous manner in that on June 23rd of 1977 at

17    approximately 2345 hours, pursuant to an altercation

18    between the victim Steven Romero, a 25-year-old male,

19    and the inmate after Romero kicked entry into the

20    inmate's residence at 984 Elm Street, Apartment 5 in

21    San Jose.  The inmate stabbed Romero with a butcher

22    knife, then chased Romero, inflicting the fatal stab

23    wound in the parking lot of an apartment complex,

24    piercing Romero's chest and pulmonary artery.  The

25    ANTONIO ALVARADO    C-09142    DECISION PAGE 1    5/31/07

70

1   witness said that the inmate owed the victim two

2   hundred dollars for reds, for drugs.  Multiple victims

3   were attacked or killed in separate instances.   On

4   January 6th  of 1979, the inmate had been drinking at

5   the residence of his wife, Christina Lopez and her

6   family, including her sister, Alice Cortez, who had

7   left Billy Romo for domestic violence reasons.   Under

8   the influence, the inmate threatened to kill Romo, as

9   he frequently did under the influence of alcohol and

10  drugs.  This offense was carried out in a dispassionate

11  and calculated matter in that 2100 hours that evening,

12  the inmate brandished a loaded 22-caliber pistol he

13  claimed was a disposed-of Nuestra Familia weapon.

14  Later, Cortez family members found Romo lying on the

15  floor of his residence at 767 East Julien Street in San

16  Jose, with eight gunshot wounds.   Romo's blood tested

17  positive for PCP, and police officers found a

18  hypodermic syringe needle and heroine.   The inmate was

19  apprehended at 0030 hours on January 7th of 1979 after

20  running a red light in San Jose.   The inmate's blood

21  alcohol tested at .23 percent, and morphine was

22  detected in his system.   Sir, you have a massive

23  history of violations, including three commitments to

24  California Youth Authority beginning at a very early

25  **ANTONIO ALVARADO    C-09142    DECISION PAGE 2**    5/31/07

71

1    age.  You have weapons offenses, assaults, prior

2    criminality, including burglaries, property offenses,

3    drugs, destruction of property, crimes against police

4    officers, an escalating pattern of criminal conduct and

5    violence that includes having failed society's prior

6    attempts to correct your criminality.  You had juvenile

7    parole, adult probation, juvenile probation.  You had

8    county jail time.  You had possession of narcotics

9    charges, property crimes, driving under the influence,

10   under the influence crimes and assault crimes.  Sir,

11   your institutional behavior has included some

12   commendable programming most recently, and also limited

13   programming or insufficient programming early in your

14   career in the California Department of Corrections and

15   Rehabilitation.  Currently you're doing good work with

16   satisfactory to above average work reports in PIA wood

17   products as a machine operator.  And we have the most

18   recent reportage there of 2006 and 2007.  You've also

19   in that line worked as a furniture finisher.  You've

20   also worked previously as a dish washer and line

21   server.  You've had good work reports in those tasks.

22   You did achieve your GED through CDC in 1982.  You also

23   achieved completion of silk screening in 2000, and you

24   have several certifications as a machine shop operator

25   **ANTONIO ALVARADO    C-09142    DECISION PAGE 3**    5/31/07

72

1    most recently.  Read into the record were laudatory

2    chronos from 2005 through 2007.  You have also

3    participated in some self-help programming, including

4    the inmate employability program and two or more anger

5    management programs.  You also are to be commended for

6    your work as a volunteer and obtaining donations on a

7    voluntary basis, and you have laudatory chronos to that

8    effect.  You also are a practicing Catholic.  Also, you

9    have participated for a number of years in AA or NA.

10   However, under questioning, you show that you have not

11   yet internalized the steps that are provided in these

12   programs that are intended to give you ready tools for

13   operating on the outside successfully.  As to your

14   misconduct in prison, you do have a significant history

15   of -- certainly of alcohol in prison, with 20 115s.

16   The good news, however, is that you had a positive

17   change in 1993, and have been discipline free since

18   that time.  You do have a history of nine 128As, and a

19   rather disturbing recency in those 128As, the most

20   recent being in 2005 for refusal to report to work, and

21   prior to that, in 2003, disobeying a direct order.  But

22   you have to your credit, sir, shown a positive change

23   that seems to be holding, and you are programming

24   successfully, although as to self-help on a limited

25   **ANTONIO ALVARADO    C-09142   DECISION PAGE 4    5/31/07**

73

1   basis.  As to the psychological report dated December

2   28th, 2006 by Dr. Richard Starrett, S-T-A-R-R-E-T-T,

3   basically Dr. Starrett's report does not support your

4   parole.  It is not supportive of your release.  And in

5   addition to the quotations that were made by

6   Commissioner Enloe into the record, we would like to

7   add these, which we feel are dispositive in your case.

8            As to Dr. Starrett's clinical report, under

9   history of violence, and I quote him on page 10, middle

10  page, under history of violence:  "In rating this

11  individual on historical factors, he would rate in the

12  high range in terms of his likelihood to commit future

13  violent acts when compared to other inmates with

14  similar crimes.  This rating is based on his age when

15  he first acted out --"  And I'll step out of this

16  direct quote to put on record once again that your age

17  at the crimes that are involved in the commitment

18  offense was 32 years old.  And back to quoting

19  Dr. Starrett:  "-- and when compared to other inmates

20  with similar crimes.  The rating is based on his age

21  when he first acted out violence or was in a

22  potentially violent situation, his prior criminal

23  record, being involved in unstable relationships,

24  unstable employment, being a substance abuser, having

25  **ANTONIO ALVARADO   C-09142   DECISION PAGE 5**    5/31/07

74

1    early maladjustment problems and prior failures on

2    supervision." And then also on page 10 of the same

3    clinician's report, under substance abuse: "Relapsing

4    in the use of alcohol and drugs is a concern. This has

5    been a problem for the individual on the street and

6    while incarcerated. Although he has been clean and

7    sober for a number of years now, has not been

8    continuously involved in AA or NA, which he needs to

9    be." The clinician also observed that he does -- and

10   the clinician writes, "He does some insight" -- the

11   inference is that he means he does have some insight --

12   "and does express remorse." And, sir, you have

13   expressed regret. This panel is not sure that regret

14   and remorse are actually the same things. That's a

15   question we feel you must look at in the coming time

16   that you have to serve because we feel that goes to

17   insight, and I'll talk about that in a moment.

18          As to your parole plans, your sister and your

19   fiancé have offered residence and financial support,

20   and you have no job plans that are substantial. So

21   those need to be enforced, or reinforced, rather, and

22   planned. You do, however, have machine shop skills,

23   and your sister has also eluded to in her letter a

24   reentry program. But you do need to look into a

25   **ANTONIO ALVARADO    C-09142    DECISION PAGE 6    5/31/07**

75

1    reentry program to actually address continuing

2    monitoring for your substantial history of adult -- or,

3    excuse me -- of alcohol and drug addiction.  As to

4    Penal Code 3042 responses, responses indicate

5    opposition to a finding of parole suitability,

6    specifically by the District Attorney of Santa Clara

7    County, and also San Jose Police Department.

8         In a separate decision, the hearing panel finds

9    it is not reasonable to expect that parole would be

10   granted at a hearing during the following four years.

11   Specific reasons for this finding are as follows.  This

12   offense was cruel and callous, and actually, it's this

13   set of offenses.  On June 2000 -- or, excuse me -- 1977

14   at 2345 hours, after an argument between the victim,

15   Steven Romero, who was 25 years of age at the time, and

16   you.  After Romero kicked entry into your residence at

17   984 Elm Street, Apartment 5 in San Jose, you stabbed

18   Mr. Romero with a butcher knife, chasing him outside.

19   You then proceeded to continue to chase him, and you

20   inflicted a fatal stab wound in the parking lot of the

21   apartment complex, piercing his chest and pulmonary

22   artery.  And, sir, as your attorney stated, as was your

23   right, you did not address the crime today, although we

24   did have many questions we could not ask because of

25   **ANTONIO ALVARADO    C-09142    DECISION PAGE 7    5/31/07**

76

1   this.  But your attorney indicated that, in fact, the

2   transcript of March 28, 2000, which was your last full

3   hearing for which you were present, indicated your

4   actual view on your crime and your version of your

5   crime.  So we did reference that transcript.

6       And in terms of the June 23rd, 1977 crime, we

7   researched it, and you were talking about the -- about

8   performing the crime in reference to questioning by

9   reciting Commissioner Munoz.  And he asked him, or he

10  asked you, "So, the first time you stabbed him, you

11  were in the house?" And you answered "Yes."  Then he

12  said, "Is that right?  Did you stab him outside the

13  house too?"  And you said, "Yes, I did."  And he said,

14  "How many times in total did you stab him?"  And you

15  said, "Well, outside of the house I was just poking at

16  him to keep him away, not like a stab like inside the

17  house.  No, I just kept like poking him so he would

18  stay away from me, just to get him away from there."

19  And presiding Commissioner Munoz said, "Okay, when you

20  say poking him, do you mean just flinging at him, or do

21  you mean breaking --" (pause)  And then you said,

22  "Well, what I --"  And then he says, "-- his skin?"

23  And then you said, "Apparently, yes, but poking him not

24  so much like a stab like I guess a violent stab, just

25  **ANTONIO ALVARADO    C-09142   DECISION PAGE 8    5/31/07**

77

1    to keep him away.  But I guess it is a stab, yes."  And

2    the Presiding Commissioner said "Okay, so how many

3    times in total do you think you stabbed him?"  And you

4    said, "I don't know."  So I'd like to point out again

5    that that was the fatal stab.  You pierced his chest

6    and his pulmonary artery.  That, sir, just flies in the

7    face of frankly a poke.

8          And then as to the commitment offense, on

9    January 6th of 1979, you had been drinking at the

10   residence of Christina Lopez with her family and her

11   sister, Alice Cortez, who had left Billy Romo for

12   domestic violence.  And under the influence, you

13   threatened to kill Romo, and apparently you frequently

14   did that when under the influence of alcohol and drugs.

15   It's questionable that anyone took you seriously.  But

16   this offense was carried out dispassionately and in a

17   calculated manner in that at 2100 hours that evening,

18   you brandished a loaded 22-caliber pistol you claimed

19   was a disposed-of Nuestra Familia weapon.  And later,

20   of course, the family members found Romo lying on the

21   floor of his residence at 766 East Julien Street in San

22   Jose, with eight gunshot wounds in him.  His blood did

23   test positive for PCP, and the police officers did find

24   a hypodermic syringe needle with possibly heroine.  You

25   **ANTONIO ALVARADO    C-09142    DECISION PAGE 9    5/31/07**

78

1    were apprehended then at 0030 hours on January 7th of

2    1979 after running a red light in San Jose where your

3    BAC, your blood alcohol content, tested at 23 percent,

4    .23 percent alcohol, and you had morphine in your

5    system that tested also.  But again, referring to the

6    same transcript, Commissioner Munoz was asking you

7    about that crime, and you said:  "So I told him that I

8    would kind of talk to him, like ease off on Alice,

9    which his wife, common wife, Alice Cortez.  Apparently

10   I guess they were, you know -- he was, I guess, hitting

11   her, and I was just going to tell him just to lighten

12   up because the family was -- it was getting out of

13   control.  They weren't going to let him in the house.

14   They wouldn't want him around the house any more.  And

15   when I got there, I did have a .22 on me.  And when I

16   got there, I was sitting down talking with him.  And

17   when I brought up the conversation about him and Alice,

18   he got upset with me because I guess he thought that I

19   was trying to get into his business or his married

20   life, or whatever.  And I told him, 'No, it's not like

21   that.  I'm just letting you know how the family feels.'

22   And he got up, and he had a knife, and he came at me,

23   and I pulled out the .22 and I shot him.  He came at

24   me, and he was much bigger than I was in his stature,

25   **ANTONIO ALVARADO    C-09142    DECISION PAGE 10    5/31/07**

76

1    this.  But your attorney indicated that, in fact, the

2    transcript of March 28, 2000, which was your last full

3    hearing for which you were present, indicated your

4    actual view on your crime and your version of your

5    crime.  So we did reference that transcript.

6         And in terms of the June 23rd, 1977 crime, we

7    researched it, and you were talking about the -- about

8    performing the crime in reference to questioning by

9    reciting Commissioner Munoz.  And he asked him, or he

10   asked you, "So, the first time you stabbed him, you

11   were in the house?" And you answered "Yes."  Then he

12   said,  "Is that right?  Did you stab him outside the

13   house too?"  And you said, "Yes, I did."  And he said,

14   "How many times in total did you stab him?"  And you

15   said, "Well, outside of the house I was just poking at

16   him to keep him away, not like a stab like inside the

17   house.  No, I just kept like poking him so he would

18   stay away from me, just to get him away from there."

19   And presiding Commissioner Munoz said, "Okay, when you

20   say poking him, do you mean just flinging at him, or do

21   you mean breaking --" (pause)  And then you said,

22   "Well, what I --"  And then he says, "-- his skin?"

23   And then you said, "Apparently, yes, but poking him not

24   so much like a stab like I guess a violent stab, just

25   **ANTONIO ALVARADO    C-09142   DECISION PAGE 8    5/31/07**

77

1    to keep him away.  But I guess it is a stab, yes."  And

2    the Presiding Commissioner said "Okay, so how many

3    times in total do you think you stabbed him?"  And you

4    said, "I don't know."  So I'd like to point out again

5    that that was the fatal stab.  You pierced his chest

6    and his pulmonary artery.  That, sir, just flies in the

7    face of frankly a poke.

8         And then as to the commitment offense, on

9    January 6th of 1979, you had been drinking at the

10   residence of Christina Lopez with her family and her

11   sister, Alice Cortez, who had left Billy Romo for

12   domestic violence.  And under the influence, you

13   threatened to kill Romo, and apparently you frequently

14   did that when under the influence of alcohol and drugs.

15   It's questionable that anyone took you seriously.  But

16   this offense was carried out dispassionately and in a

17   calculated manner in that at 2100 hours that evening,

18   you brandished a loaded 22-caliber pistol you claimed

19   was a disposed-of Nuestra Familia weapon.  And later,

20   of course, the family members found Romo lying on the

21   floor of his residence at 766 East Julien Street in San

22   Jose, with eight gunshot wounds in him.  His blood did

23   test positive for PCP, and the police officers did find

24   a hypodermic syringe needle with possibly heroine.  You

25   **ANTONIO ALVARADO    C-09142   DECISION PAGE 9    5/31/07**

78

1  were apprehended then at 0030 hours on January 7th of

1  were apprehended then at 0030 hours on January 7th of

2  1979 after running a red light in San Jose where your

3  BAC, your blood alcohol content, tested at 23 percent,

4  .23 percent alcohol, and you had morphine in your

5  system that tested also.  But again, referring to the

6  same transcript, Commissioner Munoz was asking you

7  about that crime, and you said:  "So I told him that I

8  would kind of talk to him, like ease off on Alice,

9  which his wife, common wife, Alice Cortez.  Apparently

10  I guess they were, you know -- he was, I guess, hitting

11  her, and I was just going to tell him just to lighten

12  up because the family was -- it was getting out of

13  control.  They weren't going to let him in the house.

14  They wouldn't want him around the house any more.  And

15  when I got there, I did have a .22 on me.  And when I

16  got there, I was sitting down talking with him.  And

17  when I brought up the conversation about him and Alice,

18  he got upset with me because I guess he thought that I

19  was trying to get into his business or his married

20  life, or whatever.  And I told him, 'No, it's not like

21  that.  I'm just letting you know how the family feels.'

22  And he got up, and he had a knife, and he came at me,

23  and I pulled out the .22 and I shot him.  He came at

24  me, and he was much bigger than I was in his stature,

25  **ANTONIO ALVARADO    C-09142    DECISION PAGE 10    5/31/07**

79

1    and we struggled with each other, and I just kept

2    shooting the gun.  I just kept firing it until I guess

3    the bullets were out of there.  He just stood right

4    there.  He fell down and I took off."  And then

5    Commissioner Munoz asks you,  "Okay, where did this

6    confrontation take place?"  And you say, "At his house.

7    I went to his house to speak to him."  "Did you know he

8    was dead when you shot him?"  "No."  "It says here you

9    shot --"  "I didn't know he was dead."  "You didn't

10   know he was dead?"  "Not dead when I left."  "Okay, did

11   you call an ambulance?"  "No, I just left."  "Did you

12   call the police?"  "No."  But, sir, if this were a

13   self-defense maneuver, it's hard to understand why you

14   just left him, especially someone who you knew.  So

15   basically,  you abandoned him to die if he was not

16   already dead.

17       And then Commissioner Munoz, on page 30, further

18   questions you and asks about the gun.  And he says,

19   "Mr. Alvarado, I started to ask you about the gun and

20   where it came from.  You said it came from somewhere --

21   somebody in Bakersfield gave it to you." And you say,

22   "You know what?  As far as my recollection, I think

23   that's where it came from.  You know, it's been quite a

24   while."  And then Mr. Munoz says, "Well, go ahead."  And

25   **ANTONIO ALVARADO    C-09142    DECISION PAGE 11    5/31/07**

80

1    then you say, "But yeah, I think I did get it from over

2    there."  Then Commissioner Munoz says, "This Board

3    Report, there's a statement that you were given the gun

4    by a member of the Nuestra Familia."  And then you said,

5    "Yes, I read that somewhere."  And then he says, "All

6    right, did that happen?"  And then you said, "No."  And

7    then he says, "But you're not sure how you got the gun?"

8    And then you said, "I know how I got the gun."  And then

9    Commissioner Munoz says, "Who gave you the gun?"  And

10   then you say, "I don't know his name.  I can't recall

11   his name.  It was someone in Bakersfield.  I was

12   visiting in Bakersfield.  My mother and brothers live in

13   Bakersfield, Kern County.  I was down there visiting."

14          Sir, you have consistently been a very poor

15   historian.  This is your history, sir.  These events

16   would be expected to stand out in your mind, or at least

17   your representation of the surrounding material.  And

18   that's what we were given to rely upon, is your version,

19   which shows precious little insight to no insight at all

20   into your crime.  I questioned you at some length as to

21   your criminal history.  This offense, sir, was carried

22   out in a manner demonstrating exceptionally callous

23   disregard for human suffering.  Public safety was at

24   risk in both of these crimes.  You had clear

25   ANTONIO ALVARADO   C-09142   DECISION PAGE 12     5/31/07

81

1   opportunities to cease, but you continued.  And, in

2   fact, the motive for these crimes is very trivial in

3   relation to the offense as it appears to this panel.

4   And you were under the influence, but that certainly,

5   sir, is not a motive nor an explanation.  Your

6   credibility is at stake here, sir.  You have minimized

7   your entire criminal history to this panel today when I

8   tried diligently to question you about your criminality

9   from the time you were nine years old until you

10  committed this crime at age 32.  There are big gaps

11  there that you that you just flat refuse to discuss by

12  circumventing very skillfully, and basically

13  manipulating the conversation so that you did not have

14  to answer, and which that's certainly your right, sir,

15  but it does leave large question marks with this panel.

16  Sir, do you know what the word parole means?  Do you

17  know what that word actually means?

18          INMATE ALVARADO:  Yes.

19          PRESIDING COMMISSIONER BRYSON:  What does it

20  mean, sir?

21          INMATE ALVARADO:  It means someone being

22  released from incarceration, being placed on parole for

23  supervision.  There are written conditions they have to

24  follow.

25  ANTONIO ALVARADO   C-09142   DECISION PAGE 13     5/31/07

82

1    **PRESIDING COMMISSIONER BRYSON:**  All right, sir,

2    and in the CDCR system, that is what parole means.  But

3    the word itself, in English, is actually derived from

4    the French word parole, and that French word means word

5    of honor.  And, sir, when anyone leaves this prison,

6    that's all we have, is your word of honor.  We have

7    nothing else.  We have not guarantees that you'll obey

8    the law.  We are left with your word of honor.  And so,

9    sir, your word has to be gold.  Your word has to be

10   good.  The panel has to believe that you are as good as

11   your word.  And this panel today doesn't believe that

12   you've achieved that because you have minimized your

13   criminal history.  You've left gaps.  You're very

14   skillful linguistically, sir, in manipulating a

15   conversation, but, in fact, that leaves many holes.

16   That does not leave us with the feeling that you are

17   serious about becoming suitable.  In fact, today you

18   said at the very end, "I'll parole because I want to."

19   That's not true, sir.  That's not necessarily true.  You

20   could spend the rest of your life here with that

21   attitude, because it has been a laid-back attitude.  You

22   have to actively demonstrate suitability and a realistic

23   viewpoint of your readiness to a panel, not simply say

24   well, I will because I want to, because there are things

25   **ANTONIO ALVARADO    C-09142    DECISION PAGE 14    5/31/07**

83

1    you must do, sir.  You must internalize the twelve steps

2    or some version, or internalize what it is you plan to

3    do, not just say I won't drink because I won't.  It's

4    important.  Or I won't use drugs because I won't.  We've

5    been there with you, sir, before, in the past.  You've

6    been arrested, and jailed, and put into CYA many times.

7    And so you have a higher bar that you have to meet.  We

8    also feel that it's important you do correct the

9    underlying issues in terms of getting insight into them.

10   You are expected to have insight into why you committed

11   the offense because it's the only way we can understand

12   that you understand the nature and magnitude of the

13   commitment offense.  Otherwise, you remain unpredictable

14   and a threat to public safety.  And that's where we are,

15   sir, today.  We don't feel that we have progressed in

16   our confidence of you.  And so in assessing you for four

17   years, we're placing you on the 2011 calendar for your

18   next Subsequent Hearing.  This Board recommends no more

19   115s or 128As, that you get self-help and, sir, that you

20   embrace self-help.  That's important, both AA, NA, and

21   all the self-help programming you can get.  And you have

22   a lot of work to do in that regard.  We put in that you

23   advance your trade.  As you know, skills are perishable.

24   It appears that you're doing very well, so we encourage

25   **ANTONIO ALVARADO    C-09142    DECISION PAGE 15    5/31/07**

84

1    you to continue with that.  Advance in your trade.

2    Also, we encourage you to advance your education.  You

3    started college once a long time ago, and it's possible

4    for you to at least advance in terms of some courses,

5    and possibly some courses that would help you get some

6    more understanding into your criminality.  And we also

7    are requesting a new psychological evaluation because

8    primarily this will be a four-year interim -- actually a

9    five-year interval before your next Board hearing.  So I

10   wish you good luck, sir.  And I'd like to turn it over

11   to Commissioner Enloe for your remarks.

12        **DEPUTY COMMISSIONER ENLOE:**  Yes.  Mr. Alvarado,

13   I just -- I have one additional suggestion.  When you do

14   receive the transcript from this hearing, I would hope

15   that you would, you know, keep that, carefully go

16   through it and, you know, look very carefully about

17   things that have been discussed today.  I think that

18   will be a very good basis for you.  If you're truly

19   serious about wanting to parole, I think it will give

20   you some good, valuable suggestions to follow and

21   hopefully be sort of a road map for you.  And I

22   certainly do wish you the best of luck, sir.

23   ///

24   ///

25   **ANTONIO ALVARADO    C-09142    DECISION PAGE 16    5/31/07**

85

1    PRESIDING COMMISSIONER BRYSON: Good luck, sir.

2    INMATE ALVARADO: Thank you.

3    PRESIDING COMMISSIONER BRYSON: That concludes

4    this hearing. The time is now 11:50.

5                    A D J O U R N M E N T

6                        --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    PAROLE DENIED FOUR YEARS.                SEP 2 8 2007

22    THIS DECISION WILL BE FINAL ON:_____

23    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

24    DATE, THE DECISION IS MODIFIED.

25    ANTONIO ALVARADO  C-09142  DECISION PAGE 17    5/31/07

86

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, ELIZABETH A. SCOTT, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed one audio recording which covers a total of pages numbered 1 - 85, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF ANTONIO ALVARADO, CDC number C-09142, on MAY 31, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated JULY 22, 2007 at Sacramento County, California.

*Elizabeth A. Scott*

Elizabeth A. Scott Transcriber

**Northern California Court Reporters**

EXHIBIT "B"



Life-Term Inmate Evaluation for the Board of Parole Hearings
MENTAL HEALTH EVALUATION

CORRECTIONAL TRAINING FACILITY, SOLEDAD STATE PRISON

PSYCHOSOCIAL ASSESSMENT

## I. IDENTIFYING INFORMATION

NAME:                  Alvarado, Antonio
CDC #:                 C-09142
AGE:                   59 years
DOB:                   12/31/46
MARITAL STATUS:        Single
RACE:                  Hispanic
SEX:                   Male
RELIGION:              Catholic
DATE OF REPORT:        12/28/06

This report is based on review of the inmate's medical file, review of his C-File, prior Board of Parole Hearings Evaluations, prior psychological evaluations, current classification information and probation officer's report. The current interview with the inmate and the report are limited by the amount of information given to this examiner by the inmate at the time of the interview. The following information is accurate to the extent that the records and the inmate's self-report are accurate. As a result, the absolute accuracy cannot be assured. The primary purpose of this report is to provide the Board of Parole Hearings psychological data, psychiatric diagnostic information and an assessment of dangerousness in regard to his possible release to the community. This evaluator is not responsible for any inaccurate statements or changed opinions expressed by the inmate at a later date. The inmate was interviewed for approximately 60 minutes, the initial medical file and C-File were reviewed for the interview for 1 hour, the inmate's C-File file was reviewed for approximately 4 to 6 hours and dictating, report writing and editing took 4 hours.

The inmate was informed that the interview was not confidential and a report with the results of the evaluation would be submitted to the Board of Parole Hearings to assist in determining his eligibility for parole. The inmate was informed that any disagreement with the substantive conclusion could be most appropriately address at the inmate's Board hearing. The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of the inmate's ability. For reasons not limited to the possibility that an individual may have a mental disability or condition which may qualify under the American's with Disabilities Act, the evaluation was conducted by a licensed clinical psychologist.

*)*

This information is based on the inmate's statements during the time of the interview. The inmate's crime occurred on January 6, 1979. He was received into California Department of Corrections on October 20, 1979. He was 32 years old at the time of the crime. The inmate was convicted of PC §187 *Murder in the First Degree with an enhancement of PC §12022*. He received a 27 years to life sentence. His minimum eligible parole date was February 4, 2000. He has served 28 years. His initial Board was in 1999 and this is his third subsequent.

This information is based on the inmate's statements during the time of the interview. The inmate has received a total of twenty CDC 115's. The last one was in 1993. He has had one for violent related, a number of alcohol and drug related.

The inmate upgraded himself educationally. He received his Graduate Equivalency Diploma and has 13 college units. The inmate has completed silk screen and graphic arts. He is currently in woodshop and working on a lamination certificate. The inmate plans to *work in textiles, wood or as a laborer when he is released. The inmate is currently on the* list for AA or NA. He has about 18 months active in AA. He says he is active in his religion. The inmate completed about three groups years ago in Corcoran.

## II. DEVELOPMENTAL HISTORY:

This information is based on the inmate's statements during the time of the interview. The inmate was born in Planview, Texas. He was about 2 or 2 1/2 years old when the family relocated to Bakersfield. He denies any prenatal or birth complications or birth defects growing up. He states that his development in terms of speech, language and motor skills were within normal limits. He denies any emotional or health problems in childhood. He denies any traumas or abuse in childhood. There were disruptions in childhood in that he was in Youth Authority at 10 years of age.

## III. EDUCATION:

The inmate dropped out of school in the eleventh grade. He was in ESL classes initially. He denies any learning problems, grade failures, or ever being in special education classes. He denies any behavioral problems in school. He was never suspended or expelled, never got into fights.

The inmate's grade point level is approximately 11.5. He has had educational upgrades.

## IV. FAMILY HISTORY:

The inmate's Family History is the same as the prior Board of Parole Hearings psychological evaluations.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

The inmate's Psychosexual Development is the same as the prior Board of Parole Hearings psychological evaluations.

## VI. MARITAL HISTORY:

The inmate's Marital History is the same as the prior Board of Parole Hearings psychological evaluations.

## VII. MILITARY HISTORY:

The inmate has no military history.

## VIII. EMPLOYMENT/INCOME HISTORY:

The inmate's Employment/Income History is the same as the prior Board of Parole Hearings psychological evaluations.

## IX. SUBSTANCE ABUSE HISTORY:

The inmate's Substance Abuse History is the same as the prior Board of Parole Hearings psychological evaluations.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

Medical:

The inmate denies any allergies, asthma, cardiac, respiratory, vision, hearing or orthopedic problems. He has had a hernia surgery. He has no head injuries. He denies any seizures, thyroid, diabetes or venereal diseases. He sees his current health as above average.

Mental Health:

The inmate denies ever being treated for mental health problems in the community or while incarcerated. He denies any mental health hospitalizations or ever being on psychotropic medications.

## XI. PLANS IF GRANTED RELEASE:

The inmate plans to parole to San Jose and live with his fiancée. He does not have a job offer there but feels that he will have no trouble finding work in textiles.

## CLINICAL ASSESSMENT

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

The inmate was oriented by person, place and time. He was alert and cooperative. His simple registration was intact, but there was a slight impairment in terms of his short-term memory. He could only remember two of three words across time. His mathematical ability was intact. His simple abstract thinking was intact. His complex problem solving abilities were very concrete and impaired.

At the current time, he denies any problems with depression, anxiety, mood swings or mood disorder. He denies any auditory or visual hallucinations. He denies any delusional or paranoid thinking. He denies any eating or sleeping problems. He denies any mental health problems as a child. He denies any suicidal or homicidal thinking.

## DIAGNOSTIC IMPRESSIONS DSM-IV:

AXIS I        304.8  Polysubstance Dependent, in institutional remission but not in treatment.

AXIS II       301.7  Antisocial Personality Disorder, in remission since his last CDC 115 in 1993.

AXIS III             Deferred.

AXIS IV              Psychosocial Stressors: Incarceration.

AXIS V               Global Assessment of Functioning (GAF): 70.

The inmate is currently in the General Population and has never been a member of the MHSDS system while incarcerated. He currently is not active in self-help or in NA or AA.

## XIII. REVIEW OF LIFE CRIME:

The inmate was convicted of PC §187 Murder in the First Degree with an enhancement of PC §12022. He received a 27 years to life sentence. His minimum eligible parole date was February 4, 2000. He has served 28 years.

Alvarado, Antonio              PAGE 4              MENTAL HEALTH EVALUATION

Summary of the Crime:  On 01/06/79 Alvarado had been drinking at the residence of his common-law-wife, Christina Lopez, with members of her family include her two brothers and her sister, Alice Cortez, the former common-law-wife or the victim Billy Romo. Alice Cortez was residing in Alvarado's home after leaving Romoo as a consequence of a fight, where Romo had physically hit her.  As Alvarado became increasingly inebriated, he threatened to kill Romo out loud.  These threats were not taken seriously by the members of the Cortez family; however, since Alvarado reportedly frequently made such threats while under the influence of alcohol and drugs.  At approximately seven o'clock: in the evening, Alvarado began to brandish a loaded .22 caliber pistol, which he indicated previously was used in u killing by the "Nuestra Familia" and was given to him for disposal.

Members of the Cortez family went to Romo's residence at 767 East Julian Street: in San Jose, California, where they found the victim lying on the floor in the living room with multiple gunshot wounds.  The police and ambulance were called to the scene of the crime. Romo was found to be dead from what was later reported.  It should be noted that later analysis of Romo's blood was found to be positive for the presence of phencyclidine. A search of the residence uncovered a hypodermic syringe, needle possibly containing heroin, two .22 caliber rifles and ammunition.

Alvarado was apprehended at approximately 12:.30 a.m. on 01/07/79 after running a red light in a vehicle in the downtown San Jose area.  Alvarado was initially released with the instruction to walk home but was subsequently detained after a radio broadcast listing him as the suspect in the above offense.  Alvarado offered no resistance at the time of his arrest.  A blood sample revealed .23% level of alcohol as well as the presence of morphine in his system.

The above information was obtained from the Santa Clara County Probation Officer's Report (POR) dated 09/13/79. Pages 3 and 4.

Inmate's Version: The prisoner presented the following statement in writing:

"On 06/23/77 late in the evening a loud bang and kicking was being done on my apartment door.  I looked out my window and saw 2 men qt my door. At first I didn't recognize who it was.  One of the men left and one continued to bang and kick my door making threatening comments.  I, my wife and newborn Son were in the apartment in bed to fall asleep.  I told my wife Christina Cortez: to stay in the bedroom with our Son.  I repeatedly ask the victim (Mr. Romero) to go away but. he didn't and continued to kick down the door.  I had no firearms in the house so I went to the kitchen and grab a kitchen knife.  By that time Mr. Romero had kick the door open so as soon as he broke in I stab him in the stomach area.  Mr. Romero was much larger in size then me so he continue to attack me. I followed him outside because I still fear he may somehow get. a firearm and come back and kill me and my family.  The other person(s) got scared and hide out of sight cause I didn't see them anymore.  I cannot say I did the right thing because the lost of a human life

can never be right and I strongly believe one human has not the right to take another ones life. My heart now will always remain somewhat sad for the pain. and lost of someone's Son. Father. Husband, etc,  Months later I seen his wife and [ expressed how much I wished it didn't have to happen that way."

"On 06/23/77 what lead to the incident of PC192.1 and PC12022(B)... To the best of my recollection I can clearly recall how it all took place that my door was being kicked down .. about 4 or 5 days prior to 06/23/77 I was driving my car and my brakes went. out so I stopped and seen that I was near Mr. Romero's house .. reason I knew was because at the apartments where I resided. a person there knew Mr. Romero and had taken me there one time, he went to smoke Pot and since I was there too I too smoke some as well.. when my brakes went out I knock on Mr. Romero's door and ask if I could push my car into his carport temporarily while I could tow my car or have it fixed.. his wife said yes ..I came back a few hours later and at one point: ask if I could use their telephone .. I was invited with hospitality and used the phone and left .. However my so call neighbor was already there .. I called picked up my car and left .. well at that time I didn't know but: it turned out that the other person who was there had took some drugs (PCP) belonging to Mr. Romero ... well the next day I went: to Bakersfield .. my family lives there it was not unusual for me to go to Bakersfield especially on Summer Season... while at: Bakersfield my wife Christina Cortez called and explain to me how Mr. Romero had went to our apartment and made some threatening comments to her, my child, and me that if I didn't pay him or return the drugs (PCP) about a gram amount.. I told my wife I would get on the first bus back to San Jose.. I was worried and well concern for our safety.. I didn't. arm myself because I wanted the opportunity to talk to him and let him know it wasn't me who took his PCP and not to be coming to my house in such hostile manner displaying antagonism.. unfortunately I never had that opportunity and that's when the breaking of my door begin."

"On 01/06/79 I went to Mr. Romo's house to talk to him... Mr. Romo was husband to my wife's sister.. I had stop by to talk to him about his behavior toward the in-laws.. it appeared that Mr. Romo was having differences with his wife and would go where ever she was to confront his anger toward her... being his in-laws were my in-laws too I said I would talk to him and ask him to tone it down or he might end up back: in prison .. I meant to talk to him in good fate after all we did get along well.. no one else could talk to him everyone was scared of his temper ... So on 01/06/79 I went to talk to him, 1 was sitting down and so was he and I started to tell him how he had the whole family scared and that it wasn't. a good thing and try to tone it down ... well he got mad and got up to walk toward me and I noticed he had a knife in his hand as he started to approach me so I got to my feet right away and pulled out a .22 pistol I had and told him to back off but he continued to come at me so I shot once and he still continued to come closer so I grab his arm the one with the knife and he grab my arm the one with the .22 pistol and we both were trying to take away each others weapon but as we struggled I continued to fire my pistol to try to stop him .. finally he got weaker as I continue to hit him .. he fell and that's when I left ... I've wished so many times it wouldn't have turn out that way .. I didn't want none of these two deaths to occur. I have no right to take away any human life.. I have

been locked away from my freedom for 25 years and my sorrow will never go away because their love ones will always feel the sadness. pain and the lost of their love one. I cannot say that I've done or paid for such crime with any amount of time because there's not enough time in ones life time to pay for such crimes .. I will say sadness in my heart will always be there because of my actions and that I've mature since and will never place myself in situations where person's life will be taken by me."

"On 01/06/79 what lead to the incident of PCl87 Murder and PC 12022.5 Use of Firearm. On 01/06/79 being a Saturday my wife was working at the San Jose Airport from 2 p.m. to 10 p.m. I wasn't employed and basically baby sat our son .. I spent a lot of time at my in-laws and was close to my Father in-law which I would sit drink wine and shoot the breeze with him .. He was a hard working man and very old fashion .. I had been drinking and got away from him earlier then usual because zipping on wine was beginning to take it's toll.. I hated the drunk feeling I would have prefer to smoke Pot better as a choice of high .. anyway I ended up with his son my Brother in-law...Richard Cortez and we were drinking a beer as he begin to talk about Billy Romo (victim) how Billy would beat his sister up and go to the house and terrorize the family by displaying his anger .. I ask Richard if he wanted to go talk to Billy that I would go with him and help him if Billy got violent .. Richard kept talking aggressively and so it got to the point where he said he felt like killing him and I said to him well if your going to do it then you better make sure you do because Billy will come back and take you out .. finally I told him lets just go talk to him before someone really gets hurt cause it looks to me it's out of control...Richard after talking aggressively said no I'll just go home I said alright but told him I didn't want to hear him complaining to me anymore about Billy .. so a little while later I decided to go talk to Billy because I thought if anyone could talk to him was me and I did like my in-laws and it also was a part or my family surroundings .. that's how I ended at Billy's house on 01/06/79."

Personal Comment: "The fact remains a life has been taken arid I'll take full responsibility for my actions .. for it is our choice to make how we live our lives in order to avoid ourselves of unfortunate circumstances .. 'The matter of how a life is lost is never good."

Aggravating Factors: Alvarado was armed with a .22 caliber pistol and used the weapon in the commission of the crime. Murder was senseless and calculated. Alvarado has a history of criminal behavior. Alvarado's nature of the crime exhibited viciousness and cruelty.

Mitigating Factors: None.

Multiple Crimes:
Voluntary Manslaughter With Use of Deadly Weapon, 3 years. PC 192.1 and PC 12022(b). consecutive 1 year Enhancement. Ct:. 1, Santa Clara County Case Number 67828. Viedm: Billy Ramo, was (30) thirty years of age at. the time of the instant offense. Date received CDC is 10/04/79. Term: 3 years plus I year Enhancement.

Summary of the Crime: On 06/23/77 at approximately 11:45 p.m., an altercation between Steven Romero and the defendant developed at the apartment, of the defendant's residence at 984 Elm Street:. Apt. #5. San .Jose, California. Romero gained entry into the Alvarado residence by kicking in the front door, at which time Alvarado confronted him. Alvarado obtained a butcher knife from the kitchen prior to Romero's entry into the apartment. The two men (Romero and .Alvarado), while fighting. fell onto the floor in the living room of the apartment. At this time, Alvarado began stabbing at Romero who was unarmed. Romero was able to break: free from Alvarado's grasp and ran out of the apartment to the parking lot of the apartment complex. Alvarado followed him out of the apartment to the parking lot and stabbed him again. It was at. this point that the fatal wound (a stab to the chest area. which pierced the pulmonary artery) was inflicted.

The above information was obtained from the Santo Clara County Probation Officer's Report (POR.) dated 04/13/79. page 3.

Inmate's Version: See the above-attached Prisoner's Version.

Aggravating Factors: Alvarado armed himself with a butcher knife from the kitchen in his apartment, which was used in the commission of the crime. The crime involved violence and potential for great bodily injury. Alvarado had the opportunity to cease but continued with the crime.

Mitigating Factors: None Noted.

Juvenile Arrest History: 1956, Age 9, Burglary, Sentenced to CYA; 1961, Age 14, Burglary, Sentenced to CYA; 1964, Age 17, Destruction Property, Malicious Mischief, Sentenced to CYA

The above information was obtained from the State of California Department of Justice Bureau of Identification, page 2.

Adult Arrest History: 1965, Bakersfield, Drunk, $25 or 5 days; 1965, Bakersfield, Drunk W/out License, 2 days jail & $10; 1965, Bakersfield, 5 Traffic Commitments      6 days jail; 1966, Bakersfield, Destruction of Property, $29 fine; 1966, Bakersfield, Drunk/Resist Arrest, $110 or 20 days, 3 years probation; 1966, Bakersfield, Drunk Drive/Open Container, 90 days & 30 days concurrent; 1967, Bakersfield, Poss Narcotics/Juvenile Pass Alcohol, 30 days suspended 1 year; 1967, Bakersfield, Drunk, Dismissed; 1967, Bakersfield, Driving w/Suspended License, Dismissed; 1967, Bakersfield, Theft, Dismissed; 1967, Bakersfield, Burglary, Dismissed; 1968, Bakersfield, Drunk, Dismissed; 1968, Bakersfield, Theft, 30 days; 1968, Bakersfield, Sniffing Glue, 90 days suspended 2 years; 1969, Bakersfield, Drunk, $25 or 4 days; 1969, Bakersfield, Battery (warrant), 60 days suspended; 1969, Bakersfield, Poss Marijuana/Dangerous Drug, 3 years probation; 1969, Bakersfield, Inhale Poison Fumes, FT A/B/B.W.; 1969, Bakersfield, Drunk/Exhibit F/A, 30 days; 1970, Bakersfield, Drunk, 6 months jail; 1970, Bakersfield, Drunk, 90 days suspended 1 year; 1970, Bakersfield, Resist Arrest/Drunk Drive/Hit & Run/Drive

Suspended License, 1 year jail; 1970, Bakersfield, Drunk, No disposition; 1970, Bakersfield, Trespass/Inhale Fumes, 1 year probation/9 days jail; 1971, Bakersfield, Drunk, 180 days/suspended 1 year.

1971, Bakersfield, Drunk, 1 year probation; 1971, Bakersfield, Jaywalk/No License, 10 days jail; 1971, Bakersfield, Drive Revoked License/Hit & Run Drunk/Assault/Battery, Dismissed; 1971, Delano, Drunk/Assault/Battery, 180 days suspended 2 years 90 days; 1972, San Jose, Assault/Battery, Detain/Release; 1972, Bakersfield, Exhibited Deadly Weapon, 6 months/1 day suspended; 1973, San Jose, Drunk Drive, 2 months jail; 1973, Campbell, Poss Toluene, $25/6 months probation; 1973, San Jose, Revoked License, 2 months jail; 1973, Bakersfield, Drunk, $65 or 5 days; 1973, Bakersfield, Warrant, Release O/R Los Banos; 1973, Campbell, Poss Toluene, No disposition; 1973, Campbell, Poss Toluene/Disturbing Peace, 4 months jail; 1973, Campbell, Walk Away, 180 days jail; 1974, Campbell, Poss Toluene, 3 days jail; 1974, San Jose, Warrant, Parole/Probation hold; 1974, San Jose, Assault/Battery/Theft, 4 months jail; 1975, Bakersfield, Warrant (San Jose), Released; 1975, San Jose, Poss C/S, Detained only; 1975, San Jose, Warrant-Theft, 45 days jail; 1975, San Jose, Pass C/S, Dismissed; 1976, San Jose, Warrant/Theft/Poss C/S Weapon, Insufficient evidence; 1976, San Jose, U/I C/S, Dismissed; 1976, San Jose, Pass Hypodermic/DUI Drugs, 60 days jail/$250 fine.

1976, San Jose, DUI Drugs, 6 days jail/5 days suspended/$500 fine/$ 185 suspended 2 years probation; 1977, San Jose, Pass C/S, Insufficient evidence; 1977, San Jose, DUI/No License, No Disposition; 1977, San Jose, Resist Arrest, Plea Disorderly/5 days; 1977, San Jose, Resist Arrest/DUI/No License, No Disposition; 1977, San Jose, Murder, Dismissed; 1977, Campbell, Auto Theft/Resist Arrest, Auto Theft Dismissed, Resist Arrest - 5 days jail; 1977, San Jose, Voluntary Manslaughter, No disposition; 1978, San Jose, Warrant - DUI/No License, No disposition; 1978, San Jose, Warrant - No License, 30 days jail/$130 fine; 1978, San Jose, Influence C/S, No disposition; 1978, San Jose, No License, Dismissed; 1978, San Jose, Influence C/S, No License, 90 days jail; 1979, San Jose, Murder, 25 to Life.

The above information was obtained from the State of California Department of Justice Bureau of Identification. pages 2 -through. 13.

In the current interview, when asking the inmate about his getting into trouble as a young man, the inmate states that he was hanging out in the streets with his friends. He feels that part of it was due to poverty. He said during that time period, also he did not want to be called a chicken and he was easily influenced by peers. He started getting in trouble about 10 years of age.

When asking the inmate why this crime occurred, he said alcohol clearly had a role in the crime. He said his wife's sister was terrified of the victim. The victim was very aggressive with her and she was terrified of him. The family was all upset and he was very close to the family and volunteered to talk to the victim. He said he went to the individual's house and confronted him with the situation. He had been drinking a lot. He said, "He came at

me with a knife. We wrestled over my gun and I shot him. I went there to talk to him and prevent future family problems."

The inmate goes on to say that he feels a lot of remorse and sadness regarding what happened.

When asking the inmate what has changed about him so that something like this will not happen again, he says that he is more mature. He is more serious. He said his whole frame of thought is different now. He is more courteous and more responsible and he tries to stay positive.

The inmate goes on to say he feels very fortunate that he has loved ones who care for him. He would like to be able to extend himself to them and do some volunteer work or charity work in the community.

## XIV. ASSESSMENT OF DANGEROUSNESS:

In order to determine the inmate's risk of representing a substantial danger of physical harm to others, he was assessed on a number of research derived risk factors that are associated with an increased risk for future violence.

History of Violence:

According to the Probation Officer's Report and prior records, the inmate's criminal history would be an aggravating factor. In rating this individual on the historical factors, he would rate in the high range in terms of his likelihood to commit future violent acts when compared to other inmates with similar crimes. This rating is based on his age when he first acted out violent or was in a potential violent situation, his prior criminal record, being involved in unstable relationships, unstable employment, being a substance abuser, having early maladjustment problems and prior failures on supervision.

Prior Performance on Supervised Release:

This would be an aggravating factor.

Inmate's Compliance With Board Requests and Treatment:

The inmate has been discipline-free since 1993. He has upgraded himself educationally and vocationally. The inmate claims that he is active in his religion. This needs to be verified. The inmate has only done, however, 18 months in AA in the past. He is on the list currently to his credit. He also has only completed three self-help groups and is not in any right now.

Substance Abuse:

Relapsing in the use of alcohol and drugs is a concern. This has been a problem for the individual on the street and while incarcerated. Although he has been clean and sober for a number of years now, he has not been continuously involved in AA or NA, which he needs to be.

Mental Health Issues:

The inmate, at the current time, is placed in the general population and has never been in the mental health system. He does not appear to have any complicating mental health problems.

Clinical/Insight:

The inmate accepts responsibility for the crime. He does some insight and does express remorse. In rating this individual in the clinical factor, he would rate in the moderate range for future violence. This rating is based on the fact that the inmate has not been continuously involved in AA, NA or self-help, reflecting a possible negative attitude in this area. There also is a discrepancy between his account and the file account.

Environmental Risks/Risk Management:

The inmate would rate in the moderate range in terms of his risk management for the future. Until 1993, the inmate had problems handling stress, compliance and destabilizers in the institutional environment. His parole plans need a little more development in terms of job offers. On the positive side, the inmate has been programming positively since 1993.

In summary, this individual's propensity to commit violence the future when compared to similar violent inmates has went down from the high range down into the moderate range at the current time. This rating will continue to decrease as the inmate is continuously involved in AA, NA and self-help.

## XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

It is recommended that the inmate continue to be discipline-free. It is recommended that the inmate continue to program positively, vocationally and educationally. It is recommended that the inmate be continuously involved in his religion, self-help groups and AA or NA or both.

Thank you for the opportunity to assist in this interesting consultation.

_____
RICHARD STARRETT, Ph.D., Ph.D.
Contract Psychologist, CA License PSY 13628
CTF Soledad State Prison

12-28-6
Date

RS/ls/cam

EXHIBIT "C"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2006 CALENDAR

ALVARADO, ANTONIO                                        C09142

I.    **COMMITMENT FACTORS:**

    A.    Life Crime: Remains the same as stated in the previous hearing.

        1.    Summary of Crime: Remains the same as stated in the previous hearing.

        2.    Prisoner's Version: Remains the same as stated in the previous hearing.

        3.    Aggravating/Mitigating Circumstances:

            a.    Aggravating Factors: Remains the same as stated in the previous hearing.

            b.    Mitigating Factors: Remains the same as stated in the previous hearing.

    B.    Multiple Crime(s): None.

        1.    Summary of Crime: None.

        2.    Prisoner's Version: None.

II.   **PRECONVICTION FACTORS:**

    A.    Juvenile Record: Remains the same as stated in the previous hearing.

    B.    Adult Convictions and Arrests: Remains the same as stated in the previous hearing.

    C.    Personal Factors: Remains the same as stated in the previous hearing.

III.  **POSTCONVICTION FACTORS:**

ALVARADO, ANTONIO        C09142                CTF-SOLEDAD                JUN/2006

LIFE PRISONER EVALUAT    J F  ORT                              2
PAROLE CONSIDERATION  IEA  JG
JUNE 2006 CALENDAR

    A.    **Special Programming/Accommodations:** None noted.

    B.    **Custody History:** Alvarado transferred from SATF III to CTF II, housed with the general population, assigned to PIA wood products.

    C.    **Therapy and Self-Help Activities:** Alvarado is a member of the Alcoholics Anonymous program.

    D.    **Disciplinary History:** Alvarado has remained disciplinary free for the last 13 years.

    E.    **Other:** On 6/15/04, BPH made the recommendations to deny parole for two years, a new psych report, remains disciplinary free, and get self-help.

**IV.    FUTURE PLANS:**

    A.    **Residence:** Alvarado plans to live with his fiancé Eva Robinson at 2085 Sanunador Commons San Jose, CA (408) 297-2820.

    B.    **Employment:** Alvarado plans to work in silk-screening, textiles or wood products in Santa Clara County.

    C.    **Assessment:** Parole plans need more detail in employment plans.

**V.    USINS STATUS:** Alvarado is a U.S. citizen.

**VI.    SUMMARY:**

    A.    Prior to release Alvarado could benefit from: getting self-help, and make better employment plans.

    B.    This report is based upon 2 hours of research, an interview with Alvarado, and incidental contact.

    C.    Alvarado reviewed his Central File on 7/10/06 .

    D.    No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

ALVARADO, ANTONIO    C09142        CTF-SOLEDAD    JUN/2006

LIFE PRISONER EVALUATION REPORT                                    3
PAROLE CONSIDERATION HEARING
JUNE 2006 CALENDAR



_P.O.P_ 9-1-06
_____     _____
P.O. Taporco                          Date
Correctional Counselor I



_____     9/5/06
M. Arfa                               Date
Correctional Counselor II



_____     9/11/06
J.L. Clancy                           Date
Facility Captain



_____ C&PR 9-11-06
D. S. Levorse                         Date
Classification and Parole Representative



ALVARADO, ANTONIO          C09142              CTF-SOLEDAD          JUN/2006

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

- [ ] DOCUMENTATION HEARING
- [x] PAROLE CONSIDERATION HEARING
- [ ] PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10/03 to 10/04 | | | **PLACEMENT:** Remained at SOL III and housed with the general population. **CUSTODY:** Remains at Medium A. **VOC. TRAINING:** Alvarado received a certificate of completion in Vocational silk-screening on 2/4/00. **ACADEMICS:** Alvarado received his GED in 1982. **WORK RECORD:** Alvarado was assigned to the laundry room. **GROUP ACTIVITIES:** None noted. **PSYCH. TREATMENT:** None noted. **PRISON BEHAVIOR:** Alvarado has remained disciplinary free during this period of review. **OTHER:** On 6/15/04 BPH made the recommendations to deny parole for two years, get self-help. |

CORRECTIONAL COUNSELOR SIGNATURE                                    DATE  9-1-06

ALVARADO              C09142              CTF-SOLEDAD              JUN/2006

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10/04 to 10/05 | | | **PLACEMENT**: Remained at SOL III, and housed with the general population. **CUSTODY**: Remains at Medium A. **VOC. TRAINING**: Alvarado received a certificate of completion in Vocational silk-screening on 2/4/00. **ACADEMICS**: Alvarado received his GED in 1982. **WORK RECORD**: Alvarado was assigned to the laundry room. **GROUP ACTIVITIES**: None noted. **PSYCH. TREATMENT**: None noted. **PRISON BEHAVIOR**: Alvarado has remained disciplinary free during this period of review. **OTHER**: None noted. |

ORDER:
- [ ] BPT date advanced by _____ months.
- [ ] PBR date advanced by _____ months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify
- [ ] Schedule for Progress Hearing on appropriate institutional calendar

| ALVARADO | C09142 | CTF-SOLEDAD | JUN/2006 |
|---|---|---|---|

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10/05 to 7/06 | | | **PLACEMENT:** Remained at SOL III and housed with the general population, 1/23/06, he was non-adversely transferred to CTF-II, and housed with the general population. <br> **CUSTODY:** Remains at Medium A. <br> **VOC. TRAINING:** Alvarado received a certificate of completion in Vocational silk-screening on 2/4/00. <br> **ACADEMICS:** Alvarado received his GED in 1982. <br> **WORK RECORD:** Alvarado is currently assigned to PIA wood products. <br> **GROUP ACTIVITIES:** A CDC 128B dated 4/5/06 reflects that Alvarado is an active member of the AA program. <br> **PSYCH. TREATMENT:** None noted. <br> **PRISON BEHAVIOR:** Alvarado has remained disciplinary free during this period of review. <br> **OTHER:** None noted. |

ORDER:
☐ BPT date advanced by _____ months.          ☐ BPT date affirmed without change.
☐ PBR date advanced by _____ months.          ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

| ALVARADO | C09142 | CTF-SOLEDAD | JUN/2006 |
|---|---|---|---|

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

EXHIBIT "D"

Criminal
DEPT. No. __5__    CASE NO. 67828

In the Superior Court of the State of California

IN AND FOR THE........................ COUNTY OF ...SANTA CLARA...

DUPLICATE ORIGINAL

ABSTRACT OF JUDGMENT
(Commitment to State Prison as provided by Penal Code Section 1215.5)

The People of the State of California,

Hon. PAUL T. GALLAGHER
(Judge of Superior Court)

vs

RICHARD E. GARDNER, ESQ.
(District Attorney)

ANTONIO ARMANDO ALVARADO,
Defendant.

DAVID JOHNSON, ESQ.
(Counsel for Defendant)

This certifies that on the ..20th.. day of ..September.., 19..79.... judgment of conviction of the above-named defendant was entered as follows:

In Case No. ..67828.......... Count No....ONE......... he was convicted by ..JURY...., on his plea of .........
(Court or Jury)

....Not Guilty.......................... (guilty, not guilty, former conviction or acquittal once in jeopardy,

not guilty by reason of insanity); of the crime of ...VOLUNTARY MANSLAUGHTER.....

(designation of crime and degree, if any, including fact that it constitutes a second or subsequent conviction of same offense if that affects the sentence and if under Section 359 of the Penal Code whether victim suffered bodily harm);

in violation of.....California Penal Code Section 192.1.......
(reference to Code or Statute, including Section and Sub-section);

with prior convictions charged and proved or admitted as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|------------------|-------|-------------|
|      | NONE             |       |             |
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |

and did use a deadly
Defendant.....WAS........... charged and admitted being, or was found to have been armed with ~~a deadly weapon~~
(was or (was not)
weapon during the commission of the offense within the meaning of Penal Code
~~Sections 969c and 3024 and 12022, and/or that said defendant was armed at the time of his commission~~
~~of the offense or his arrest within the meaning of~~ Section 12022(b).

1356 REV 1074

NOTE: Repeat below ALL of the foregoing factors with respect to each additional count of which defendant was convicted: (Additional pages if necessary.)

This certifies that on the __20th__ day of __September__, 19__79__ judgment of conviction of the above-named defendant was entered as follows:

In case No.__67828__ Count No.__THREE__ he was convicted by __Jury__ ; on his plea of_____
(Court or Jury)

__Not Guilty__ (guilty, not guilty, former conviction or acquittal, once in jeopardy, not guilty by reason of

insanity); of the crime of __MURDER, FIRST DEGREE_____

(designation of crime and degree, if any, including fact that it constitutes a second or subsequent conviction of same
offense if that affects the sentence and if under Section 209 of the Penal Code whether victim suffered bodily harm);

in violation of__California Penal Code Section 187__
(reference to Code or Statute, including Section and Sub-section);

with prior convictions charged and proved or admitted as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|------------------|-------|-------------|
|      | NONE             |       |             |
|      |                  |       |             |

Defendant__was__ charged and admitted being, or was found to have been armed with̶x̶x̶x̶d̶x̶x̶x̶x̶x̶x̶ x̶x̶x̶x̶x̶x̶x̶x̶ **and did use a Firearm**
**during Commission** of the offense within the meaning of Penal Code Section
x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶ x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶
x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶ **12022.5.**

This certifies that on the_____ day of_____, 19_____ judgment of conviction of the above-named defendant was entered as follows:

In case No. _____ Count No._____ he was convicted by_____; on his plea of_____
(Court or Jury)

_____ (guilty, not guilty, former conviction or acquittal, once in jeopardy, not guilty by reason of

insanity); of the crime of_____

(designation of crime and degree, if any, including fact that it constitutes a second or subsequent conviction of same
offense if that affects the sentence and if under Section 209 of the Penal Code whether victim suffered bodily harm);

in violation of_____
(reference to Code or Statute, including Section and Sub-section);

with prior convictions charged and proved or admitted as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|------------------|-------|-------------|
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |

Defendant_____ charged and admitted being, or was found to have been armed with a deadly weapon at the time
(was) or (was not)

of commission of the offense, or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code Sections 969c and 3024.

7956 REV 8/74

Defendant........was not........adjudged a habitual criminal within the meaning of Sub-division....a or b........of
................(was) or (was not)................(a) or (b)

Section 644 of the Penal Code; and the defendant........is not........a habitual criminal in accordance with Sub-division (c)
................(is) or (is not)

of that Section.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprison-
ment in the State Prison of the State of California for the ~~xxxxxxxxxxxxx~~ **See Below** and that he be remanded to the Sheriff
of the........................County of....SANTA CLARA........and by him delivered to the Director of Corrections of the
State of California at the place hereinafter designated.

It is ordered that sentences shall be served in respect to one another as follows....................................................

COUNT ONE-Probation is Denied. State Prison for the term prescribed by law, said
sentence to run consecutive to the sentence imposed on Count THREE.
COUNT THREE-Probation is Denied. The Court designates Count THREE as the Prin-
cipal term. State Prison for a term of 27 years to Life(25 Years to Life on
base charge plus 2 years enhancement for the Penal Code Section 12022.5 charge

and in respect to any prior incomplete sentence (s) as follows:....................................................
................(NOTE whether concurrent or consecutive as to all incomplete sentences from other jurisdictions);
Defendant is credited for time spent in custody as follows:
COUNT ONE- 17 days Actual Local Time plus 4 days 4019(b)PC Credit
COUNT THREE- 202 days Actual Local Time plus 66 days 4019(b)PC Credit for
a Total Credit of 289 days.

To the Sheriff of the ........................ County of....SANTA CLARA........and to the Director of Corrections:

Pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the
custody of the Director of Corrections at....RECEPTION-GUIDANCE CENTER, VACAVILLE, CALIFORNIA
at your earliest convenience.

Witness my hand and seal of said court

this....26th........day of....September    1979

....JOHN KAZUBOWSKI........................ Clerk

by....A.J. VANEK........................ Deputy

State of California,

........County of....SANTA CLARA........}ss.

I do hereby certify the foregoing to be a true and correct abstract of the judgment duly made
and entered on the minutes of the Superior Court in the above entitled action as provided by Penal
Code Section 1213.
Attest my hand and seal of the said Superior Court this 26th day of....September 19 79..

....JOHN KAZUBOWSKI    by    A.J. VANEK, Deputy....
........County Clerk and Ex-officio Clerk of the Superior Court of the State of California in and for the
........County of....SANTA CLARA

The Honorable:....PAUL T. GALLAGHER
........Judge of the Superior Court of the State of California, in and for the.................... County of

........SANTA CLARA

Note: If probation was granted in any sentence of which abstract of judgment is certified, attach a
minute order reciting the fact and imposing sentence or ordering a suspended sentence into effect.

EXHIBIT "E"

IN THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA

                             Plaintiff,

         vs.

ANTONIO ARMANDO ALVARADO

                          Defendant,

**REPORT OF
ADULT PROBATION OFFICER**

No. 67828
September 13, 1979
R. Gardner, D.A.
D. Johnson, P.D.

CHARGE:  Count One, Section 192.1 of the Penal Code (Voluntary
Manslaughter) with a violation of Section 12022(b) of
the Penal Code (Armed With and Did Use a Deadly Weapon
During Commission of Offense) Found True

        Count Three, Section 187 of the Penal Code (Murder),
First Degree, with a violation of Section 12022.5 of
the Penal Code (Use of Firearm During Commission of
Offense) Found True

DATE OF ARREST:  Count One:  June 24, 1977  (San Jose Police Dept.)

        Count Three:  January 7, 1979 (San Jose Police
                                  Dept.)

DATE OFFENSE COMMITTED:  Count One:  June 23, 1977

        Count Three:  January 6, 1979

DAYS IN JAIL AT TIME OF REPORT:  (Count One)

          -17 actual days (4 days 4019 PC);
          -21 total days; rel. purs. to Sec.
          849(b) PC 6/24/77; rearr. 11/8/77,
          rel. on bail 11/23/77.

          (Count Three)

          -195 actual days (64 days 4019 PC);
          -259 total days; pres. in cust.;
          (see supplemental info.)

PLEA OR CONVICTION:  Found Guilty by Jury Trial 8/8/79 of Ct. 1,
        Sec. 192.1 PC (Voluntary Manslaughter) a les-
        ser included offense of Sec. 187 PC (Murder),

In the Case of:  ANTONIO ALVARADO
Charge: Sec. 192.1 and 187 of P C
Santa Clara County Number:  67828                    September 13, 1979

PLEA OR CONVICTION:        (Continued)

with a viol. of Sec. 12022(b) PC (Armed With
and Did Use a Deadly Weapon During Commission
of Offense) found to be true; and Guilty
of Ct. 3, Sec. 187 PC (Murder) fixed at 1st
Deg., with a viol. of Sec. 12022.5 PC (Use of
Firearm During Commission of Offense) found
to be true.)

On 8/7/79, the special circumstances as to Ct.
3 were dism. by the Crt., and Ct. 2, Sec. 245(a)
PC (Assault With a Deadly Weapon) was subm. to
the jury as a lesser included offense under Ct.
1.)

On 8/14/79, Ct. 4, Sec. 211 PC (Robbery) was
dismd by the Crt.

AGE & DATE OF BIRTH:  33; December 31, 1946; Plainview, Texas

SUPPLEMENTAL INFORMATION:

The following is a summary of additional charges and dispositions
against the defendant during his current incarceration:

On January 17, 1979, the defendant was ordered to serve two 30
day sentences (assumed to be concurrent) for violations of Section
14601a of the California Vehicle Code (Driving With Suspended Li-
cense) by the San Jose Municipal Court.  Those sentences were com-
pleted (good time and work time) on February 5, 1979.

On August 10, 1979, in the San Jose Municipal Court, the defendant
was ordered to serve a 90 day County Jail sentence for violations
of Section 11550 of the Health and Safety Code (Under the Influence
of Heroin) and 23105 of the California Vehicle Code (Driving While
Addicted to Heroin), and was ordered to serve an additional one
year consecutive County Jail sentence for another violation of Sec-
tion 11550 of the Health and Safety Code (Under the Influence of
Heroin).  He will complete those sentences, with good time and
work time, on June 10, 1980.

The defendant is also scheduled for further proceedings on today's
date on Superior Court Docket Number 71147, charging him with
alleged violations of Section 11351 of the Health and Safety Code
(Possession for Sale of Heroin) and 11550 of the Health and Safety
Code (Under the Influence of Heroin), a misdemeanor.

- 2 -

In the Case of:  ANTONIO ALVARADO
Charge: Sec. 192.1 and 187 of P C
Santa Clara County Number:  67828                    September 13, 1979

INVESTIGATING OFFICERS' REPORT:

The following is a summation of offenses as noted in Counts One and Three above, as obtained from reports of the San Jose Police Department.

(Count One)

At approximately 11:45 p.m. on the evening of June 23, 1977, an altercation developed between victim Steven Romero (age 25 years) and defendant Alvarado at the defendant's residence at 984 Elm Street, Apartment 5, San Jose.

Victim Romero was able to gain entry to the defendant's residence by kicking through the front door, at which time he was confronted by Alvarado, who had obtained a butcher knife from the kitchen. The two fell onto the floor on the living room of the apartment and the defendant began stabbing at the victim, who apparently was unarmed.  Victim Romero was able to free himself from the defendant's grasp and ran from the apartment, but was followed and again stabbed by the defendant in the parking lot of the apartment complex.  It was at this point that the fatal wound (a stab to the chest area which pierced the pulmonary artery) was inflicted.  End

Witnesses to the incident summoned the San Jose Police Department, who took the defendant into custody.  One of those witnesses was later questioned and indicated that Billy Romo (victim in Count Three), a friend of the defendant, had indicated to her that the stabbing had occurred because the defendant owed the victim $200 for some "reds", and that such incidents were not uncommon as "that was the way drug people are."

(Count Three)

On January 6, 1979, defendant Alvarado became intoxicated at the residence of his common-law-type wife (Christine Cortez), with members of her family, including her two brothers and her sister Alice Cortez, the former common-law-type wife of victim Billy Romo.  Alice was residing in their house after leaving the victim as a consequence of a fight in which she had been struck by the victim.  As the defendant became increasingly inebriated, he began to make threats against victim Romo, indicating that he planned to kill him.  These threats were not taken seriously by members of the Cortez family, however, since the defendant reportedly frequently made such threats when under the influence of alcohol or drugs.

In the Case of:  ANTONIO ALVARADO
Charge:  Sec. 192.1 and 187 of P C
Sante Clara County Number:  67828

September 13, 1979

INVESTIGATING OFFICERS' REPORT:    (Continued)

At approximately 7:00 p.m. on the above date, the defendant be-
gan to display a loaded .22 caliber pistol, which he had indi-
cated was previously used in a killing by the Nuestra Familia
which had been given to him for disposal. The defendant left the
residence with the gun and returned a short time later, bragging
that he had "just shot Billy eight times." He then entered the
bathroom of the residence where he began to inject heroin into
his arm.

Members of the Cortez family subsequently went to the residence
of the victim at 767 East Julian Street in San Jose, where they
found him lying on the living room floor with numerous bullet
wounds.  Police and ambulance units were summoned to the scene,
but the victim was found to be dead, from what was later deter-
mined to be multiple gunshot wounds.  It should be noted that a
later analysis of the victim's blood was found to be positive for
the presence of phencyclidine.  A search of the residence uncover-
ed a hypodermic syringe, a needle, possibly containing heroin,
two .22 caliber rifles and ammunition.

The defendant was subsequently apprehended at approximately 12:30
a.m. on January 7, 1979.  After running a red light in a vehicle
in the downtown San Jose area.  He was initially released with
the instruction to walk home, but was subsequently apprehended
after radio broadcasts listing him as a suspect in the above of-
fense were aired.  He offered no resistance at the time of his appre-
hension and a subsequent blood sample revealed a .23 percent level
of alcohol as well as the presence of morphine in his system.

In further questioning of witnesses and family members, it was
learned that victim Billy Romo had joined the Nuestra Familia
gang while in prison but had subsequently been attempting to dis-
associate himself from the group following his release on parole.
The victim had a large tatoo covering his entire back with the
emblem of the Nuestra Familia.  Witnesses indicated that it was
known that the two disliked one another and had possibly had ar-
guments over drugs.  Other information was developed which indicated
the defendant was also a former member of the Nuestra Familia who
may have been attempting to regain his status with the gang through
the killing.  The defendant refused to provide any information re-
garding the offense, denying his guilt.

DEFENDANT'S STATEMENT:

The defendant refused to meet with the probation office to discuss
the offense or to provide his social history.  The following infor-

-- 4 --

In the Case of:  ANTONIO ALVARADO
Charge: Sec. 192.1 and 187 of P C                    September 13, 1979
Santa Clara County Number:  67828

DEFENDANT'S STATEMENT:  (Continued)

mation was obtained from prior probation referrals as well as po-
lice reports on the present offenses.

FAMILY HISTORY:

The defendant was born to Antonio and Felipa Alvarado on December 31,
1946, in Plainview, Texas.  His father subsequently died in 1947
and his mother married a Mr. Lupe Estrada, with whom she moved to
California in 1949.  The defendant has four brothers, Rueben, age
27 years, Raymond, age 25 years, Richard, age 22 years, and Sammy,
age 22 years.  At last report, these brothers, as well as his two
sisters, Yolanda, age 30 years and Marilou, age 19 years, all live
in the Bakersfield area, as do his mother and stepfather.

In 1968, the defendant entered into a common-law-type relationship
with a Ms. Eva Robinson, by whom he has one son, Antonio, now age
10 years.  That relationship terminated some time prior to 1976,
when he then entered into a common-law-type relationship with Ms.
Christina Cortez, by whom he now a one two and one-half month
old child.  The defendant was living with Ms. Cortez at 450 North
Fifth Street, Apartment 4, San Jose, at the time of the present
offense.

Records indicate that the defendant discontinued his education
after completing the 11th grade at East Bakersfield High School
in Bakersfield, California, at the age of 17 years.  He moved to
Santa Clara County in 1972.

WORK RECORD:

The defendant's only two known periods of employment were as a
general laborer on a poultry farm in Bakersfield, California,
prior to 1970 for approximately one and one-half years, and as a
cannery worker in San Jose for an undetermined period of time
in 1974.  His source of income at the time of the present offense
is unknown.

The defendant has no military history.

PRIOR RECORD:  CII#:  a 222 268   (Attached)

                SS#:  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

-- 5 --

In the Case of:  ANTONIO ALVARADO
Charge: Sec. 192.1 and 187 of P C
Santa Clara County Number:  67828                    September 13, 1979

INTERESTED PARTIES:

The undersigned contacted Alice Romo, who resided in a common-law-
type relationship with victim William Romo, (Count Three), until
shortly before the present offense.  Ms. Romo (true name Cortez)
indicated that she had no specific comments for the Court regard-
ing sentencing other than that she hopes the defendant is incar-
cerated for a substantial period of time.

Efforts to contact relatives of victim Romero met with negative
results.

DISCUSSION:

Rule 414:  Criteria Affecting Probation

(Count One - Not applicable)

(Count Three)

(a)  The defendant is ineligible for probation due to the finding
of use of a firearm pursuant to Section 12022.5 of the Penal Code.

(b)  Based upon the nature of the present offense and the defen-
dant's prior arrest record, it can be concluded that he is a dan-
ger to others if not imprisoned.

(c)(1)  The nature of the offense is so serious as to preclude
consideration for probation.

(c)(2)  The victim lost his life as a consequence of the present
offense.

(c)(3)  The defendant used a deadly weapon during the commission
of the offense.

(c)(4)  The defendant inflicted bodily injury upon the victim.

(c)(5)  It appears from the defendant's statements prior to the
commission of the offense that it was planned and, in fact, car-
ried out despite the admonitions of others.

(c)(6)  It appears that the offense was carried out without great
provocation, and given the defendant's background, could potentially
recur in the future.

(c)(7)  Although criminal sophistication cannot be attributed to
the defendant's actions, the almost casual manner in which the act

In the Case of: ANTONIO ALVARADO
Charge: Sec. 192.1 and 187 of P C
Santa Clara County Number:   67828                    September 13, 1979

DISCUSSION:

Rule 414:  Criteria Affecting Probation:   (Continued)

was carried out can be attributed to his significantly ingrained
criminal orientation.

(c)(8)  It can be concluded that the defendant took advantage of
his relationship and near family ties with the victim to gain en-
try to the apartment.

(d)(1)  The defendant's lengthy and increasingly serious prior
record demonstrates his potential for a serious threat to the
community.

(d)(2)  The defendant has failed on previous orders for probation
and drug diversion.

(d)(3)  The defendant refused to cooperate with the probation de-
partment in the discussion of the present offense and in past pro-
ceedings on other offenses.

(d)(4)  The defendant has not completed his education, is apparent-
ly a narcotics addict and has unstable family ties.

(d)(5)  The defendant has a poor employment history and it appears
that his support may have been derived from criminal activities.

(d)(6)  The defendant has a long-standing history of abuse of
alcohol and narcotics.

(d)(7)  In view of his minimal support to his family members, his
incarceration would pose no realistic hardship upon his dependents.

(d)(8)  The defendant has already established a serious arrest re-
cord including numerous felonies.

(d)(9)  In view of his unwillingness to discuss the offense with
the probation department, it has not been possible to determine
if he is remorseful.

(d)(10)  Restitution to the victim is not a consideration.

Rule 421:  Circumstances in Aggravation

(Count One - Not applicable)

(Count Three - Not applicable)

In the Case of: ANTONIO ALVARADO
Charge: Sec. 192.1 and 187 of P C
Santa Clara County Number:  67828                    September 13, 1979

DISCUSSION:

Rule 423:  Circumstances in Mitigation

(Count One - Not applicable)

(Count Three - Not applicable)

Enhancements:

(Count Three)

A violation of Section 12022.5 of the Penal Code (Use of Firearm)
was found true as to this count, thereby requiring a period of
imprisonment to be enhanced by two years.

Case Evaluation:

It can be reasonably concluded from a review of the defendant's
prior arrest record (dating from a commitment to the California
Youth Authority for burglary at age 10 years), his chronic and
almost random use of all forms of intoxicants (including alcohol,
glue, depressants and heroin), his possible affiliation with pri-
son gangs, and his obvious disregard for the value of human life,
that he is of such a serious threat to the community that he should
be incarcerated for the remainder of his life.  Mr. Alvarado is
somewhat unique in that there is absolutely nothing in his life
that this officer can interpret as being a positive contribution
to society, with the possible exception of his fathering of two
children, for whom he has apparently never provided any support.

In view of the above, as well as the fact that each of the present
offenses was committed completely independent of one another and
each resulted in the loss of human life, it is felt that conse-
cutive commitments to the Department of Corrections are appropriate.

All indications are that the defendant has no ability to pay a fine
pursuant to Section 13967 of the Government Code.

SUGGESTED PRISON TERM:

| CRIME | MITIGATED | AGGRAVATED | BASE TERM | ENHANCEMENTS | TOTAL TERM |
|---|---|---|---|---|---|
| (Ct. 3) 187 PC, 1st Deg. | N/A | N/A | 25 years to life | 2 years (12022.5 PC) | 27 years to life |

In the Case of:  ANTONIO ALVARADO
Charge: Sec. 192.1 and 187 of P C
Santa Clara County Number:  67828                    September 13, 1979

RECOMMENDATION:

(Count Three)

Probation be denied, a two year enhancements be imposed, the defen-
dant be committed to the California Department of Corrections for
a period of 27 years to life, and be advised of a subsequent period
of five years parole supervision.

(Count One)

Probation be denied, and the defendant be committed to the Califor-
nia Department of Corrections, to be served consecutively to Count
Three.

                              Respectfully submitted,

                              WALTER D. MORSE
                              Chief Adult Probation Officer


                              J. Ronald Metz, Deputy
                              Adult Probation Officer


JRM:arh
Attachments

Reviewed by:



Supervising Adult
Probation Officer


The above report has been read and considered by the Court.



                              PAUL T. GALLAGHER
                              Judge of the Superior Court
                              Santa Clara County, California

8-13-79

SANTA CLARA COUNTY
ADULT PROBATION INTERVIEW SHEET

Date Prepared _____
Prob. Officer _____ TB _____

Court No. _____ 67828 _____
Date Due _____ 8-30-79 _____
Time Due _____ 11:00 _____
Judge _____ Gallagher _____

Name _____ ANTONIO ARMANDO ALVARADO _____

Aka _____ "Playboy" _____

Address _____ 450 N 5 #4 S.J. _____

Charge _____ 187 PC _____ 12022 ___ 192.1 w.th 12022(b) PC _____ Plea or (Conviction) _____ 03-8-79 Jury Verdict

Date of Arrest _____ Ct1: 11/5/77 _____ Ct3: 11/7/79 _____ Arr. Agency _____ SJPD _____

Where Arrested _____ S J _____ Bail _____ In _____

Co-def., Accomplices _____ none _____

Atty _____ P.D. _____ Johnson _____ D.A. _____ GARDNER _____

Name, Address of Complaining Witness _____

Local Relatives, Friends _____

Date of Birth _____ 12/31/46 _____ Age _____ Birthplace _____ Plain View Ark _____

Father's Name _____ Antonio Alvarado _____ died 1947 _____ Mother's Maiden Name _____ Felipa Alvarado _____ remarried Perez

Parents Address, Marital Status _____
_____ Mother remar - reside in Bakersfield _____

Brother's Name, Address _____ Ruben Alverkin 27 yrs, Bakersfield
Raymond 25, Richard - Bakersfield, Larry 23
Bakersfield

Sister's Name, Address _____ Yolanda Neri, 30yrs - married - Bakersfield
Mary Lou 19, Bakersfield

Marriages, Common-law, Dates, Maiden Name

(1) _____ Christina Corbi, age 25 yrs _____ 1976 → pregnant

(2) _____ Evie _____ 1968 _____ common law _____ until 1969
_____ Roberton

(3) _____

Separated, Divorced — Date

(1) _____

(2) _____

(3) _____

Children — Sex, Address (1) _____ one - 2 1/2 yr _____ grand rearing

(2) _____ one age 10 _____ Antonio _____ (3) _____

(4) _____

BEST AVAILABLE
COPY

County Aid_____ No._____ Ct. Support_____

Education____11th grade_____ City____East Palo Alto____ Age Left____17 yrs

Come to U.S._____ State____30 yrs____ County____7 yrs____ Citizen_____

Occupation____Cannery Works_____ Union Member_____

Present Employment_____ Dates_____ Wage_____

Previous Employment (1)_____

(2)____NCC Cannery St. Burlys 1974_____

(3)____Paily Farm Edenfield 2 yrs_____

Other Sources of Income____now_____ Soc. Sec. No.____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

Military Record____none_____ Date of Enlistment_____ _____

Discharge_____ Type_____

Courts Martial_____

Over-Seas Service_____ Service No._____

Comment Re: Prior Arrest_____

Hold for Other Agencies_____

Vehicle_____ Lic. No._____ Oper. Lic.____C41 P0925924

C.I.I.
I.D. No.____1222268____ FBI No.____122834F____ DMV No._____

Height____5'8"____ Weight____140____ Eyes____BR____ Hair____BK

STATEMENT OF ACT:

____illegible Rant 250-0354

EXHIBIT "F"

Court of Appeal, Sixth Appellate District - No. H032389
**S160344**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re ANTONIO A. ALVARADO on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

MAR 1 2 2008

Frederick K. Ohlrich Clerk

Moreno, J., was absent and did not participate.

Deputy

**GEORGE**

Chief Justice

# EXHIBIT "G"



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

Court of Appeal - Sixth App. Dist.

**FILED**

JAN 1 5 2008

MICHAEL J. YERLY, Clerk

By _____

DEPUTY

In re ANTONIO A. ALVARADO,

on Habeas Corpus.

H032389
(Santa Clara County
  Super. Ct. No. 67828)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Bamattre-Manoukian, Acting P.J., Mihara, J., and McAdams, J.,

participated in this decision.)

Dated ____ JAN 1 5 2008 ____    BAMATTRE-MANOUKIAN, J. ____ Acting P.J.

# EXHIBIT "H"

**(ENDORSED)**
**FILED**

NOV 16 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

|  |  |
|---|---|
| In re | No.: 67828 |
|     ANTONIO A. ALVARADO, | ORDER |
| On Habeas Corpus | |

ANTONIO A. ALVARADO, hereinafter Petitioner, has submitted to the Superior Court a habeas corpus petition in which he asserts the Parole Board violated his due process rights when it denied him parole.

While the Board may have committed error in failing to explain why it categorized Petitioner's life offense exceptional, the Board's reliance on Petitioner numerous other crimes presently still supports a parole denial. Accordingly, the petition is denied.

DATED: 11/16 , 2007     _____
ARTHUR BOCANEGRA
JUDGE OF THE SUPERIOR COURT

cc:  Petitioner
Attorney General
Research (10-5A)
CJIC

1

**THE SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA CLARA**

_Plaintiff:
    PEOPLE OF THE STATE OF CALIFORNIA

_Defendant:
    ANTONIO A. ALVARADO

**F I L E D**
**(ENDORSED)**

NOV 16 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

| PROOF OF SERVICE BY MAIL OF:<br>ORDER IN RE: RESTITUTION ORDER | CASE NUMBER:<br>67828 |
| --- | --- |

CLERK'S CERTIFICATE OF MAILING: I certify that I am not a party to this case and that a true copy of this document was mailed first class postage fully prepaid in a sealed envelope addressed as shown below and the document was mailed at SAN JOSE, CALIFORNIA on  NOVEMBER 16, 2007.  I declare under penalty of perjury that the foregoing is true and correct.



KIRI TORRE, Chief Executive Officer/Clerk

By _____ Deputy
    R. LOZA-GARCIA

ANTONIO ARMANDO ALVARADO
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689 / EAST DORM 134-LOW
SOLEDAD, CA. 93960-0689

Research Attorney Criminal Division
190 W. Hedding Street
San Jose Ca. 95110

*Placed in Reasearch Attorney pick up box at HOJ*

Office of the District Attorney
70 West Hedding Street
San Jose, Ca 95110

CJIC

*Placed in District Attorney pick up box at HOJ*

**PROOF OF SERVICE BY MAIL**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA


Antonio Alvarado
        Petitioner,
            v.                          Case No. _____

Ben   Curry,
        Respondent.                     PROOF OF SERVICE
_____/


        I hereby certify that on May 08, 2008, I served a copy of the
attached PETITION FOR WRIT OF HABEAS CORPUS by placing a copy in a
postage paid envelope addressed to the person(s) hereinafter listed,
by depositing said envelope in the United States Mail at
Bakersfield, California, 93306.


                UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
                San Francisco Division
                450 Golden Gate Avenue
                San Francisco, CA.
                   94102-3483


        I declare under penalty of perjury that the foregoing is true
and correct.

Yolanda Neri
929 Chelsea
Bakersfield, CA. 93306


For Petitioner Antonio Alvarado

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA


Antonio Alvarado
        Petitioner,
            v.                          Case No. _____
Ben  Curry,
        Respondent.
                                        PROOF OF SERVICE
_____/


        I hereby certify that on April 28, 2008, I served a copy of
the attached PETITION FOR WRIT OF HABEAS CORPUS by placing a copy
in a postage paid envelope addressed to the person(s) hereinafter
listed, by depositing said envelope in the United States Mail at
Soledad, California, 93960-0689

                        YOLANDA NERI
                        929 Chelsea
                      Bakersfield, CA.
                          93306


        I declare under penalty of perjury that the foregoing is
true and correct.

Antonio Alvarado, C-09142
Petitioner in Pro Se